**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Stefano Farsura, SF Capital Partners LLC, | Case No. 1:21-cv-09030-AT-RWL |
| *Plaintiffs*, | |
| v. | Judge Analisa Torres |
| QC Terme US Corp., | Magistrate Judge Robert W. Lehrburger |
| *Defendant*. | |

**PLAINTIFFS' RESPONSE TO**
**DEFENDANT'S RULE 56.1 STATEMENT OF MATERIAL FACTS**

Plaintiffs submit this Response to Defendant's Rule 56.1 Statement of Material Facts.

If a statement of fact asserted by Defendant is undisputed, it is undisputed solely for the purpose of Plaintiffs' Opposition to Defendant's summary judgment motion, and Plaintiffs reserve the right to dispute any statement for all other purposes and for any reason.

To the extent that any of the statements in Defendant's Rule 56.1 Statement are immaterial, not properly supported by the record, argumentative, or conclusory, such statements should be rejected under Local Rule 56.1.  *See Whitehurst v. 230 Fifth, Inc.*, 998 F. Supp. 2d 233, 260 (S.D.N.Y. 2014) (assertions in 56.1 statement should be stricken where they are "unsupported by citation to evidence"); *Bank of Am., N.A. v. Fischer*, 927 F. Supp. 2d 15, 19-20 (E.D.N.Y. 2013) (assertions in 56.1 statement must be "adequately supported with record evidence" to be valid). Plaintiffs reserve the right to make any and all evidentiary objections to the purported evidence cited in the Defendant's Rule 56.1 Statement, regardless of whether an objection is asserted below.

To the extent Defendant states as a "fact" in its memorandum of law any proposition not reflected in its Rule 56.1 statement of undisputed facts below, and the Court finds such "fact" to be material to the resolution of Defendant's motion, then the Court should conclude that Defendant has not met its burden of showing that the "fact" is undisputed.  *See Glidepath Holding B.V. v. Spherion*

*Corp.*, 2010 WL 1372553, at *5 (S.D.N.Y. Mar. 26, 2010), *aff'd*, 425 F. App'x 76 (2d Cir. 2011) ("Nor have Plaintiffs used their Local Rule 56.1 statements to identify other misrepresentations or omissions that have properly been placed in the record. . . To the extent that Plaintiffs have tried to use briefing and oral argument to raise misrepresentations or omissions that were not identified in . . . or referenced in Plaintiffs' 56.1 statements, the Court rejects these misrepresentations and omissions as improperly raised."); *Pharmacy, Inc. v. Am Pharm. Partners, Inc.*, 511 F. Supp. 2d 324, 332 (E.D.N.Y. 2007).  In addition, or in the alternative, Plaintiffs disputes each and every such fact.

Plaintiffs reprint below, but do not respond to, the headings and footnotes contained in Defendant's Rule 56.1 Statement, and object to such headings and footnotes to the extent that they purport to state or characterize facts as such facts or characterizations are not properly supported with citations to the record.  To the extent a response is required, Plaintiffs dispute any facts or characterizations contained in these headings or footnotes.

Plaintiffs further object to Defendant's Rule 56.1 Statement on the basis that it does not meet the Rule's requirement that such statement be "short and concise" and identify only facts that would be "material" to any motion for summary judgment.

Reference to "Ex." refers to exhibits introduced by Defendant.  "Levy Ex." refers to exhibits introduced by Plaintiff.  Capitalized terms and acronyms not otherwise defined have the meaning given them in Defendant's Rule 56.1 Statement.

## GLOSSARY OF DEFINED TERMS

| Defined Term | Definition |
| --- | --- |
| Amended Lease | First Amendment to Lease (Ex. 95, QCT00012461–66) |
| Designation Letter | Letter from The Trust for Governors Island to QC Terme, Quadratec S.r.l., and Colonnade Group dated January 31, 2014 (Ex. 20, QCT00053809–40) |
| Draft Services Agreement | Advisory and Consulting Service Agreement draft sent January 17, 2012 (Ex. 15, FAR00028121–27) |
| February 28, 2018 Letter | Letter from Stefano Farsura to Andrea Quadrio Curzio and Saverio Quadrio Curzio dated February 28, 2018 (Ex. 97, FAR00041719–29) |
| JLL | Jones Lang LaSalle Incorporated |
| JLL Valuation | Business Valuation Report: QC Terme New York LLC dated November 7, 2018 (Ex. 100, JLL_000415–553) |
| MAP | MAP S.r.l. |
| QC | Quadrio Curzio |
| QC Brothers | Andrea Quadrio Curzio and Saverio Quadrio Curzio |
| QC NY | QC Terme-branded spa and wellness center on Governors Island, New York |
| QC Terme | The QC Terme group |
| QC Terme NY | QC Terme NY LLC |
| QC Terme US | QC Terme US Corp. |
| US Holding | QC Terme US Holding LLC |
| Quadratec | Quadratec S.r.l. |
| RFP | Request for Proposal issued by The Trust for Governors Island in 2012 |
| SF Capital | Plaintiff SF Capital Partners, LLC |
| The Trust | Governors Island Corporation d/b/a The Trust for Governors Island |
| White Bridge | White Bridge Investments, S.p.A. |
| WBI-MAP Investment Contract | Investment Contract relating to MAP S.r.l. dated July 14, 2017 (Ex. 4, QCT00054824–48) |
| White Bridge Acquisition | White Bridge Investments, S.p.A.'s October 18, 2017 acquisition of an approximately 47.8% stake in MAP S.r.l. for approximately €54.5 million |

## I.    The Parties

1.    Plaintiff Stefano Farsura is an individual and resident of New York City.  ECF No. 1-2 ("Compl.") ¶ 9.  Mr. Farsura is a citizen of the United States and of Italy and a real estate developer in New York City.  *Id.*

**RESPONSE:** Undisputed.

2.    Plaintiff SF Capital Partners, LLC ("**SF Capital**") is a limited liability company incorporated under the laws of New York.  *Id.*  SF Capital Partners has two members:  Mr. Farsura and his wife, Kirsten Jordan.  Ex. 1, FAR00086022 at FAR00086037.

**RESPONSE:** Disputed as incomplete.  Plaintiffs do not dispute that Plaintiff Stefano Farsura owns a 99% stake in SF Capital Partners LLC and his wife owns a 1% share.   However, Stefano Farsura gave his wife a 1% share in the business purely for accounting and tax purposes, and Kirsten Jordan has no involvement whatsoever in the management or affairs of SF Capital Partners LLC. Ex. 81, K. Jordan Dep. Tr. at 222:23-223:4; Ex. 10, S. Farsura Dep. Tr. at 18:20-19:7.

3.    QC Terme US is a Delaware corporation with offices in New York, N.Y.  *See* Compl. ¶ 12.  QC Terme US is 100% owned by non-party QC Terme S.r.l. (f/k/a MAP S.r.l.).  *Id.*

**RESPONSE:** Disputed as incomplete.  On November 30, 2021, Defendant informed Plaintiffs and the Court that MAP has been succeeded by QC Terme, S.r.l.  Dkt. 21 at 1, n. 1.  In fact, however, MAP, S.r.l. had merged with its wholly-owned subsidiary, Quadratec, S.r.l., and another Italian entity, QC Terme, S.r.l., which had existed on paper only since the 1970s.  Ex. 6, F. Varni Dep. Tr. at 21:14-18; Ex. 12, Saverio QC Dep. Tr. at 25:4-20.  Prior to 2019, MAP, S.r.l. was the parent holding company.  *See* Ex. 2 ¶¶ 2-5; Ex. 18, Andrea QC Dep. Tr. at 54:10-18; Ex. 12, Saverio QC Dep. Tr. 25:2-20.  Quadratec, S.r.l. provided certain company-wide services, such as

1

spa-design, accounting, and accounts payable and receivable. Quadratec had incurred losses of "about 20 million between 2000 and 2008." Italian tax law stated that the company that incurred the losses may carry them forward. Quadratec performed services for subsidiaries (the QC Terme spas) and those spas paid an annual fee for the services. It also did all the projects for the new companies and passed on the cost to the new companies. Levy Ex. 43, FAR00054836. Those activities have all been consolidated into a single corporate entity, QC Terme, S.r.l. Ex. 6, F. Varni Dep. Tr. 11:3-5.

## II.   Relevant Non-Parties

4.      QC Terme S.r.l.—formed in 2018 through the merger of MAP with its wholly and directly owned subsidiary Quadratec S.r.l.—is a leading Italian wellness provider with a number of subsidiaries operating over 10 wellness centers in Europe, including in Rome, Chamonix, Milan, Torino, and other locations. Ex. 2, Varni Aff. ¶ 5; Ex. 3, QCT00041594 at QCT00041601; *see also* Compl. ¶ 27.

**RESPONSE:** Disputed as incomplete. Plaintiffs do not dispute that QC Terme, S.r.l. formed in 2018 through the merger of MAP with its wholly owned subsidiary Quadratec S.r.l. However, this statement omits QC Terme, S.r.l.'s operation of the spa location in New York, and its plans to expand to further locations. Ex. 6, F. Varni Dep. Tr. 11:17- 25, 102:17-103:3, 76:16-24. QC Terme, S.r.l. operates its spa centers in Europe using the same corporate structure its U.S. business: it owns local subsidiary entities that directly own and operate the spa. Ex. 6, F. Varni Dep. Tr. 22:12-23, 77:14-21.

5.      QC Terme was founded in 1982 by the Quadrio Curzio ("**QC**") brothers Andrea QC and Saverio QC (the "**QC Brothers**") and, until October 18, 2017, was wholly owned by the QC Brothers and their mother. Ex. 4, QCT00054824 at QCT00054826; Ex. 5, Devescovi Aff. ¶ 12; https://www.qcterme.com/en/corporate/family-history. As described more fully below, since

2

October 18, 2017, the QC Brothers have each owned slightly more than 25% of QC Terme and a special-purpose investment vehicle established by White Bridge Investments, S.p.A. ("**White Bridge**") has owned the remainder of QC Terme S.r.l.'s shares. Ex. 5 Devescovi Aff. ¶ 12.

**RESPONSE:** Disputed as incomplete. Plaintiffs do not dispute that QC Terme was founded by the QC Brothers. Before October 2017, the QC Brothers and their mother wholly owned MAP S.r.l. Levy Ex. 42, FAR00060951. After October 18, 2017, White Bridge acquired a 47% stake, through Giuturna, in MAP for approximately €50 million, and the QC Brothers owned the remaining shares. *Id*. Following the merger of QC Terme S.r.l., Quadratec S.r.l., and MAP S.r.l. in 2018, White Bridge owned a 48% stake in QC Terme with the QC Brothers owning the remaining shares. Levy Ex. 42, FAR00060951.

6.      Saverio QC is the President and COO of QC Terme Ex. 6, F. Varni Dep. Tr. 11:11– 12. Andrea QC and Francesco Varni are each co-CEOs of QC Terme. *Id.* at 11:8–12. Mr. Varni is also the President and Treasurer of QC Terme US. Ex. 7, QCT00032859 at QCT00032859.

**RESPONSE:** Disputed as incomplete. Prior to 2019, Saverio and Andrea Quadrio Curzio were board members and co-CEOs of MAP, S.r.l. Ex. 12, Saverio QC Dep. Tr. 26:6-15; Ex. 18, Andrea QC Dep. Tr. 25:2-15. Francesco Varni was the sole director, CEO and secretary of QC Terme US Corp. Ex. 6, F. Varni Dep. Tr. 94:16-19. He was the co-CEO and board member of MAP, S.r.l., and CEO of Quadratec, S.r.l. Francesco Varni is also on the Board of QC Terme US Corp. Ex. 6, F. Varni Dep. Tr. 11:6-12.

**III.     OC Terme's Introduction to Mr. Farsura**

7.      Opening a QC Terme spa in New York has long been a dream of the QC Brothers and Saverio QC in particular. *See* Compl. ¶ 29; Ex. 8, FAR00069884 at FAR00069884.

3

**RESPONSE:** Disputed as incomplete.  Saverio QC told Farsura of his dream to expand the QC Terme spa business into North America in September 2011.  On October 7, 2011, Farsura wrote to Kiarsis about Saverio QC and QC Terme.  He said "They are now really interested in getting into the US market starting from NYC and about a year ago they looked at the opportunity of Pier 57 without success.  In my last trip to Milan, I happen to meet them through my partners in 403 Greenwich (my little Tribeca project) and we immediately clicked.  Saverio has just told me that he is coming to NY on Oct 21-22 to study the market better and take a look at some opportunities I presented to him (in Brooklyn)."  Ex. 8, FAR00069884.

8.    Beginning in or around 2010, QC Terme started looking to expand its operations to the United States. *See* Ex. 2, Varni Aff. ¶ 6.  For instance, in October 2010, Mr. Varni—then the General Manager of QC Terme—wrote to the Hudson River Park Trust and the developer of the "Pier 57" project in Manhattan regarding a proposal to open a QC Terme spa as part of that development. *See* Ex. 8, FAR00069884 at FAR00069884–85; *see also* https://www.prnewswire. com/news-releases/hudson-river-park-trust-and-young-woo--associates-announce-unanimous-  city-council-approval-of-the-proposed-redevelopment-of-historic-pier-57-202283951.html. Mr. Varni even met with the developer to discuss the idea while on a personal trip to New York in  November 2010, but  QC  Terme  did  not  pursue  the project. Ex.  9, FAR00072182  at FAR00072182.

**RESPONSE:** Disputed.  Plaintiffs do not dispute that in October 2010, Mr. Varni emailed the Hudson River Park Trust regarding bringing the QC Terme spa business to the Hudson River Park and that Saverio QC made plans to meet in person the developer Greg Carney regarding an in person meeting.  However, QC Terme did not seriously explore the possibility of expanding into North America until September 2011, when it made contact with Mr. Farsura.  Ex. 14,

4

FAR00028057.  Prior to that point, there is no evidence that QC Terme publicly discussed expansion plans or made any concrete efforts to identify possible locations in North America.

9.    In fall 2011, Mr. Farsura traveled to Italy to meet with potential investors for his New York real estate development business, Colonnade Group, which he ran at that time with his partner, Greg Altshuler.  Compl. ¶ 25–26, 41; *see* Ex. 2, Varni Aff. ¶ 7; Ex. 10, S. Farsura Dep. Tr. 19:13–20:6, 23:7–24:15.

**RESPONSE:** Disputed.  The answer above mischaracterizes the Colonnade Group and the relationship between Greg Altshuler and Stefano Farsura.  Colonnade Group is a brand name for real estate ventures involving Farsura and Altshuler. Ex. 10, S. Farsura Dep. Tr. 23:7-24:14, 238:6-10.  The ownership and management structure of projects carried on under this brand name varied by project.  Levy Ex. 44, FAR00062861.  Farsura and Altshuler generally owned their portion of the project through an individually controlled entity, and in some cases, developed projects under the Colonnade Group brand name without the involvement of the other.  Levy Ex. 44, FAR00062861; Levy Ex. 42, FAR00060951.

10.    While Mr. Farsura was in Italy, Pierfrancesco Pozzetto, a mutual friend of Mr. Farsura and Saverio QC, arranged a meeting for Mr. Farsura with Saverio QC as a potential investor in Mr. Farsura's New York real estate business.  *See* Ex. 2, Varni Aff. ¶ 6; Compl. ¶ 26; Ex. 10, S. Farsura Dep. Tr. 83:22–25; Ex. 11, P. Pozetto Dep. Tr. 20:18–21:7, 36:16–38:2.  At that meeting, Mr. Farsura expressed an interest in helping QC Terme expand into the New York market. *See* Ex. 2, Varni Aff. ¶ 7; Compl. ¶¶ 29–30; Ex. 10, S. Farsura Dep. Tr. 83:22–25.

**RESPONSE:** Undisputed.

11.    Shortly thereafter, in October 2011, Saverio QC traveled to the United States and met with Mr. Farsura in New York.  *See* Ex. 12, S. QC Dep. Tr. Vol.1 64:9–11; Ex. 10, S. Farsura

Dep. Tr. 83:22–25; Compl. ¶ 33.  While in New York, Mr. Farsura and Saverio QC went to see "a large day spa in Queens," New York called Spa Castle.  Ex. 10, S. Farsura Dep. Tr. at 85:3; Compl. ¶ 33.

**RESPONSE:** Disputed as incomplete.  In October 2011, Stefano Farsura organized three days of scouting locations and comparable spa facilities.  Levy Ex. 45, FAR00032572.  One stop was Spa Castle in Queens, NY.

12.     While visiting Spa Castle, Mr. Farsura and Saverio QC "started discussing about, oh, wow, we should do this together" and Mr. Farsura "basically said, [']I think there is a huge opportunity here.  We need to do it.[']" Ex. 10, S. Farsura Dep. Tr. 86:6–8, 86:13-17.  In Mr. Farsura's understanding, Saverio QC agreed and "also said that he needed a partner, because clearly [QC Terme was] an Italian company with an Italian presence . . . [a]nd so they couldn't do it by themselves." *Id.* at 86:18–24.

**RESPONSE:** Undisputed.

13.     That meeting at Spa Castle was "the very first time in which [Mr. Farsura and Saverio QC] talked about being partners and doing something together." *Id.* at 87:9–12; *see also* Ex. 12, S. Quadrio Curzio Dep. Tr. Vol. 1 52:20–22.  In Mr. Farsura's understanding, at that meeting, he and Saverio QC "agreed that we would do this together," i.e., "be partners, and . . . go after the whole North American market . . . [s]tarting with New York." *Id.* 87:23–88:6; *see also id. at* 89:8–11.  Mr. Farsura had "a grand vision of just doing -- not just one, not just New York, but the whole -- the whole North American market." *Id.* at 88:8–11.  Mr. Farsura and Saverio QC agreed that Saverio QC would go back to Milan to "work[] on some of the details with Francesco Varni" regarding an agreement. *Id.* at 89:16–19.

6

**RESPONSE:** Disputed as incomplete. On October 24, 2011 following the Spa Castle meeting Saverio Quadrio Curzio emailed Stefano Farsura, telling him he "will be sure to talk to my brother [Andrea Quadrio Curzio] and Francesco [Varni] as soon as I get back to Milan, and to send you a proposal ASAP." Levy Ex. 14, FAR00032591. On October 28, 2011, Saverio Quadrio Curzio said he would be meeting with Mr. Varni and his brother in a few days and would provide an update on the agreement for operations in New York and USA as soon as possible. Levy Ex. 15, FAR00032606.

14.     A few days after meeting Saverio QC in New York, Mr. Farsura emailed Saverio QC to let him know that Mr. Farsura "would very much like to be able to give [Saverio QC] a hand with introducing and developing QC Terme in NY and in the US." Ex. 13, FAR00028015 at FAR00028016–17; *see* Ex. 10, S. Farsura Dep. Tr. 83:22–84:15. "As for the financial structure of a collaboration," Mr. Farsura stated that he would be "very interest[ed]" in the possibility of taking a "a share of the business." Ex. 13, FAR00028015 at FAR00028016; *see* Ex. 10, S. Farsura Dep. Tr. 87:7–88:11.

**RESPONSE:** Disputed as incomplete. Defendant uses FAR00032591 as Ex. 13 in their Index of Exhibits, Dkt. 301-1, yet uses a different document, FAR00028015, for Ex. 13 here. Plaintiffs dispute the translation of Defendant's Ex. 13, whether it is document FAR00028015 or FAR00032591. Plaintiffs' translation of the most inclusive email in the thread, Levy Ex. 14, FAR00032591, shows Farsura's email to Saverio QC on October 24, 2011 stated that Saverio QC "had mentioned your desire to possibly leave a stake in the business[,]" which Farsura stated would be "very interesting" to him. *Id.*

15.     Saverio QC responded that he "ha[d]n't thought much about the possible collaboration yet," but would "speak with [Andrea QC] and with Francesco [Varni], and [would]

7

send [Mr. Farsura] a proposal as soon as possible." Ex. 13, FAR00028015 at FAR00028016.

**RESPONSE:** Disputed as incomplete. Saverio QC's response to Farsura also stated that he "would also like to work with [Farsura] to develop our initiatives in the US." Levy Ex. 14, FAR00032591. In addition, although Saverio QC stated that he had not "thought about the possible collaboration yet," he also stated that he would "like to reiterate my desire to find partners rather than brokers." *Id.*

16.  After Saverio QC returned to Italy, Mr. Varni emailed Mr. Farsura on November 19, 2011 with some "reflecti[ons] on the essential elements of an agreement." Ex. 14, FAR00028057 at FAR00028058. Mr. Varni relayed:

> [O]ur conclusions are to propose, in a nutshell, to plan, for the initiatives that will be successful, the transfer to you, or the legal entity you wish to indicate, a minority stake in the capital of the new.Co for which our holding company will give life for the development and operation of the health center in the selected location(s). Currently, in fact, and even before delving into the opportune analyses also with respect to the local legislation, we imagine proceeding with the corporate structure currently adopted in Italy and in developed European markets, which calls for the incorporation, for each center established, of a new company, essentially " special- purpose" and, obviously, limited liability. As it concerns the professional consulting activities, that is, more technical and material, that you are potentially able to offer in the various development phases of the initiative (from the planning to the opening and during the operation), these could be covered by specific, separate agreements. With respect to the stake, we can tell you in advance that our idea is to set aside a share of up to 20% for you, imagining having to reserve an additional maximum 20% in the event that lenders or owners of the property where the business operates take an equity stake in the management new.Co.

*Id.* Mr. Varni continued that, "[i]f our general approach seem[ed] acceptable" to Mr. Farsura, QC Terme would draft "the text of the agreement under these terms." *Id.*

**RESPONSE:** Disputed as incomplete. Ex. 14, FAR00028057. This email also specified that these "essential elements of an agreement" with Farsura were "[w]ith respect to the activities aimed at identifying and selecting suitable locations for setting up a health center according to the QC Terme concept, activities that you have in fact already started in the New York area and that, in theory, we could extend to other areas of the United States that we agree on." Ex. 14, FAR00028057 at FAR00028058.

17.     Mr. Farsura responded three days later that he was "thrilled" at the possibility of working with QC Terme in its efforts to expand to the United States and the proposal for Mr. Farsura to be compensated with a minority stake in the "company for each wellness center" "exactly matche[d] [Mr. Farsura's] wishes" to have "the highest possible [share] in the business." *Id.*

**RESPONSE:** Disputed only to the extent that Plaintiffs' translation of the document differs, although the substance is materially the same. Ex. 14, FAR00028057 ("I am very excited about being able to work closely with you on your expansion in the U.S. and therefore the proposal to have the highest possible share in the business corresponds precisely to my desires.").

18.     For his part, Mr. Farsura offered that he would be able to help QC Terme with all aspects of the business that were "not strictly 'Spa specific,'" including "construction management, marketing, management, search for investors/ financing, etc." *Id.* at FAR00028057; *see* Ex. 12, Saverio QC Dep. Tr. Vol. 1 53:9-54:14. This also included "identify[ing] and negotiate[ing] the various opportunities in the most suitable locations" starting in New York and then, "with proper caution and at the suitable times, we could also think about exploring those [other U.S.] markets" in which Mr. Farsura and his "partner" Greg Altshuler had "worked extensively." Ex. 14, FAR00028057 at FAR00028057. In Mr. Farsura's view, "[a] quick start in New York could create the opportunity to eventually go to other markets in the future." *Id.*

**RESPONSE:** Undisputed.

19.     On November 29, 2011, Mr. Varni responded, agreeing that "New York has all the characteristics to host our group's local master spa and [would] allow us to then turn our attention to other US markets." *Id.* Mr. Varni also agreed that Mr. Farsura's proposed activities in assisting with the successful development of a spa, including "[t]he search for investors, the financing[,]

9

and the construction," could "constitute a sort of contribution" towards a potential stake in the business. *Id.* Based on the conversation, QC Terme was "convinced" that they could "find a mutually satisfactory solution" for working with Mr. Farsura; it was just a matter of "trying to draw up a draft agreement." *Id.*

**RESPONSE:** Disputed as incomplete. Ex. 14, FAR00028057. Varni responded that "[w]e are very pleased that the approach is acceptable and we will try to put it into action quickly." *Id.* Instead of "could," Varni wrote, "Your activities will constitute a sort of contribution that we will reward in terms of equity." *Id*.

20.     On January 17, 2012, Mr. Varni sent an email following up on his prior exchange with Mr. Farsura attaching a draft "Advisory And Consulting Service Agreement" between Quadratec and Mr. Farsura ("**Draft Services Agreement**") with a proposed two-year duration. Ex. 15, FAR00028120 at FAR00028121–27; *see id.* at FAR00028123 (§ 3.1). The Draft Services Agreement recited that QC Terme contemplated that Mr. Farsura would "advise, consult and assist Quadratec in finding a suitable location . . . in particular, but not exclusively, in the New York area, for the purpose to lease such location and setting up a spa and wellness facility." *Id.* at FAR00028122 (§ 1.1). To that end, under the Draft Services Agreement, Mr. Farsura would "support Quadratec: (i) in finding the location; and, (ii) in negotiating the lease agreement, as well as [carrying] out any other ancillary activity related thereto." *Id.*

**RESPONSE:** Disputed as incomplete. Plaintiff does not dispute the email was sent and that it contains the quoted language. Mr. Farsura explained that the email referred to a "management agreement" as well as the Operating Agreement. Ex. 10, S. Farsura Dep. Tr. 135:4-11. He said the Trust was having them sign papers. *Id*. 132:18-19. QC Terme was "asking me to just be . . . the local representative of the company in the United States" so they discussed title,

10

role, renumeration.  That was entirely separate from the "ownership side of the deal." *Id*. 129:2-20.

21.     By way of compensation, the Draft Services Agreement provided that, if QC Terme "stipulate[d] a lease agreement as a result of the services provided by Stefano Farsura under th[e] Agreement,"  Mr. Farsura would "be entitled to a success fee (the 'Success Fee') in the amount of the 15% of the annual rental provided by the lease agreement" subject to a defined "monetary cap" that was to be filled in later. *Id*. (§ 2.1.).  "[A]part from the Success Fee," Mr. Farsura would "not be entitled, under any circumstance, to any additional or further compensation, reimbursement or indemnity of any kind for the activities rendered and the services provided under" the Draft Services Agreement. *Id*. (§ 2.2).  If QC Terme "decide[d] to purchase (instead of to lease) a location (as a result of the services provided by)" Mr. Farsura, QC Terme and Mr. Farsura would "discuss in good faith" Mr. Farsura's compensation. *Id*. at FAR00028123 (§ 2.4).

**RESPONSE:** Disputed as incomplete.  Plaintiff does not dispute the email was sent and that it contains the quoted language.  Mr. Farsura explained that the email referred to a "management agreement" as well as the Operating Agreement.  Ex. 10, S. Farsura Dep. Tr. 135:4-11.  He said the Trust was having them sign papers. *Id*. 132:18-19.  QC Terme was "asking me to just be … the local representative of the company in the United States" so they discussed title, role, renumeration.  That was entirely separate from the "ownership side of the deal". *Id*. 129:2-20.

22.     In the alternative, the Draft Services Agreement provided that, "in the event the lease agreement be stipulated by a Newco incorporated in the USA by [QC Terme]," Mr. Farsura would "be entitled, in substitution and not in addition to the Success Fee, to subscribe the 20% of the share capital of the Newco." *Id*. at FAR00028122–23 (§ 2.3).  If Mr. Farsura elected this

alternative compensation, the parties would "negotiate in good faith a shareholders agreement aimed to attribute to [Mr. Farsura] the right to select a Director in the Board of Directors of the Newco." *Id.* But if they could "not agree on the terms: (i) of the Deed of Incorporation (or any part thereto); (ii) or of the bylaws (or any part thereto) of the Newco, or o[f] the shareholders agreement," Mr. Farsura would "only have the right to obtain the payment of the Success Fee." *Id.*

**RESPONSE:** Disputed as incomplete. Plaintiff does not dispute the email was sent and that it contains the quoted language. Mr. Farsura explained that the email referred to a "management agreement" as well as the Operating Agreement. Ex. 10, S. Farsura Dep. Tr. 135:4-11. He said the Trust was having them sign papers. *Id*. 132:18-19. QC Terme was "asking me to just be … the local representative of the company in the United States" so they discussed title, role, renumeration. That was entirely separate from the "ownership side of the deal". *Id*. 129:2-20.

23.    Mr. Farsura immediately forwarded the Draft Services Agreement to Mr. Altshuler, but never responded to Mr. Varni's email. *See* Ex. 16, FAR00032980 at FAR00032980. Rather, that same day Mr. Farsura emailed Saverio QC a proposed schedule of activities for a visit by the QC Brothers to New York at the end of January 2012. *See* Ex. 17, FAR00033029 at FAR00033029.

**RESPONSE:** Undisputed.

24.    While on that trip to New York, the QC Brothers met Mr. Farsura and Mr. Altshuler for a dinner at which they continued to discuss the terms of an agreement governing the relationship, reaching agreement on certain key terms. Compl. ¶ 41. For instance, at that dinner, Mr. Farsura and the QC Brothers agreed to increase the 20% stake contemplated as alternative compensation in the Draft Services Agreement to 22%. *Id.*; *see* Ex. 10, S. Farsura Dep. Tr. 258:18–

23.

**RESPONSE:** Disputed as incomplete. There was no mention of the 22% stake in the company being the alternative compensation stated in the Draft Services Agreement at that dinner or in the passage cited. Mr. Farsura's deposition testimony states, "So, 22 percent was established back in 2012 in a meeting between me and the QC brothers, and it came out of the negotiation. I was asking for 25. They were offering 20. We ended up at 22." Ex. 10, S. Farsura Dep. Tr. 258:18–23. As Mr. Farsura stated earlier, the Draft Services Agreement was entirely separate from the OA. QC Terme was asking him to be "the local representative of the company in the United States" so they discussed title, role, renumeration. That was entirely separate from the "ownership side of the deal". Ex. 10, S. Farsura Dep. Tr. 129:2-20.

25. Despite extracting this concession from the QC Brothers, Mr. Farsura never signed the Draft Services Agreement or any other agreement with QC Terme. *See* Ex. 10, S. Farsura Dep. Tr. 150:8–152:10; Ex. 6, F. Varni Dep. Tr. 148:17–25; Ex. 93, F. Gala Dep. Tr. 93:4–10, 120:17–20. Nevertheless, the parties agreed to work together in good faith while negotiating over the terms of an agreement governing the relationship. *See* Ex. 10, S. Farsura Dep. Tr. 77:9–79:22, 150:8–152:10; Ex. 6, F. Varni. Dep. Tr. 46:21–47:9, 79:25–81:23; *see also* Compl. ¶ 66.

**RESPONSE:** Disputed. Although there was no signed agreement, it is not completely accurate to say that the parties continued to "negotiat[e] over the terms of an agreement governing the relationship." Rather, the essential terms of the agreement governing the relationship were those agreed-upon at the dinner referenced in paragraph 24, above, and in the email on "essential terms" which was reached in November 2011; the parties later agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057.

13

Acting on those, terms, QC Terme set up a corporate structure providing Farsura's LLC, SF Capital, with a 22% stake in the Governors' Island spa business, with QC Terme's LLC, Defendant QC Terme Corp., holding a 78% stake. *See* Levy Ex. 2, FAR00004656 at FAR00004661 (2016); Levy Ex. 3, FAR00010981 at FAR00011065 (2017); Levy Ex. 30, FAR00089910 at FAR00089912 (2018); Levy Ex. 31, FAR00096746 at FAR00096748 (2019). Those terms were also referenced in the August 2, 2017 operating agreement (Ex. 64) which Farsura contends was binding despite not being signed. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

## IV.    OC Terme Expands to New York

26.    Between 2011 and 2012, Mr. Farsura and Mr. Altshuler identified various sites for possible QC Terme locations in New York. *See* Ex. 2, Varni Aff. ¶ 8; *see also* Ex. 18, A. Quadrio Curzio Dep. Tr. 36:7–8. None of their suggestions was suitable for a QC Terme location. *See* Ex. 2, Varni Aff. ¶ 8; *see also* Ex. 12, S. Quadrio Curzio Dep. Tr. Vol. 1 53:13–15.

**RESPONSE:** Disputed. Farsura, not Mr. Altshuler, was responsible for scouting locations, and later work performed on the project. Levy Ex. 13, FAR00032387, Levy Ex. 48, FAR00054816, Levy Ex. 22, FAR00051324. Further, it is inaccurate that Farsura did not secure a suitable location for the QC Terme project. Farsura, identified, for example a site in Brooklyn, that QC Terme pursued at great length to the point of architect calculations and a feasibility report. Levy Ex. 13, FAR00032387, Levy Ex. 4, FAR00015481, Levy Ex. 10, FAR00028992.

27.    In 2012, Saverio QC learned of a Request for Proposal issued by The Trust for Governors Island ("**The Trust**") for a redevelopment project on Governors Island, New York (the "**RFP**"). *See* Ex. 2, Varni Aff. ¶ 9; Ex. 10, S. Farsura Dep. Tr. 242:11–15; Ex. 6, F. Varni Dep. Tr. 44:3–11.

**RESPONSE:** Undisputed.

28.    In March 2013, in response to the RFP, Quadratec submitted a proposal to The Trust for a QC Terme spa on Governors Island ("**QC NY**").  *See* Ex. 2, Varni Aff. ¶ 9.  Mr. Farsura "did not contribute to" QC Terme's RFP response.  Ex. 10, S. Farsura Dep. Tr. 242:16; *see also* Ex. 6, F. Varni Dep. Tr. 46:17–19.  In fact, Mr. Farsura initially opposed pursuing the RFP, telling Mr. Varni "multiple times that it was . . . [a] waste of time to try to follow the RFP."  Ex. 6, F. Varni Dep. Tr. 45:2–4.

**RESPONSE:** Disputed as incomplete.  Varni writes to Governors Island stating they "have been informed about the RFP" and introduce QC Terme. They ask for the site information and the Trust's final responses to questions.  Governors Island responds with a link to the most updated information. Farsura/Greg Altshuler pay the $10 for QC Terme to access the link and information. Levy Ex. 23, FAR00015314.  Varni, and Saverio and Andrea Quadrio Curzio publicly referred to Farsura as "our partner" or "our business partner."  Levy Ex. 28, FAR0072611; Levy Ex. 11, FAR00029345. On April 19, 2013, the Trust sent correspondence to QC Terme that asked "Colonnade was not listed as a partner in your original proposal.  Please provide a profile of the firm, a cv for Stefano Farsura, a list of Colonnade projects, and references for the NYC projects. Please describe the role of Colonnade in this project's development phase and in the operating phase. How much equity does Colonnade intend to invest?" Levy Ex. 49, QCT00000538.  Farsura and Varni sent the required information (*see id.*), and Farsura was included on all further correspondence with the Trust.  Levy Ex. 28, FAR00072611; Levy Ex. 50, FAR00063319; Ex. 10, S. Farsura Dep. Tr. 232:13-239:24.

29.    As part of its due diligence regarding the QC NY proposal, The Trust asked Quadratec what its "plan for local presence and expertise" would be.  Ex. 19, TGIPROD00000467 at TGIPROD00000468.  Despite not having a written agreement with Colonnade Group or Mr.

Farsura, Quadratec responded by identifying Colonnade Group as its "business partner in the US," in addition to identifying Robert D. Henry Architects as its local architectural and design consultant. *Id.*; *see also* Ex. 6, F. Varni Dep. Tr. 59:11–14. And regarding "the roles of key team members for [the QC NY] project," Quadratec stated the QC Brothers and Mr. Varni would "be directly involved in plan[ning] and coordinat[ing] the different phases, with the cooperation of Stefano Farsura (principal of the local partner firm)." Ex. 19, TGIPROD00000467 at TGIPROD00000468; *see also* Ex. 6, F. Varni Dep. Tr. 59:11–14.

**RESPONSE:** Undisputed.

30.    On January 31, 2014, The Trust issued a Designation Letter conditionally designating "QC Terme, Quadratec S.r.1. ('Quadratec'), and the Colonnade Group ('Colonnade'), jointly and severally, or any Qualified Successor Entity" as tenants on a 49-year lease of three buildings (111, 112, 114) and their attached grounds. Ex. 20, Designation Letter QCT00053809 at QCT00053809; *see also* Ex. 2, Varni Aff. ¶ 11. The annual "base rent" for the lease would be $1,482,570. Ex. 20, Designation Letter QCT00053809 at QCT00053820.

**RESPONSE:** Undisputed.

31.    Under the Designation Letter, "Qualified Successor Entity" meant an entity for which "Quadratec and/or QC Terme" held "not less than fifty percent (50%) of the ownership interests in such entity" or "the power directly or indirectly to manage the management and affairs of such entity." Ex. 20, Designation Letter QCT00053809 at QCT00053809–10.

**RESPONSE:** Disputed as incomplete. The Qualified Successor Entity was also required to be a New York entity according to the Designation letter which says, "A Qualified Successor Entity must be qualified to conduct business in the State of New York." Ex. 20, QCT00053809 at QCT00053810.

16

32.     Section 5 of the Designation Letter, labeled "Assignment of Designation Letter to a Qualified Successor Entity" provided:

> If QC Terme, Quadratec and Colonnade desire to assign this Designation Letter to a Qualified Successor Entity that will act as Tenant for the Project, they shall form such Qualified Successor Entity within ninety (90) days after the Effective Date. As a condition to any such assignment, they shall deliver to The Trust such Qualified Successor Entity's organizational documents evidencing its formation and executed partnership agreement, limited liability company agreement or certificate of incorporation and by-laws, as applicable, setting forth each of the partners', members' or shareholders', as applicable, rights, responsibilities and obligations within such entity, which entity shall thereafter be deemed to be Tenant hereunder. Notwithstanding the creation of any Qualified Successor Entity, QC
>
> Terme and Quadratec shall remain jointly and severally liable with such Qualified Successor Entity for all obligations under this Designation and if a Final Lease is executed for all Tenant leasehold obligations through full completion of the Project build-out.

*Id.* at QCT00053812.

**RESPONSE:** Disputed as incomplete. The Trust rules required that a New York entity hold the lease on Governor's Island. Ex. 20, QCT00053809 at QCT00053810; Levy Ex. 76, Deposition of Daniela Masala at 29:21-30:2. Varni, Farsura, and representatives of the Trust discussed the proper ownership structure for the entity to be named as the Qualified Successor on the lease. Levy Ex. 51, FAR00061187. Eventually, the parties elected to create the entire US ownership structure before designating an entity on the lease. Levy Ex. 52, FAR00062845, FAR00062846; Levy Ex. 51, FAR00061187; Levy Ex. 53, FAR00061182; Levy Ex. 54, FAR00041148 at FAR00041153; Levy Ex. 55, QCT00021077 at QCT00021083 and QCT00021129.

## V.     The Formation of QC Terme US Holding LLC

33.     At the time of the Designation Letter, neither QC Terme nor Quadratec had a written agreement with Colonnade Group or Mr. Farsura. *See* Ex. 10, S. Farsura Dep. Tr. 82:19–21, 92:17–18, 163:18–22. Thus, in an effort to establish a Qualified Successor Entity under the

17

terms of Section 5 of the Designation Letter, Mr. Farsura and QC Terme undertook a years-long effort to negotiate an "executed partnership agreement, limited liability company agreement or certificate of incorporation and by-laws" consistent with the "very, very clear understanding and agreement that [Mr. Farsura and Saverio and Andrea QC] . . . wanted to be partners." Ex. 20, Designation Letter QCT00053809 at QCT00053812; Ex. 10, S. Farsura Dep. Tr. 77:13–20, 151:10–152:4; *see also* Ex. 6, F. Varni Dep. Tr. 80:7–12, 254:24–255:10.

**RESPONSE:** Disputed. None of the cited exhibits, nor any other evidence, support the assertion that the parties engaged in "a years-long effort to negotiate an agreement." An agreement on "essential terms" was reached in November 2011. Ex. 14, FAR00028057. Pursuant to that agreement, Farsura was granted an ownership stake in the business, including as reflected in the June 2016 creation of Holding LLC, in which Plaintiffs had a 22% stake. Levy Ex. 2, FAR00004656 at FAR00004661 (2016); Levy Ex. 3, FAR00010981 at FAR00011065 (2017); Levy Ex. 30, FAR00089910 at FAR00089912 (2018); Levy Ex. 31, FAR00096746 at FAR00096748 (2019). QC Terme's agreement was with Stefano Farsura, not Colonnade Group. Ex. 14, FAR00028057; Ex. 18, Andrea QC Dep. Tr. 60:23-61:18, 90:8-14, Ex. 12, Saverio QC Dep. Tr. 79:24-80:7; Ex. 64.

34.    Over the next several years, on the basis of "a handshake agreement with" the QC Brothers, Mr. Farsura and QC Terme "work[ed] in good faith very hard on both sides to really get to this -- to get done this project, and [to] finaliz[e], you know, what would have been the memorialization of certain final details about that [agreement]." Ex. 10, S. Farsura Dep. Tr. 151:10–152:4.

**RESPONSE:** Undisputed except to the extent paragraph 34 implies that an agreement had not yet been reached between the parties. In fact, an agreement on essential terms was reached

18

despite the fact that there was no signed document.  Levy Ex. 36, QCT00048908.

35.    As Mr. Farsura recounted, it "eventually turned out that we created an entity together that reflected some of those -- the agreement," i.e., QC Terme eventually would form QC Terme US, QC Terme US Holding LLC ("**US Holding**")—an entity that QC Terme and Mr. Farsura intended to be (i) the vehicle through which the contemplated partnership would be achieved and (ii) the corporate parent of the Qualified Successor Entity, QC Terme NY LLC. *Id.* at 77:13–20; *see also* Ex. 6, F. Varni Dep. Tr. 78:17–81:23; Ex. 21, FAR00018729 at FAR00018729–30.

**RESPONSE:** Undisputed.

36.    To that end, on March 30, 2014, Mr. Farsura wrote to Mr. Varni that, "we should push to define the agreements between the partners and [for] the corporate structure." Ex. 22, FAR00064274 at FAR00064274.  Mr. Varni responded the next day that he would provide an outline of "how we would intend to proceed," but that he would want to get input from tax advisors before moving forward on any agreement. *Id.*

**RESPONSE:** Disputed.  An agreement on "essential terms" had already been reached in November 2011.  Ex. 14, FAR00028057.  Subsequent to that, both Farsura and Varni expressed interest in structuring the relevant entities in the most tax efficient way possible, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the more specific terms of the operating agreement.  Levy Ex. 38, QCT00048933; Ex. 14, FAR00028057.

37.    On April 28, 2014, Mr. Varni wrote to Mr. Farsura attaching a "note" summarizing items to be discussed, "preferably before the incorporation of the companies," that were based on an "an in-depth review with [QC Terme's] lawyer." Ex. 23, FAR00018054 at FAR00018054.

19

Among other items that would need to be discussed was the question of whether "QC Group and Colonnade Group might have the interest to participate to the Newco through a sub holding company formed in the US" such that "the contribution of QC Group (services) and Colonnade Group (services) [w]ould be made to the US Sub holding (the membership interests of which could be divided 78% to QC Group and 22% to Colonnade Group) [and s]uch Sub holding [w]ould then, in turn, contribute the services received by QC Group and Colonnade Group to the Newco." *Id.* at FAR00018055.

**RESPONSE:** Disputed as to translation of the cover email. Varni wrote to Mr. Farsura "preferably before incorporating the business." And not "preferably before the incorporation of the companies." Levy Ex. 56, FAR00018054. Disputed to the extent paragraph 37 implies that an agreement had not yet been reached; it had been with respect to the essential terms. Levy Ex. 36, QCT00048908. Disputed to the extent paragraph 37 is ambiguous regarding who the parties discussing the items in the three page "note" were. The cover email states "I've highlighted the aspects to discuss with Farina" which is Nicola Farina of InterTaxCons S.p.A. Levy Ex. 56, FAR00018054.

38.    The note also encouraged the parties to seek "local legal advice" regarding the "[m]anagement of the company." *Id.* at FAR00018055, FAR00018056. In particular, the note advised:

> Legal advice should be sought as to the more appropriate way to clearly define the fiduciary duties of the managers of the Sub holding and (of the Newco), as well as the other duties associated to the management offices o[f] such companies (avoidance of the conflict of interest, duty of disclosure of information to members, accounting principle to be applied in the preparation of financial statement, etc.).
>
> As you know, under Italian corporate law, almost all this elements are statutorily imposed by the Civile Code. In the US there is more flexibility and it is possible (at least to a certain extent, varying from State to State) for the members to regulate these duties in the Operating Agreement. It is necessary to clearly define these aspects in order to avoid the risk that minority members could decide to use unclear

20

aspects of the operating agreement in order to exercise undue pressure on the management, also with the threat of bring[ing] frivolous (but costly) litigation before courts.

*Id.* at FAR00018056.

**RESPONSE:** Undisputed to the extent that quoted material appears in the cited document.

39.     Two days later Mr. Varni wrote to Mr. Farsura suggesting that they seek to extend the 90-day period for forming a Qualified Successor Entity under Section 5 of the Designation Letter "to properly define the agreements." Ex. 24, FAR00036229 at FAR00036230. Mr. Varni explained that "the additional time will allow us to properly define the governing documents" following the receipt of the requested tax advice. *Id.*

**RESPONSE:** Undisputed to the extent that quoted material appears in the cited documents.

40.     Mr. Farsura responded that he did not believe extra time was needed, because "[c]reating a corporate entity does not require having all the by-laws defined and does not require any [e]quity. It can be done in a day at a fairly minimal cost." *Id.*; *see also* Ex. 10, S. Farsura Dep. Tr. 122:6–10.

**RESPONSE:** Undisputed to the extent that the text of the documents speaks for itself.

41.     Mr. Varni reminded Mr. Farsura that Section 5 of the Designation Letter required more than just the formation of the Qualified Successor Entity. Ex. 24, FAR00036229 at FAR00036229. Mr. Varni continued:

> I know that there is no need for partnership agreements or capital for the establishment [of a corporate entity], but we have to establish QC Terme USA 78/22 among ourselves (I mean between our holding [company held by] Map S.r.l. and your LLC) and then this will constitute QC Terme NYC, with a 100% stake in it. QC Terme USA will be a Co.? Will it be based in Delaware? You really think we can do that by [April]?

*Id.*

**RESPONSE:** Undisputed to the extent that the text of the documents speaks for itself.

21

42.     On June 11, 2014, Messrs. Varni and Farsura had a call with Luigi Perin, a tax advisor from Funaro & Co, to discuss the corporate structure of the Qualified Successor Entity and its ownership.  Ex. 25, FAR00036517 at FAR00036517.  On that call, they discussed a structure by which "QC Terme (Delaware corp) and Farsura LLC are shareholders of the HOLDING LLC (Delaware) which is a shareholder of the PROJECT LLC (NY)," i.e., the Qualified Successor Entity.  Ex. 21, FAR00018729 at FAR00018730.

**RESPONSE:** Undisputed to the extent the referenced call occurred and the quoted material appears in the cited documents.

43.     Over the next several days, Messrs. Varni and Farsura reached an agreement to use Funaro & Co and, per Mr. Farsura, "agree[d] to proceed asap" with "[c]reating the NEWco."  Ex. 25, FAR00036517 at FAR00036517. Mr. Farsura suggested that "we should also accelerate the operating agreement." *Id.*

**RESPONSE:** Undisputed to the extent that the documents cited contain the quoted statements, but disputed to the extent paragraph 43 implies that an agreement had not yet been reached; it had been with respect to essential terms.  Levy Ex. 36, QCT00048908.

44.      On July 2, 2014, Mr. Varni wrote to Mr. Perin and Mr. Farsura, providing them with "the latest draft of the B[usiness ]P[lan] for the initiative," which, though "provisional" would give Mr. Perin "an idea of the mechanism for equity contributions by the sponsors [of the QC NY project], so that you can consider it also in terms of the tax aspects and we can confirm the set up." Ex. 26, FAR00031837 at FAR00031839.  Mr. Varni then copied in Manuel Capurro, an attorney at the Italian law firm Capurro e Michetti and added: "As for the agreements between shareholders, this will be followed by our trusted lawyer, Atty. Manuel Capurro in Milan[.]" *Id.*

**RESPONSE:** Disputed. The July 2, 2014 email from Varni to Perin and Farsura at Levy Ex. 38, QCT00048933 (translated version of FAR00031839) states: "To take another step forward, I'm attaching the latest draft of the BP of the initiative. Please consider that the investment assumptions are still provisional, since the due diligence on the buildings is not yet complete and the detailed design will be discussed with representatives of the Trust for Governors Island next week. However, I think it might be useful for you to get an idea of the promoters' equity contribution mechanism, so that you can also consider it with respect to tax profiles and we can confirm the approach." Further, in the follow up email, Mr. Varni does not refer to it as an agreement between shareholders, but instead a "partnership agreement." *Id*.

45. Four days later, Mr. Capurro sent an email to Messrs. Perin, Varni, and Farsura noting that "many of the assumptions underlying the business plan are still uncertain (or subject to further negotiations with investors and lenders)." *Id.* at FAR00031837. Mr. Capurro noted that "there do not seem to be any particular problems from the perspective of the agreements between the shareholders" with regard to the incorporation of the US entities "by US professionals." *Id.* As Mr. Capurro explained:

> (i) the only company with multiple shareholders [is] the US subholding (whose shareholders will be the US holding of QC Terme and a US company owned by the Farsura Group parent company); and (ii) this company will still need to be regulated by an Operating Agreement which gives all management-related rights (i.e., the appointment of management) to the US holding of QC Terme. In terms of the regulation of relations between shareholders, then, we can foresee the usual right- of- first-refusal clauses, tag along/drag along, etc.

*Id.*

**RESPONSE:** Disputed. The July 6, 2014, email from Capurro to Perin and copying Varni, Farsura and Maturo Didio at Levy Ex. 38, QCT00048933 (translated version of FAR00031839) states: "many of the assumptions to the business plan is based on are still uncertain (or subject to

23

further negotiations, with both investment partners and financiers)." He goes on to say that "[i]n practice, we currently only know with certainty that it is necessary to create the corporate entities in the US, particularly… a US subholding company falling under the US holding company of QC Terme (78%) and a US corporation referring to Gruppo Farsura (22%)." *Id.*

46.    On July 20, 2014, Mr. Farsura contacted Christian Moretti, a partner at the law firm Schnader Harrison Segal & Lewis to ask about "draft[ing] us the o[perating ]a[greement] for Qc terme New York." Ex. 27, FAR00036793 at FAR00036794. Mr. Moretti responded by asking: "Do you have a term sheet? Is there still a lot to negotiate, or have you reached a commercial agreement?" *Id*. at FAR00036793.

**RESPONSE:** Disputed.    The    description    above    mischaracterizes    Mr.    Farsura's communications with Mr. Moretti. Defendant misleading excerpts a single line from Mr. Farsura's email, stating "[i]t needs to be set up from scratch and it will probably take 2 [operating agreements]." That statement referred to the text of the Operating Agreement. Ex. 27, FAR00036793 at FAR00036794. An agreement on "essential terms" had already been reached in November 2011. Ex. 14, FAR00028057.

47.    Mr. Farsura answered Mr. Moretti, copying in Mr. Varni, that the corporate structure "needs to be set up from scratch and it will probably take 2 [operating agreements]." *Id.* Besides an operating agreement for the Project LLC, there needed to be an operating agreement for a "Holding company in Delaware" for which "QC Terme US Corp (company still to be incorporated and owned by Quadratec Srl) will be a shareholder of 78%" and "EDI llc (Stefano Farsura) will be a shareholder of 22%." *Id.* Mr. Farsura continued:

> Regarding the [Holding company in Delaware's] agreement, the set–up needs to be very friendly and simple. Given that we necessarily need to provide some governance mechanisms for protecting everyone, QC Terme will take on the manager role.
>
> Edi [(an entity controlled by Mr. Farsura)] will be the local shareholder who [supervises]

24

the work in NY and possibly will take care of seeking out new opportunities in North America, in addition to helping out with the financing phase, fundraising, etc.

We should probably plan for a board with 3 members, 2 for QC and one for EDI. There will need to be some major decisions that will necessarily be shared, such as way outs (buyout provisions), in the even[t] no agreement can be reached on these. Fiscal optimization will be an important aspect, because of the possibilities of transfer pricing. The compensation linked to services provided will also need to be specified in detail.

*Id.*

**RESPONSE:** Disputed.    The description above mischaracterizes Mr. Farsura's communications with Mr. Moretti.  Defendant misleading excerpts a single line from Mr. Farsura's email, stating "[i]t needs to be set up from scratch and it will probably take 2 [operating agreements]."    That statement referred to the text of the Operating Agreement.  Ex. 27, FAR00036793 at FAR00036794.  An agreement on "essential terms" had already been reached in November 2011, although they were negotiating in good faith the more detailed terms of an operating agreement.  Ex. 14, FAR00028057.

48.    On August 25, 2014, The Trust, MAP, Quadratec, and Colonnade Group executed an agreement extending the due diligence period under the Designation Letter until November 30, 2014 and extending the Expiration Date of the conditional designation until June 3, 2015.  Ex. 28, QCT00025362 at QCT00025363–65.

**RESPONSE:** Undisputed.

49.    On September 9, 2014, Mr. Moretti sent Messrs. Farsura and Varni "the first draft of the operating agreement for QC Terme Holding LLC" dated September 9, 2014.  Ex. 29, FAR00031856 at FAR00031856.  In the email attaching the September 9, 2014 draft, Mr. Moretti provided a "summary of the main provisions" and a list of "a few issues requiring" Mr. Varni's and Mr. Farsura's attention.  *Id.*

**RESPONSE:** Undisputed to the extent the text of the documents speaks for itself.

25

50.      Among the issues requiring further discussion between Mr. Farsura and Mr. Varni were questions concerning "fundamental decisions" and whether "either of the two shareholders may initiate a 'buy/sell' process to propose the purchase of the other's share" "[i]n the event of failure to reach an agreement on fundamental decisions." *Id.* at FAR00031857. Mr. Moretti also proposed including "put/call options at a fixed price or a price to be determined by appraisal" in the event the parties could not agree on fundamental decisions. *Id.* Separately, Mr. Moretti raised the topic of capital contributions, asking Messrs. Varni and Farsura for clarification of what consequences would be if a "shareholder[] does not contribute its share of capital calls" for the project. *Id.*

**RESPONSE:** Undisputed, except to the extent the issues raised were characterized as "fundamental decisions." Furthermore, to the extent it is alleged that the foregoing shows an agreement that these provisions were "essential terms" such that there would be no agreement on the operating agreement absent agreement on these issues, that is disputed. Farsura Decl. ¶ 5.

51.      The September 9, 2014 draft operating agreement included a provision in Section 7.09(b) waiving fiduciary duties:

To the fullest extent permitted by applicable law, this Agreement is not intended to, and does not, create or impose any fiduciary duties on the Members or their Affiliates (including the Board). Further, to the fullest extent permitted by applicable law or equity, the Members and the Company hereby waive any and all fiduciary duties that, absent such waiver, may be implied by law or in equity, and in doing so, recognize, acknowledge and agree that their duties and obligations to one another and to the Company are only as expressly set forth in this Agreement.

*Id.* at FAR00031882.

**RESPONSE:** Undisputed to the extent the cited documents contain the quoted language.

52.      On October 23, 2014, Mr. Moretti emailed Messrs. Varni and Farsura a revised draft operating agreement for US Holding. *See* Ex. 30, FAR00020087 at FAR00020087. Mr. Moretti explained that he "implemented your comments and tried to find a solution to some of the

26

issues we discussed." *Id.*

**RESPONSE:** Undisputed.

53.     The revised version of the operating agreement included numerous changes to multiple sections of the draft, including edits to Sections 3.05 (Non-Competition; Co-Investment Opportunities) (*see id.* at FAR000200139–40), 3.06 (Related Party Transactions) (*see id.* at FAR000200140), 3.07 (Confidentiality) (*see id.* at FAR000200140–41), 4.02 (Additional Capital Contributions) (*see id.* at FAR000200141–42), 7.03 (Major Decisions) (*see id.* at FAR000200149–50), and 8.01 (Buy-Sell) (*see id.* at FAR000200152–53).  Other than being renumbered at Section 7.08(b), however, the provision waiving fiduciary duties remained unchanged. *See id.* at FAR000200112.

**RESPONSE**: Undisputed that Moretti sent a revised draft of the operating agreement. Farsura and Varni provided comments to ensure that the operating agreement conformed to the parties' existing arrangement.  An agreement on "essential terms" was reached in November 2011. Ex. 14, FAR00028057.  To the extent Defendant alleges that this reflects an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed.  Farsura Decl. ¶ 7.

54.     Negotiations over the draft operating agreement paused for a period towards the end of 2014. *See* Compl. At 19, n.4.  On January 21, 2015, The Trust, MAP, Quadratec, and Colonnade Group again agreed to extend the due diligence period under the Designation Letter until March 31, 2015 and extend the Expiration Date of the conditional designation until October 3, 2015.  Ex. 31, QCT00025439 at QCT00025440–42.  On March 31, 2015, The Trust, MAP, Quadratec, and Colonnade Group agreed to a further, final extension the due diligence period under the Designation Letter until December 31, 2015 and to extend the Expiration Date of the

27

conditional designation until July 3, 2016. Ex. 32, QCT00000241 at QCT00000241–43.

**RESPONSE:** Disputed as incomplete. The parties continued to work towards the development of the QC NY spa between 2014 and 2016. Notably, and without limitation, Mr. Farsura:

- Presented to the Landmark Commission, which resulted in favorable Landmark Commission approval. Levy Ex. 7, FAR00024086; Levy Ex. 8, FAR00024287.

- Showed the site to potential investors. Levy Ex. 75, FAR00064249.

- Secured and coordinated with structural and MEP engineers to review the site and begin pre-construction assessments. Levy Ex. 18, FAR00035729; Levy Ex. 58, FAR00016887.

- Negotiated the retainer with MacRostie historic advisors, to begin the tax credit process. Levy Ex. 59, FAR00016889.

- Coordinated and consulted with a variety of other vendors. Levy Ex. 59, FAR00016899; Levy Ex. 29, FAR00072761; Levy Ex. 33, at QCT0001780; Levy Ex. 18, FAR00035729; Levy Ex. 25, FAR00063994; Levy Ex. 19, FAR00035773; Levy Ex. 6, FAR00019576; Levy Ex. 17, FAR00035651; Levy Ex. 20, FAR00049415; Levy Ex. 39, QCT00049477.

55.    At the beginning of 2016, the parties made a renewed push to negotiate the draft operating agreement as they formed the Qualified Successor Entity and the various legal entities required to carry out QC Terme's business on Governors Island. *See* Compl. At 19, n.4. Thus, on February 16, 2016, Mr. Varni emailed Mr. Farsura another revision of the draft operating agreement, referred to as the January 11, 2016 draft. Ex. 33, FAR00061311 at FAR00061311. As with the prior drafts, the January 11, 2016 draft reflected numerous edits, including further edits to Sections 3.05 (Conflicts of Interest), 3.06 (Related Party Transactions), 3.07 (Confidentiality),

28

4.02 (Additional Capital Contributions), 7.03 (Major Decisions), and 8.01 (Call and Put Options). *See id.* at FAR00061325–29, FAR00061335–41.  But Section 7.08(b), waiving fiduciary duties, remained unchanged. *See id.* at FAR00061337–38.

**RESPONSE:** Undisputed except to the extent paragraph 55 implies that an agreement was not already reached between the parties.  An agreement on "essential terms" was reached in November 2011, and the parties later agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement.  Ex. 14, FAR00028057.  Moreover, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed.  Farsura Decl. ¶ 7.

56.     After Mr. Varni sent Mr. Farsura the January 11, 2016 draft of the US Holding operating agreement, Mr. Farsura retained an attorney, Kenneth Sicklick, to represent him in connection with the negotiation of the operating agreement.  *See* Ex. 10, S. Farsura Dep. Tr. 153:24–155:19.  QC Terme continued to use Mr. Capurro to represent it in connection with the negotiation of this document.  *See id.* at 153:20–23.

**RESPONSE:** Disputed.  Kenneth Sicklick represented Farsura in a non-arms length drafting process for the Operating Agreement.  Sicklick's law firm jointly represented both Farsura and the QC Group in connection with the Governor's Island development. That has been Defendant's position throughout this litigation.  In fact, Defendant has withheld emails from Goulston & Storrs (Sicklick's law firm) that were <u>sent to Farsura</u> on the grounds that Farsura was acting on behalf of QC Terme at that time. Dkt. 99-1 (category 3 – listing "S. Farsura" as a "client" of Goulston & Storrs, together with F. Varni, D. Masala, E. Boisio, and S. Quadrio Curzio.).

57.     On April 10, 2016, Mr. Sicklick emailed Mr. Farsura attaching "a very light mark–

up of the draft LLC agreement." Ex. 34, FAR00007908 at FAR00007909. Mr. Sicklick's revisions included edits to Sections 3.05 (Conflicts of Interest) (*see id.* at FAR00007962–65), 3.06 (Related Party Transactions) (*see id.* at FAR00007963), 4 (Capital) (*see id.* at FAR00007964–67), 6.03 (Distributions) (*see id.* at FAR00007970), 7.03 (Major Decisions) (*see id.* at FAR00007972– 73), and 8 (Call and Put Options) (*see id.* at FAR00007975–76).

**RESPONSE**: Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties later agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057. Moreover, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

58.     Mr. Sicklick's April 10 email also provided Mr. Farsura with a number of "talking points" explaining the revisions to the draft operating agreement. *Id.* at FAR00007909. One of Mr. Sicklick's talking points noted that "[w]e will have to review the Project LLC Agreement to see, among other things, what the capital call provisions look like in that document, as the capital call provisions in the [draft of the US Holding operating agreement] tie back to capital contributions made by the Project LLC." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties later agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to,

and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057.

59.    Mr. Sicklick also included a talking point related to the provision waiving fiduciary duties: "While we understand the desire to waive fiduciary duties, we did provide that only the duty of loyalty continues to apply to Board members (i.e., they can't enrich themselves at the expense of the Company) and that they must act in the best interests of the Company." *Id.* at FAR00007910. To that end, the attached draft revised Section 7.08(b):

> To the fullest extent permitted by applicable law, this Agreement is not intended to, and does not, create or impose any fiduciary duties on the Members or their Affiliates (including the Board). Further, , other than (in the case of the Board) the duty of loyalty and the obligation to act in the best interests of the Company. Further, except (in the case of the Board) with respect to the duty of loyalty and the obligation to act in the best interests of the Company, to the fullest extent permitted by applicable law or equity, the Members and the Company hereby waive any and all fiduciary duties that, absent such waiver, may be implied by law or in equity, and in doing so, recognize, acknowledge and agree that their duties and obligations to one another and to the Company are only as expressly set forth in this Agreement.

*Id.* at FAR00007974 (as in original).

**RESPONSE:** Undisputed.

60.    The parties continued to negotiate the US Holding operating agreement the following month in May 2016. *See* Ex. 35, FAR00007651 at FAR00007651. Specifically, on May 25, 2016, Mr. Varni sent Mr. Farsura a revised draft of the operating agreement dated May 11, 2016. *See id.* at FAR00007653. Like prior drafts, the May 2016 draft contained additional edits to Sections 3.05 (Conflicts of Interest) (*see id.* at FAR0000766–67), 3.06 (Related Party Transactions) (*see id.* at FAR00007667), 4 (Capital) (*see id.* at FAR00007668–71), 7.03 (Major Decisions) (*see id.* at FAR00007676–77), and 8 (Call and Put Option) (*see id.* at FAR00007679–80). The May 11, 2016 draft, however, accepted the revisions regarding the waiver of fiduciary duties in Section 7.08(b), making no further changes. *See id.* at FAR00007678.

31

**RESPONSE:** Undisputed. However, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

61. With the July 2016 Expiration Date of the Designation Letter rapidly approaching, the parties also sought to finalize negotiations with The Trust over the lease agreement. *See* Ex. 10, S. Farsura Dep. Tr. 112:4–10. Thus, on June 3, 2016, The Trust sent a revised draft of the lease agreement. *See* Ex. 36, FAR00060035 at FAR00060037. The Trust also noted that it was still missing the "Name of Tenant and local address" for the lease. *Id.* at FAR00060038.

**RESPONSE:** Undisputed.

62. On June 7, 2016 Mr. Farsura emailed attorneys at Goulston & Storrs—the law firm the parties had been using to negotiate the lease—that, "[a]s for the entity, we should proceed with forming the 2 entities (QC Terme NY LLC and QC Terme Holding LLC) by the end of the month," as "[t]he goal is to sign [the lease] by the end of this month." *Id.* at FAR00060036.

**RESPONSE:** Undisputed.

63. On June 20, 2016, though the parties were still negotiating the terms of a comprehensive written operating agreement, they agreed to form QC Terme NY to be the Qualified Successor Entity that would sign the lease with The Trust and a holding company, US Holding, that would own 100% of QC Terme NY. *See* Ex. 37, FAR00084753 at FAR00084753; *see also* Ex. 10, S. Farsura Dep. Tr. at 112:4–10.

**RESPONSE:** Undisputed except to the extent it implies that paragraph 63 implies that an agreement was not already reached between the parties. An agreement on "essential terms" was reached in November 2011. Ex. 14, FAR00028057. Moreover, on the same day, the parties formed by agreement US Holding LLC, consistent with the general structure of the joint venture

previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057.

64.     Mr. Varni emailed Mr. Farsura to confirm the understanding that the structure would be:

> QC Terme US Co. (Delaware) - 100% MAP S.r.l.
>
> QC Terme US Holding LLC (NY) - 78% MAP S.r.l. - 22% EDI (or another entity of [Mr. Farsura]), with signed OA
> QC Terme New York LLC (NY) - 100% QC Terme US Holding LLC.

Ex. 37, FAR00084753 at FAR00084753.  Mr. Varni asked Mr. Farsura: "Do you disagree?" *Id.*

**RESPONSE:** Undisputed.

65.     Mr. Farsura responded correcting Mr. Varni that US Holding would be a Delaware, not New York, company and that it "cannot have MAP behind it but, rather, QC Terme US Co." *Id.*  Mr. Farsura did not disagree with the statement that the 78%/22% split of US Holding would be "with [a] signed O[perating ]A[greement]." *Id.*; *see* Ex. 10, S. Farsura Dep. Tr. at 101:18–103:23; Ex. 6, F. Varni Dep. Tr. at 79:24–81:23.

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached.  The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011 (and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement).  Ex. 14, FAR00028057. Disputed to the extent the paragraph suggests Farsura was asked about the Operating Agreement in his deposition on pages 101-103.  On pages 101-103 Mr. Farsura suggested the company be incorporated in Delaware because "to put the holding base in a high taxation state did not make a lot of sense." Ex. 10, S. Farsura Dep. Tr. 101:9-17.  Disputed to the extent that this is intended to suggest an agreement that the operating agreement would not be binding without a signature.

33

Farsura Decl. ¶ 6.   Disputed to the extent that this is intended to suggest that Mr. Farsura's

ownership of 22% of the LLC was contingent on execution of a written operating agreement; the

parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the

joint venture previously agreed to, and continued to negotiate in good faith the terms of the

operating agreement.  Ex. 14, FAR00028057.

66.     QC Terme NY and US Holding were formed on June 20, 2016. *See* Ex. 36,

FAR00060035 at FAR00060035; *see also* Ex. 37, FAR00084753 at FAR00084753–54.  And QC

Terme US was formed on June 23, 2016.  Ex. 38, FAR00059867 at FAR00059867.

**RESPONSE:** Undisputed.

67.     On June 27, 2016, QC Terme NY executed the Agreement of Lease with The Trust

effective July 1, 2016.  *See* Ex. 39, FAR00059541 at FAR00059541; Ex. 40, QCT00000580.

Under the Agreement of Lease, QC Terme NY was required to make its first rent payment of

$593,028 no later than December 31, 2017.  *See id.* at QCT00000592, QCT00000601,

QCT00000690; Ex. 2, Varni Aff. ¶ 12.

**RESPONSE:** Undisputed.

## VI.     The Parties' Continued Negotiations Over a Written Operating Agreement for US Holding

68.     At the same time as the parties were proceeding with forming the entities and

signing the lease, negotiations over the US Holding draft operating agreement were ongoing.  *See*

Ex. 41, FAR00059827 at FAR00059827.  Thus, on June 23, 2016, Mr. Varni sent Mr. Farsura

another draft of the operating agreement.  *See id.*  This version was designated as the June 23, 2016

draft and reflected edits to many of the same provisions previously revised by the parties, including

Sections 7.03 (Major Decisions) (*see id.* at FAR00059850) and 10.01 (No Transfer) (*see id.* at

FAR00059855–56).  There were no changes to the provisions of Section 7.08(b) waiving fiduciary

34

duties. *See id.* at FAR00059852.

**RESPONSE:** Undisputed. However, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

69. On June 26, 2016, Mr. Sicklick emailed Mr. Farsura another draft of the operating agreement, along with a redline comparing the edits to the June 23, 2016 version. *See* Ex. 42, FAR00059556 at FAR00059556. Included among the new edits introduced by Mr. Sicklick were further edits to Sections 3.05 (Conflict of Interest) (*see id.* at FAR00059614–15), 4 (Capital) (*see id.* at FAR00059616–19), 7.03 (Major Decisions) (*see id.* at FAR00059624), and 8 (Call and Put Options) (*see id.* at FAR00059627–28). Mr. Sicklick also introduced entirely new provisions into the draft, including a new section for "SF Registration Rights" (*see id.* at FAR00059642–47) and a new section addressing "Tag-Along Rights" (*see id.* at FAR00059636). There were no changes to the provisions of Section 7.08(b) waiving fiduciary duties. *See id.* at FAR00059626.

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057. Moreover, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

70. Mr. Sicklick's June 26, 2016 edits also introduced references to "signatures" and "execution." Specifically, Mr. Sicklick added "[Signature Page to QC Terme Holding LLC

35

Operating Agreement] at the bottom of the execution page. *Id.* at FAR00059638 (brackets in original). He also added that the "details of SF's duties . . . shall be finalized by QC US and SF as promptly as practicable following the execution of this Agreement." *Id.* at FAR00059641.

**RESPONSE:** Disputed. Farsura had been working on the QC Terme New York development for almost five years by June, 2016, and his duties were well-defined. Ex. 14, FAR00028057. The inclusion of signature pages at this stage reflected that the draft was in its near final form. Ex. 64 at FAR00056787. To the extent the paragraph is intended to allege that there was an agreement that the operating agreement would not be binding until signed, this is disputed. Farsura Decl. ¶ 6.

71.    The parties continued to negotiate the US Holding operating agreement well into July 2016. For example, in a July 19, 2016 email to his attorney, Mr. Farsura listed three "big items still on the table" regarding the draft agreement, including Sections 4.02 and 7.03, as well as the provision dealing with "[d]rag along" rights. *See* Ex. 43, FAR00059043 at FAR00059043.

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011. Ex. 14, FAR00028057. Moreover, to the extent this is intended to imply that the parties agreed any of these provisions were essential terms, and that the operating agreement would not be binding absent agreement on those terms, that assertion is disputed. Farsura Decl. ¶ 5.

72.    On July 25, 2016, Mr. Farsura sent Mr. Varni another revised version of the operating agreement. *See* Ex. 44, FAR00058839 at FAR00058888. This draft, dated July 1, 2016, reflected various edits to many of the same provisions the parties had been negotiating, including further edits to Sections 3.05 (Conflicts of Interest), 4 (Capital), 7.03 (Major Decisions), and 10.01

(No Transfer). *See id.* at FAR00058840, FAR00058901–06, FAR00058911, FAR00058917. The July 1, 2016 version of the operating agreement also included another new section added by Mr. Sicklick: Section 13.16 (Drag-Along Right). *Id* at FAR00058923–25. There were no changes to the provisions of Section 7.08(b) waiving fiduciary duties. *See id.* at FAR00058913.

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057. Moreover, to the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

73.     The following week, on August 1, 2016, QC Terme's lawyer, Mr. Capurro, emailed Mr. Sicklick, with copies to Mr. Farsura and Mr. Varni, attaching another updated and revised draft of the US Holding operating agreement. *See* Ex. 45, QCT00040123 at QCT00040123. This revised draft included additional edits to Section 7.03 (Major Decisions) (*id.* at QCT00040147), as well as edits to the newly added Section 13.16 (Drag-Along Right) (*id.* at QCT00040158–60). In addition to the new edits in the draft agreement, Mr. Capurro told Mr. Sicklick that he did not understand how the Drag-Along clause worked with the "Right of First Refusal" and asked Mr. Sicklick for clarification in the event that QC Terme entered into a merger agreement with another company and Mr. Farsura exercised his right of first refusal. *See id.* at QCT00040123. There were no changes to the provisions of Section 7.08(b) waiving fiduciary duties. *See id.* at QCT00040148.

37

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached.  The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement.  Ex. 14, FAR00028057.  To the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed.  Farsura Decl. ¶ 7.  To the extent Defendant alleges that there was agreement that reaching agreement on the drag-along rights was an essential term, that too is disputed.  Farsura Decl. ¶ 5.

74.    On August 7, 2016, Mr. Sicklick emailed Mr. Capurro, copying Messrs. Varni and Farsura, to identify three items in the draft operating agreement that needed to be resolved including "Approval of Major Decisions," "Assignability of [Right of First Refusal]," and Right of First Refusal "in Context of a Merger."  Ex. 46, FAR00070899 at FAR00070899.  Mr. Sicklick stated in that email that "SF Capital Partners should be free to structure the exercise of its [Right of First Refusal] as it sees fit, and it should be free to assign the [Right of First Refusal]," and that "prior to executing any merger agreement, the proposed deal would be brought to SF Capital Partners, and SF Capital Partners would have the right to effect the merger acquisition." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached.   The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement.  Ex. 14, FAR00028057.  To the extent this allegation is meant to imply that there was agreement that any of the referenced

38

provisions were essential terms, and that agreement on their content was needed before agreement on the balance of the operating agreement could be finalized, that is disputed. Farsura Decl. ¶¶ 4-5.

75.     Two days later, on August 9, 2016, Mr. Capurro responded to Mr. Sicklick's email, also copying Messrs. Varni and Farsura. *See* Ex. 47, QCT00007065 at QCT00007065. Mr. Capurro stated that "QC Terme does not like the idea that the [Right of First Refusal] could be, by itself, the object of a sale/assignment by the minority partner," and that "[i]n my opinion it is rather difficult to negotiate a merger agreement with a third party agreeing all the necessary details (also from an economic/financial point of view) under the 'Sword of Damocles' of a [Right of First Refusal] of the minority partner." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011. Ex. 14, FAR00028057. To the extent this allegation is meant to imply that there was agreement that any of the referenced provisions were essential terms, and that agreement on their content was needed before agreement on the balance of the operating agreement could be finalized, that is disputed. Farsura Decl. ¶ 5.

76.     Negotiations continued into the fall of 2016 and, on October 5, Mr. Sicklick sent Messrs. Capurro and Farsura, copying Mr. Varni, another "revised draft of the operating agreement of QC Terme Holding[] LLC," which, according to Mr. Sicklick, "reflects our last conference call and hopefully is the final draft." Ex. 48, FAR00058122 at FAR00058122. This draft, dated "September __, 2016," contained further revisions to Sections 7.03 (Major Decisions) and 13.16 (Drag-Along). *Id.* at FAR00058128, FAR00058195, FAR00058207–8. There were no changes to the provisions of Section 7.08(b) waiving fiduciary duties. *See id.* at FAR00058196–97.

**RESPONSE**: Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057. To the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7. To the extent Defendant alleges that there was agreement that reaching agreement on the drag-along rights was an essential term, that too is disputed. Farsura Decl. ¶ 5.

77.    Mr. Sicklick advised that "we need to insert a date in the first paragraph and we need to complete the notice information in Section 13.02," but "[o]therwise, this should be final." *Id.* at FAR00058122. Consistent with his prior "talking point," however, Mr. Sicklick noted that "the operating agreement for the Project LLC," which "has not been updated in a long time," "should be finalized in conjunction with this agreement." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011. Ex. 14, FAR00028057.

78.    Neither Mr. Capurro nor Mr. Varni responded to Mr. Sicklick's email and, on October 25, 2016, Mr. Farsura sent a fellow-up email seeking "any feedback" on the September 2016 draft. Ex. 49, FAR00058041 at FAR00058042. Mr. Capurro responded by providing his opinion, "expressed without prejudice as to the position of QC Terme," that he "was fine with the revi[s]ed draft with the exception of Point 7.0[3](a)." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material

40

terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057.

79. Mr. Farsura responded that he understood and that he would "wait for [Mr. Varni] to confirm this is ok and maybe we can finalize [the operating agreement] in Milan next week or the following." *Id.* at FAR00058041. Mr. Farsura also inquired whether Mr. Capurro had "looked at the NY LLC Operating Agreement," which Mr. Capurro had not because, in Mr. Capurro's view, "the agreement must be finali[z]ed once that the various issues concerning financing of the project have been clarified." *Id.*

**RESPONSE:** Disputed to the extent the paragraph implies that agreement on material terms had not yet been reached. The parties sought to memorialize their existing agreement on "essential terms," reached in November 2011, and the parties agreed to form US Holding LLC in June 2016, consistent with the general structure of the joint venture previously agreed to, and continued to negotiate in good faith the terms of the operating agreement. Ex. 14, FAR00028057.

80. Between October 25, 2016 and January 18, 2017, negotiations of the draft operating agreement paused while QC Terme worked to obtain financing for the QC NY project. *See* Ex. 2, Varni Aff. ¶ 13. In order to develop the QC NY location, QC Terme needed significant investment and funding. *See id.* Thus, towards the end of 2016, QC Terme began to identify potential partners and investors to support these development efforts. *Id.*

**RESPONSE:** Disputed. The assertion that negotiations were paused because of work to obtain financing is unsupported by any evidence cited. Farsura had been working to obtain financing from 2012 through 2017. He invited potential investors to view potential sites for QC

Terme's facility and introduced them to the project.   Levy Ex. 60, FAR00063202;  Levy Ex. 61, FAR00070104;   Levy Ex. 75, FAR00064249;   Levy Ex. 63, FAR00070442;   Levy Ex. 64 QCT00002552; Levy Ex. 65, FAR00051364.

81.      One of the entities with whom QC Terme discussed a potential partnership was White Bridge. *Id.* ¶ 14. QC Terme's discussions with White Bridge began in 2016 (*id.*) and by late 2016 White Bridge was on the brink of signing a letter of intent to acquire a minority stake in MAP. *See* Ex. 50, FAR00054566 at FAR00054566.

**RESPONSE:** Undisputed.

82.      Mr. Farsura learned of White Bridge's interest in acquiring a stake in QC Terme in late 2016. *See id.*  And, on December 31, 2016, Mr. Varni emailed to tell Mr. Farsura that Mr. Varni would introduce him to Marco Pinciroli, one of the CEOs of White Bridge. *See id*; *see also* Ex. 10, S. Farsura Dep. Tr. 173:11–14. Mr. Varni explained to Mr. Farsura that QC Terme was about to sign a Letter of Intent with White Bridge and that White Bridge would then begin a due diligence process. *See* Ex. 50, FAR00054566 at FAR00054566.

**RESPONSE:** Disputed as incomplete.   QC Terme Group was facing liquidity issues that it had not disclosed to Farsura. There were complaints that the QC Terme Group was not paying invoices, or paying invoices late. Levy Ex. 66, FAR00025793.  On June 23, 2016, Robert Henry wrote to Varni and Farsura that "Please realize both Dominic and ourselves have outstanding Balances on Invoices from (5) months ago. These balances need to be paid prior to us progressing to future work." Levy Ex. 67, QCT00007511.  By December 2, 2016, Robert Henry was requesting previous invoices to be paid before filing documents with the Department of Buildings. Levy Ex. 68, QCT00007546.  By March 3, 2017, QC Terme was so behind on their payments to the architects that they put their pens down. Varni then paid them and in a WhatsApp

chat with Farsura said "We paid Bob an invoice yesterday, so he doesn't break the f***. We organize restart calls for next Monday / Tuesday." Ex. 74, FAR00062971 at FAR00062999. By May 9, 2017 the Trust called Farsura and Farsura relayed the message to Varni that TGI expected "payment on the ferry ASAP. They are not flexible and they will assess late payment penalties if this is not addressed immediately. It was not a very pleasant tone nor a friendly request. They are leaving no other option than to pay." Levy Ex. 69, FAR00004118.

83.      Shortly after learning of White Bridge's decision to sign a letter of intent to acquire a minority stake in QC Terme, Mr. Farsura met Mr. Pinciroli in Italy in early January 2017. Ex. 10, S. Farsura Dep. Tr. 171:18–176:7. During that meeting, Messrs. Farsura and Pinciroli discussed a variety of topics, including the development of the QC NY project. *See id*. Additionally, Messrs. Farsura and Pinciroli shared their phone numbers with one another and then exchanged a series of WhatsApp messages between January 3, 2017 through October 20, 2017. *See* Ex. 51, FAR00011892 at FAR00011892–11.

**RESPONSE:** Undisputed.

84.      A few days after Mr. Farsura met Mr. Pinciroli in Italy in early 2017, White Bridge and QC Terme's shareholders (i.e., the QC Brothers, their mother, and their respective corporate entities) signed a Letter of Intent on January 17, 2017, pursuant to which White Bridge would ultimately acquire a minority stake in QC Terme (the "**White Bridge Acquisition**"). Ex. 2, Varni Aff. ¶ 14. After White Bridge signed the Letter of Intent, it began a six-month due diligence period. *Id.*

**RESPONSE:** Undisputed.

85.      Two days after White Bridge and QC Terme signed the Letter of Intent, Mr. Farsura wrote an email to Mr. Varni expressing his desire to "define, among other things, what type of

role, responsibilities, remuneration you want me to have here in NY." Ex. 52, FAR00005607 at FAR00005607. Mr. Farsura explained to Mr. Varni that he "really believe[s] in the project" and that he is "available but clearly . . . waiting for input from [Mr. Varni] and Saverio [QC]." *Id.* Mr. Farsura further remarked that "[w]e also then have to reflect that in the [Operating Agreement] between us." *Id.*

**RESPONSE:** Undisputed to the extent that quoted material appears in the cited documents.

86.    Mr. Varni responded to Mr. Farsura explaining that Mr. Farsura's "role is as it always has been" but noted they needed to "try to get is signed off on paper" and emphasized that "[w]e have to sign the OAs!" *Id.*

**RESPONSE:** Undisputed to the extent that the text of the documents speaks for itself.

87.    On February 8, 2017, following that email exchange, Mr. Varni found "the latest version of the OA[] circulated by [Mr.] Sicklick, on which it seems we were all in agreement," and forwarded it to Mr. Farsura adding "a draft of Appendix 3.06(b), which lists the activities covered by the transaction with QC US or affiliates preliminarily permitted." Ex. 53, FAR00057103 at FAR00057103. Mr. Varni advised Mr. Farsura that, "[i]f you agree, we will complete it with the few missing details and will sign it." *Id.*

**RESPONSE:** Undisputed, including that Varni stated that the Parties were "all in agreement" regarding the terms of the September 2016 operating agreement. Ex. 53. To the extent this is meant to allege that there was agreement the operating agreement would not be binding until signed, that is disputed. Farsura Decl. ¶ 6.

88.    Mr. Farsura did not sign the agreement; instead, on March 7, 2017, Mr. Farsura forwarded Mr. Varni's February 8 email to his lawyer, Mr. Sicklick, noting that "Qc is ready to sign" and noting that, in Mr. Farsura's view, "it seems [the draft] is fine (other than changing the

date." Ex. 54, FAR00057049 at FAR00057049. Mr. Farsura added that "[w]e still do not have the o[perating] a[greement] for the project llc and I am not sure it will arrive anytime soon...," adding "I should draft an employment letter to define better my role and salary+benefits...[.]" *Id.* (ellipses in original). Still, in Mr. Farsura's view, "[o]ther than this it seems good to go...[.]" *Id.* (ellipses in original).

**RESPONSE:** Undisputed, including that Farsura agreed with Varni that the Parties agreed on all the terms of the operating agreement, and could treat it as final. To the extent this is meant to allege that there was agreement the operating agreement would not be binding until signed, that is disputed. Farsura Decl. ¶ 6.

89.    Mr. Sicklick responded to Mr. Varni on March 14, 2017. *See id.* In his response, Mr. Sicklick echoed Mr. Farsura's concerns that the separate QC Terme NY operating agreement had not yet been finalized. *See* Ex. 55, FAR00093861 at FAR00093862. Mr. Sicklick advised that "you want that document before [the US Holding operating agreement] is executed." *Id.* Mr. Sicklick advised Mr. Farsura that without the QC Terme NY operating agreement signed before the parties executed the US Holding operating agreement "QC will be able to get around the protections that you negotiated for in [the US Holding operating agreement] based on how they draft the Project LLC's operating agreement." *Id.*

**RESPONSE:** Undisputed to the extent the text of the documents speaks for itself. To the extent this is meant to allege that there was agreement the operating agreement would not be binding until signed, that is disputed. Farsura Decl. ¶ 6.

90.    The following month, Mr. Varni and Mr. Farsura exchanged more drafts of the US Holding operating agreement, including multiple drafts on April 9, 2017. *See* Ex. 55, FAR00093861 at FAR00093861.

45

**RESPONSE:** Undisputed except to the extent the paragraph implies that there was no binding agreement in place. There was a binding agreement in place before this period. Ex. 10, S. Farsura Dep. Tr. at 83-93 ("my understanding is that … in 2017, early 2017, the agreement was final.").

91. Then, on April 11, 2017, Mr. Varni sent Mr. Farsura another revised version of the operating agreement designated as "Effective as of April 11, 2017" and described it as "the final clean text." Ex. 56, FAR00056986 at FAR00056986. This version included unchanged the provision in Section 7.08(b) waiving fiduciary duties. *Id.* at FAR00057011. Mr. Varni added, "Can you send me the signed pdf and then I will sign?" *Id.* at FAR00056986.

**RESPONSE:** Undisputed except to the extent the paragraph implies that there was no binding agreement in place. There was a binding agreement in place before this period. Ex. 10, S. Farsura Dep. Tr. at 83-93 ("my understanding is that … in 2017, early 2017, the agreement was final."). To the extent Defendant alleges that there was an agreement to be bound by the waiver of fiduciary duty but no other provision of the operating agreement, that allegation is disputed. Farsura Decl. ¶ 7.

92. Mr. Farsura never sent Mr. Varni a signed version of the April 11, 2017 US Holding operating agreement.

**RESPONSE:** Undisputed except to the extent the paragraph implies that there was no binding agreement in place. There was a binding agreement in place before this period. Ex. 10, S. Farsura Dep. Tr. at 83-93 ("my understanding is that … in 2017, early 2017, the agreement was final.").

93. As the negotiations over the US Holding operating agreement stalled in the spring of 2017, White Bridge continued its due diligence on QC Terme. As part of this process, Francesco

46

Loredan—the other CEO of White Bridge—visited Governors Island in April 2017 along with Mr. Farsura and others. Ex. 57, FAR00004182 at FAR00004183. Ultimately, White Bridge completed its due diligence on QC Terme in mid-July 2017 and agreed to enter into a pre-closing investment contract to purchase a minority stake in QC Terme. Ex. 2, Varni Aff. ¶ 14.

**RESPONSE:** Disputed. Negotiations over the QC Terme US Holding LLC operating agreement did not "stall." No evidence cited supports this assertion. To the contrary, Varni and Farsura repeatedly expressed that the contract reflected their full agreement. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

94.    Mr. Farsura was aware of the progress being made with respect to the White Bridge Acquisition and the pre-closing investment contract. *See* Ex. 58, FAR00062971 (WA extract 63044–46) at FAR00063044–46. On July 12, 2017, Mr. Varni wrote to Mr. Farsura and told him that "[w]e have signing scheduled for Friday with WBI" and suggested that he and Mr. Farsura schedule a "general update call as soon as possible." *Id.* at FAR00063044. The next day, Mr. Farsura wrote to Mr. Varni and asked Mr. Varni if he was "[r]eady for the signing" with White Bridge. *Id.* at FAR00063045 Mr. Varni responded that he was "reading the very last version of the contracts." *Id.*

**RESPONSE:** Disputed. The cited evidence does not support the assertion that Mr. Farsura was "aware" of all progress being made with respect to the White Bridge Acquisition and the pre-closing investment contract. The cited evidence supports only that Mr. Varni told Mr. Farsura that the signing of unspecified contracts or agreements was supposed to take place on a certain date. Further, plaintiffs lack knowledge into the specifics of this transaction and object to the use of this evidence. Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge of this transaction available for

depositions.  Defendant did not produce the White Bridge acquisition documents on which it now relies until September 28, 2022, the weekend prior to Francesco Varni's deposition, despite Plaintiffs' document requests for all documents.  Levy Ex. 47, Pls.' First Set of RFPs.   Plaintiffs cannot confirm or deny Defendant's representation about the timing and agreements between White Bridge and MAP, S.r.l., based on their selective disclosure of these documents (which occurred after the Court's dismissal order).  Further, Farsura expressly disputed such knowledge when asked about this document in his deposition. He testified in his deposition that he "h[ad] no idea" what Varni was "referring to, to be honest." Ex. 10, S. Farsura Dep. Tr. 193:4-6.  To the extent that this is meant to allege agreement that the operating agreement would only be binding upon signature, that allegation is denied.  Farsura Decl. ¶ 6.

95.    Despite knowing that QC Terme was on the cusp of signing a pre-closing investment contract with White Bridge, it "never crossed [Mr. Farsura's] mind that this transaction . . . might impact whatever rights [he] thought [he] had within the QC Terme organization." Ex. 10, S. Farsura Dep. Tr. 197:19–199:2. Nor did Mr. Farsura ask Mr. Varni to see or review any of the pre-closing investment contracts that Mr. Varni was reviewing on July 13, 2017. *See id.* at 198:9–23.

**RESPONSE:** Undisputed that Farsura did not expect the White Bridge closing to affect his deal.    QC Terme US Holding LLC was formed on June 20, 2016 and Farsura was a 22% owner. *See* Levy Ex. 2, FAR00004656 at FAR00004661 (2016); Levy Ex. 3, FAR00010981 at FAR00011065 (2017); Levy Ex. 30, FAR00089910 at FAR00089912 (2018); Levy Ex. 31, FAR00096746 at FAR00096748 (2019); Levy Ex. 32, JLL_000972.   Varni had expressed that he was ready to sign the then-current version of the Operating Agreement as early as February of 2017.   Ex. 53.   There was no reason for Farsura to expect that the investment by White

Bridge would require a modification of his arrangement.

96.     The following day, on July 14, 2017, MAP and White Bridge signed the pre-closing investment contract (the "**WBI-MAP Investment Contract**"). *See* Ex. 4, QCT00054824 at QCT00054824; *see also* Ex. 2, Varni Aff. ¶ 14. Upon signing, "[s]ubject to the terms and conditions of" the WBI-MAP Investment Contract, White Bridge agreed to purchase a significant number of the existing shares of MAP and "subscrib[e] and pay[] for a capital increase of MAP." Ex. 4, QCT00054824 at QCT00054826.

**RESPONSE:** Disputed.    Plaintiffs lack knowledge into the specifics of this transaction and object to the use of this evidence.  Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge of this transaction available for depositions.  Defendant did not produce the White Bridge acquisition documents on which it now relies until September 28, 2022, the weekend prior to Francesco Varni's deposition, despite Plaintiffs' document requests for all documents.    Levy Ex. 47, Pls.' First Set of RFPs.    Plaintiffs cannot confirm or deny Defendant's representation about the timing and agreements between White Bridge and MAP, S.r.l., based on their selective disclosure of these documents (which occurred after the Court's dismissal order).

97.     Under Section 6.1(*l*) of the WBI-MAP Investment Contract, QC Terme represented and warranted that, as of the date of signing, "[n]o QC Terme Group Company ha[d] any obligation to perform work or other interventions of any nature under Laws, contracts, judicial decisions, administrative measures, Authorizations or concessions, with the exception of those relating to the project[] relating to," among others, "Governors Island (NY) (USA) as set forth in Exhibit 18." *Id.* at QCT00054840.  Exhibit 18 reflected that, as to the QC NY project, QC Terme had committed to works estimated to cost $35 million. *See* Ex. 59, QCT00054651 at QCT00054652.

**RESPONSE**: Undisputed to the extent that quoted material appears in the cited documents.

98.     The signing of the WBI-MAP Investment Contract also initiated a lock-up period, referred to in the WBI-MAP Investment Contract as the "Interim Period."  Ex. 4, QCT00054824 at QCT00054832; *see also* Ex. 6, Varni Dep. Tr. at 142:16–21, 143:5–7, 263:11–13, 266:7–11; *see also* Ex. 60, S. Quadrio Curzio Dep. Tr. Vol. 2 250:9–251:13.  Specifically, Section 4.1 of the WBI-MAP Investment Contract provided:

> The Sellers [i.e. MAP] undertake, also pursuant to Article 1381 of the Civil Code (meaning that for the purposes of this Agreement, the third party's failure will constitute a breach by the Current Shareholders of this commitment) to ensure that, in the period between the first Business Day following the date of receipt by the Sellers of the Notice of Condition [(i.e., notice of White Bridge having raised €51,000,000, thereby triggering the obligation to purchase the stake in MAP))] and the Execution Date [(i.e., July 14, 2017)], each MAP Group Company, except as otherwise authorized in writing by [White Bridge] or expressly provided in this Agreement, and in any case in compliance with the provisions of letter (a) of Paragraph 4.2 and except for Permitted Transactions
>
> . . .
>
> (b) does not and does not undertake to carry out any transaction in relation to which the favourable vote of [White Bridge] or one of the directors appointed by designation of [White Bridge] is required under the Shareholders' Agreement [in Annex 5].

Ex. 4, QCT00054824 at QCT00054832; *see also id.* at QCT00054831.  Among those transactions requiring the favorable vote of at least one White Bridge director listed in the Shareholder Agreement was "divestiture (through any type of Transfer transaction) of corporate interests, companies, or business units."  Ex. 61, QCT00054735 at QCT00054743–44.

**RESPONSE:** Disputed. This fact is not material to the question of contract formation. Plaintiffs lack knowledge into the specifics of this transaction and object to the use of this evidence. Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge of this transaction available for depositions. Defendant did not produce the White Bridge acquisition documents on which it now relies until

September 28, 2022, the weekend prior to Francesco Varni's deposition, despite Plaintiffs' document requests for all documents. Levy Ex. 47, Pls.' First Set of RFPs. Plaintiffs cannot confirm or deny Defendant's representation about the timing and agreements between White Bridge and MAP, S.r.l., based on their selective disclosure of these documents (which occurred after the Court's dismissal order). Plaintiffs also dispute that the terms of the arrangement between WBI-MAP barred Varni from binding QC Terme US Corp. to the Operating Agreement without MAP, S.r.l. board approval, and sign off from White Bridge. Nothing in QC Terme US Corp.'s bylaws, charter, Delaware law, or any document produced in this litigation requires approval by MAP, S.r.l.'s board of directors before QC Terme US Corp. was permitted to enter into any contract. Levy Ex. 55, QCT00021077 at QCT00021121. Nothing in the plain text of the WBI-MAP agreement prohibits QC Terme US Corp., a non-party to that agreement, from signing an Operating Agreement for its part-owned subsidiary, formed over a year prior.  Ex. 4.

99.    Section 4.2 of the WBI-MAP Investment Contract further provided:

The Sellers [i.e. MAP] also undertake, also pursuant to Article 1381 of the Civil Code (meaning that for the purposes of this Agreement, the failure of the third party will constitute non–compliance by the Current Shareholders with this commitment) to ensure that, during the Interim Period, each MAP Group Company:

> (a)    is diligently and fairly managed and in compliance with Applicable Laws; and

> (b)    and except for the Permitted Transactions [in Annex 22], does not perform, and does not undertake to perform, any of the following acts:

> . . .

> (v) modify its by–laws except in accordance with the Shareholders' Agreement [in Annex 5]; increase or decrease the share capital; carry out mergers, demergers or any other extraordinary or capital transactions.

Ex. 4, QCT00054824 at QCT00054832–33.  Entering into an operating agreement for US Holding was not identified among the Permitted Transactions in Annex 22.  *See* Ex. 62,

QCT00054678 at QCT00054679.

**RESPONSE**: Disputed. This fact is not material to the question of contract formation. The WBI-MAP contract prohibits MAP, S.r.l. from entering into a contract that would "increase of decrease the share capital [of MAP, S.r.l.], carry out mergers, demergers or any other extraordinary capital transactions." Ex. 4, QCT00054824 at QCT00054832–33. Executing the QC Terme US Holding LLC Operating Agreement does not trigger that clause. Farsura held his 22% interest since June 2016. Levy Ex. 2, FAR00004656 at FAR00004661 (2016); Levy Ex. 3, FAR00010981 at FAR00011065 (2017); Levy Ex. 30, FAR00089910 at FAR00089912 (2018); Levy Ex. 31, FAR00096746 at FAR00096748 (2019); Levy Ex. 32, JLL_000972.

100.    After signing the WBI-MAP Investment Contract, Mr. Varni wrote to Mr. Farsura and said "[d]eal done!!!!" Ex. 63, QCT00050339 at QCT00050339. Mr. Farsura responded by saying "[c]ongatulations!!!!!" and asked "[w]hen you have a minute, let's talk and you can tell me?" *Id.*

**RESPONSE:** Disputed in part. Farsura testified that he was congratulating Varni on selling a piece of the company (MAP S.r.l.) to White Bridge which was unrelated to Farsura's stake in QC Terme US Holding LLC. Ex. 10, S. Farsura Dep. Tr. 194:9-195:20, 196:18-197:5 ("My view is that they invested in MAP. They did not invested in [QC Terme US Holding LLC]. And so I don't see why they would have changed anything at all for me.")

101.    After QC Terme and White Bridge executed the WBI-MAP Investment Contract on July 14, 2017, Messrs. Varni and Farsura continued to negotiate the terms of the US Holding operating agreement. *See* Ex. 64, FAR00056749 at FAR00056749. Specifically, on August 2, 2017, Mr. Farsura and his lawyer, Mr. Sicklick, participated in call with Mr. Varni and QC Terme's lawyer, Mr. Capurro. *See id.* During that call, the parties discussed further edits to the US Holding

operating agreement, including the need for more revisions to Section 3.06 (Related Party Transactions) (*see id.* at FAR00056814) and Section 7.03(a) (Major Decisions) (*see id.* at FAR00056823), as well as to Schedule 3.06(A) (*see id.* at FAR00056840).

**RESPONSE:** Disputed as to the characterization.  There was a binding agreement in place before this period.  Ex. 10, S. Farsura Dep. Tr. at 83-93 ("my understanding is that … in 2017, early 2017, the agreement was final.").  The parties scheduled a call for August 2, 2017 to finalize the agreement.  Levy Ex. 40.  On that call, the parties agreed that the agreement was final and binding.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

102.    After the parties completed their August 2, 2017 call, Mr. Sicklick sent an email to Messrs. Farsura, Varni, and Capurro with the subject line "final draft of operating agreement." *Id.* at FAR00056749.  In the email, Mr. Sicklick wrote that he was attaching what he described as "a revised draft of the operating agreement for QC Terme US Holding LLC." *Id.*  As such, Mr. Sicklick's email contained two attachments. *See id.*  One was a clean version of the US Holding operating agreement dated August 2, 2017. *See id.* at FAR00056750.  The other was a redline version of the US Holding operating agreement (*id.* at FAR00056800) reflecting edits to Sections 3.06 and 7.03(a), as well as edits to Schedule 3.06(A). *See id.* at FAR00056814, FAR00056823, and FAR00056840.  There were no changes to the provisions of Section 7.08(b) waiving fiduciary duties. *See id.* at FAR00056774.

**RESPONSE:** Disputed as incomplete. The parties considered the Operating Agreement binding despite not being signed.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

103.    In Mr. Sicklick's August 2, 2017 email, he directed Mr. Varni to "print the signature

pages from the attached clean, Word document and execute your signature block." *Id.* at FAR00056749. Mr. Sicklick added that "[w]hen both parties have executed and exchanged signature pages" the parties can "consider the agreement signed." *Id.*

**RESPONSE:** Disputed as incomplete. The parties considered the Operating Agreement binding despite not being signed. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. Mr. Varni's subsequent conversations further show that the parties had agreed to be bound by the terms of this agreement. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896.

104.    The parties, however, never signed the version of the US Holding operating agreement attached to Mr. Sicklick's August 2, 2017 email, or any other version of the operating agreement. *See* Compl. at 92.

**RESPONSE**: Disputed as incomplete. The parties considered the Operating Agreement binding despite not being signed. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11.

105.    Indeed, by August 2, 2017, Mr. Varni had not yet obtained the necessary approvals in order to sign and finalize the US Holding operating agreement. In particular, Mr. Varni had not yet obtained the necessary approval from QC Terme's Board of Directors, including approval from the QC Brothers, which was required to finalize the US Holding operating agreement. *See* Ex. 6, F. Varni Dep. Tr. at 143:14–19, 149:15–22, 150:9–14, 158:18–21; *see also* Ex. 60, S. Quadrio Curzio Dep. Tr. Vol 2. 249:5–16; *see also* Ex. 18, A. Quadrio Curzio Dep. Tr. 102:3–14.

**RESPONSE:** Disputed. Varni did not require any approvals to bind QC Terme US Corp. The bylaws of QC Terme US Corp. do not require any such pre-approval by its shareholder. The charter of QC Terme US Corp. does not require any such pre-approval by its shareholder.

Delaware law does not require any such pre-approval by its shareholder. No contract or agreement to which QC Terme US Corp. was a party required any such pre-approval. Varni had received approval to enter in the Operating Agreement from MAP's principals Saverio and Andrea Quadrio Curzio. Ex. 6, F. Varni Dep. Tr. 34:11-35:2; 249:9-250:7. His authority to bind is reflected, among other things, in communications wherein he told White Bridge that the Operating Agreement reflected the agreement he had reached on behalf of QC Terme with Stefano Farsura and should be considered binding although not signed. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896. Moreover, to the extent he lacked actual authority, Varni had apparent authority. Ex. 6, F. Varni Dep. Tr. 94:16-19; *see also id.* at 11:6-12.

106.     Nor had Mr. Varni obtained the necessary approvals from White Bridge. Given the terms of the WBI-MAP Investment Contract, including the lock-up provision, QC Terme US was not authorized to execute the US Holding operating agreement before the closing of the White Bridge Acquisition (which, as of August 2, 2017 had not yet occurred). *See* Ex. 6, F. Varni Dep. Tr. 142:16–21 ("So the purpose was to get the approval from White Bridge, because I couldn't sign everything -- anything without the approval of White Bridge and without the approval of the other member of the board of director of the parent company of the Italian holding, okay?"), 143:5–7 ("[I]t was prohibited to sign such a document at that time, prohibited by the investment contract."), 158:18–21, 165:8–11, 263:5–268:17.

**RESPONSE**: Disputed. Varni wrote in an email to Stefano Devesconi of White Bridge that "[t]he text was agreed upon over time, and although not actually signed by us, we will have to consider it as such since it reflects our understandings with Stefano Farsura." Levy Ex. 36, QCT00048908. The WBI-MAP Investment Contract speaks for itself. QC Terme US Corp. was not a party to that agreement. Further, Plaintiffs object to this paragraph on the basis that

Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions. Defendant did not produce documents relevant to this topic until September 28, 2022, the weekend prior to Francesco Varni's deposition, despite Plaintiffs' document requests for all documents. Levy Ex. 47, Pls.' First Set of RFPs.

107. Thus, on August 3, 2017—a few weeks before the scheduled closing of the White Bridge Acquisition—Mr. Varni sent Stefano Devescovi, a White Bridge senior manager, and other White Bridge employees the August 2, 2017 draft of the operating agreement for US Holding. Ex. 2, Varni Aff. ¶ 15. Mr. Varni explained to Mr. Devescovi that this document was inadvertently not included in the due diligence materials that had been previously provided to White Bridge during its earlier due diligence. *See id.*

**RESPONSE:** Disputed. Varni wrote "We are going to sign the OAs for QC Terme Holding LLC with Stefano Farsura. The text was set out some time ago together with Manuel Capurro and has undergone fine tuning in recent days." Levy Ex. 70, QCT00054536. During due diligence, he believed it was a "draft" so he didn't include it in the due diligence cloud. However, now, he "believed it appropriate to send it to you." *Id.* Further, Plaintiffs object to this paragraph on the basis that Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions.

108. Prior to Mr. Varni's August 3, 2017 email to Mr. Devescovi, White Bridge had not previously seen a draft of the US Holding operating agreement. *See* Ex. 5, Devescovi Aff. ¶ 9. Nor had it been aware of the document's existence. *See id.* Because White Bridge was on the verge of making a large investment in QC Terme for a 47.8% stake (c. €54.5 million), White Bridge's representatives wanted to review the draft operating agreement to determine how and

whether it would impact the company's interest in QC Terme. *See id.* Accordingly, Mr. Devescovi informed Mr. Varni that White Bridge needed time to review the document. *See id.*

**RESPONSE:** Disputed. On August 4, 2017, Varni represented to Devescovi and to Bigi that the agreement was final. Giulia Bigi writes to Marco Pinciroli and Stefano Devescovi, Francesca Gala and says "I spoke with Varni. They consider the text closed and are waiting for a copy signed and scanned by Farsura who will send it as soon as he has some time. Varni said to take our time reading it and if we want to make changes we will talk about it later with Farsura too, because by now, this contract has been "closed" and therefore it will be signed as it is." Levy Ex. 35, QCT00048896. Further, Varni wrote in an email to Stefano Devesconi of White Bridge that "[t]he text was agreed upon over time, and although not actually signed by us, we will have to consider it as such since it reflects our understandings with Stefano Farsura." Levy Ex. 36, QCT00048908.

Plaintiffs also object to this paragraph on the basis that Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions. Plaintiffs further object to the introduction of an affidavit by Devescovi, while at the same time denying Plaintiffs the right to depose him.

109.    In the following days, White Bridge consulted with its long-time outside counsel at Giovannelli e Associati, an Italian law firm, to discuss the August 2, 2017 version of the operating agreement. *See id.* ¶ 10. Upon White Bridge's review of the draft operating agreement, White Bridge identified a number of concerns with the proposed terms of the draft that would have impacted White Bridge's investment in MAP. These included:

  a.  The exclusivity provision that could have been read to obligate QC Terme US to involve Mr. Farsura in any future spa development in North America, and

which provision was not tied to Mr. Farsura's potential equity share;

b.     The apparent absence of any provision relating to the possibility of purchasing Mr. Farsura's potential stake in the event of the sale of QC Terme to a third party; and

c.     Provisions that could be read to give Mr. Farsura the ability to pre-empt QC Terme US from exercising its drag-along right, along with a favourable tag-along provision, both of which provisions were not tied to Mr. Farsura's potential equity share.

*See id.* White Bridge viewed all of these issues as significant concerns that would need to be resolved and over which the parties would need to continue negotiating. *See id.* ¶ 11; *see also* Ex. 2, Varni Aff. ¶¶ 16, 18.

**RESPONSE:** Disputed.     Following    the    conversations    with    Varni,    White Bridge acknowledged that the operating agreement was binding.  Loredan wrote that it was "not very courteous" for QC Terme to "finalize" the agreement without telling them.  Levy Ex. 35, QCT00048896.  Bigi wrote that the test of the agreement was "closed." *Id*.  White Bridge understood that the agreement was considered binding.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896.  White Bridge instead tried to "renegotiate the contract."  Levy Ex. 41 QCT00052914.  Plaintiffs also object to this paragraph on the basis that Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions. Plaintiffs further object to the introduction of an affidavit by Devescovi, while at the same time denying Plaintiffs the right to depose him.  Plaintiffs further objection on the basis that this paragraph relies on documents that have been withheld as privileged.  Defendant cites an affidavit from Stefano Devescovi, CEO of White Bridge's,

58

submitted in connection with a privilege dispute over privileged materials shared between White Bridge and QC Terme. Defendant has not produced those materials, and has not made Devescovi available for a deposition.

110. Given White Bridge's concerns over the terms of the draft operating agreement, the parties continued to negotiate the terms of the US Holding operating agreement well after August 2, 2017. *See, e.g.*, Ex. 65, QCT00015788; Ex. 66, FAR00094993; Ex. 67, FAR00056254; Ex. 68, FAR00086953; Ex. 69 QCT00017932.

**RESPONSE**: Disputed. Varni understood the August 2, 2017 Operating Agreement to be Final and binding. Levy Ex. 70, QCT00054536; Levy Ex. 36, QCT00048908. He communicated that position to White Bridge, which understood it. Levy Ex. 35, QCT00048896. The post-August 2, 2017 proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536; Levy Ex. 71, QCT00047478; Levy Ex. 35, QCT00048896; Levy Ex. 72, QCT00048900; Levy Ex. 36, QCT00048908.

111. On October 4, 2017, Messrs. Varni and Farsura discussed Sections 13.15 and 13.16 of the operating agreement, which concerned previously negotiated tag-along and drag-along rights. Ex. 65, QCT00015788 at QCT00015788; *see also* Ex. 64, FAR00056749 at FAR00056784–86. The following week, on October 4, 2017, Mr. Farsura wrote to Mr. Varni saying that Sections 13.15 and 13.16 of the August 2, 2017 draft operating agreement "seem to confirm what you asked me for last Wednesday." Ex. 65, QCT00015788 at QCT00015788.

**RESPONSE:** Disputed. The parties considered the Operating Agreement final and binding on August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

59

112.    Then, on October 17, 2017, Mr. Farsura sent an email to his accountant, Frank Ortega, saying that he would be "meeting with QC [T]erme this week to finalize the agreement" and he "would like to make sure everything is in order." Ex. 66, FAR00094993 at FAR00094993.

**RESPONSE**: Disputed.   The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11. The post- August 2, 2017 proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 72, QCT00048900, Levy Ex. 36, QCT00048908.

113.    The parties, however, did not finalize the operating agreement during the week of October 17, 2017. *See, e.g.*, Ex. 67, FAR00056254; Ex. 68, FAR00086953; Ex. 69, QCT00017932.

**RESPONSE:** Disputed. The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.  The post- August 2, 2017 proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 72, QCT00048900, Levy Ex. 36, QCT00048908.

114.    At the same time, in light of the ballooning project budget, QC Terme US was working to bring the costs of the QC NY project in line with QC Terme's and White Bridge's expectations.  Specifically, on September 19, 2017, the general contractor for the QC NY project

sent a draft budget reflecting a total projected construction cost of $45,535,734. Ex. 70, QCT00030345 at QCT00030347. The general contractor also provided a "Cost Estimate Summary by Phase," breaking out the construction costs for each of the three buildings making up the QC NY project (111, 112, and 114). *Id.* at QCT00030348. Varni forwarded the budget to QC Terme's in-house architect, Filippo Nosotti, expressing his surprise. *See id.* QCT00030345 at QCT00030345.

**RESPONSE:** Disputed as to the characterization, but undisputed that the draft budget reflects the cited costs, and that Varni forwarded that email to Nosotti. Further, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

115.    QC Terme US immediately began looking for ways to reduce the costs of the project. *See* Ex. 95, F. Gala Dep. Tr. 254:23–55:6. To that end, on September 28, 2017, Mr. Nosotti emailed the civil engineer for the project asking him to "check [the budget] in order to finalize the project reducing costs simplifying the design and works as much as possible." Ex. 71, QCT00005542 at QCT00005542.

**RESPONSE:** Disputed as to the characterization, but undisputed that the quoted material appears in the cited documents. Further, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

116.    At a project meeting the next day, QC Terme US told the architect on the project that the budget prepared by Noble was too high and that QC Terme would "start exploring ways to reduce the number by at least 30%." Ex. 72, QCT00005669 at QCT00005670. QC Terme US also "stated that construction phasing was never discussed in the pricing breakdown as it was never the intention to phase construction." *Id.*

61

**RESPONSE:** Undisputed to the extent that the quoted material appears in the cited documents. However, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

117.    On October 5, 2017, QC Terme US met with the general contractor to discuss changes to the budget, including removing a number of items that QC Terme US decided it would independently source. Ex. 73, QCT00005672 at QCT00005677; *see also* Ex. 74, QCT00015141 at QCT00015141.    On that basis, Noble revised the projected total construction cost to $39,309,574. Ex. 73, QCT00005672 at QCT00005680.

**RESPONSE:** Undisputed; however, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

118.    On October 18, 2017, QC Terme and White Bridge closed the White Bridge Acquisition. *See* Ex. 2, Varni Aff. ¶ 17. In connection with the White Bridge Acquisition, White Bridge was given the power to select 5 of the 11 board seats on MAP's board of directors. *Id.*

**RESPONSE:** Undisputed; however, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

119.    Following the White Bridge Acquisition, Mr. Farsura and Mr. Varni continued to negotiate the terms of the operating agreement. *See* Ex. 69, QCT00017932 at QCT00017932. Specifically, on October 23, 2017, Mr. Capurro forwarded Mr. Varni an email that Mr. Capurro had previously sent to Mr. Varni on October 7, 2017 attaching "the Operating Agreement amended in clause 8 to insert the call option in favor of QC USA in the event of a listing or sale of Map, and to which SF in these cases is entitled to a put." *Id.* at QCT00017932–33.

**RESPONSE:** Disputed. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura

62

Dep. Tr. 77:2-25; *id*. at 80:3–11. The post-August 2, 2017 proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 72, QCT00048900, Levy Ex. 36, QCT00048908; Levy Ex. 41 QCT00052914.   In particular, the "put" proposal reflected a modification demanded by White Bridge.  Levy Ex. 74; Levy Ex. 77.

120.     That same day, Mr. Varni forwarded Mr. Capurro's email to Mr. Farsura saying, "I am sending you the review performed by [Mr. Capurro] on the OA[] to introduce a call in the event of a sale/listing of the Group." *Id.* at QCT00017932.  The October 23, 2017 email to Mr. Farsura contained two attachments:  a clean version of the US Holding operating agreement and a redline version of that document. *Id*. The redline version reflected additional edits to Section 8 (Call and Put Option). *See id.* at QCT00017959.

**RESPONSE**: Disputed. The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. The post- August 2, 2017 proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 72, QCT00048900, Levy Ex. 36, QCT00048908, Levy Ex. 41 QCT00052914.

121.     Shortly after Mr. Farsura received Mr. Varni's email on October 23, 2017, Mr. Farsura forwarded the email and the attached clean and redlined versions of the US Holding operating agreement to his lawyer, Mr. Sicklick.  *See* Ex. 67 at FAR00056254.

63

**RESPONSE:** Undisputed that Farsura sent the documents he received to Sicklick. Disputed that there was any ongoing negotiation. The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11. The post-August 2, 2017, proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 36, QCT00048900, Levy Ex. 36, QCT00048908, Levy Ex. 41, QCT00052914.

122.    According to Plaintiffs' Redaction Log, Mr. Farsura's email to his lawyer on October 23, 2017 was for the purpose of "providing, requesting, or reflecting legal advice concerning the negotiation or interpretation of QC Terme operating agreement." Ex. 75, Plaintiffs' May 24, 2022 Redaction Log at Log Lines 78–80.  Plaintiffs' Redaction Log further described the email to Mr. Sicklick as an "[e]mail with attached draft agreement" and expressly referred to the attachments as the "Draft Agreement." *Id.*

**RESPONSE:** Disputed.   The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.  At a later date, QC Terme tried to change the deal already in place.  Ex. 98, QCT00018507; Levy Ex. 41 QCT00052914.

123.    Around that same time, Mr. Farsura traveled to Italy to participate in a "celebratory board meeting [of QC Terme] . . . to celebrate the fact that a new investor [White Bridge] came into the company." Ex. 10, S. Farsura Dep. Tr. 168:19–169:4.

**RESPONSE:** Undisputed that Farsura travelled to Italy to meet with the White Bridge principals and MAP, S.r.l. board.

64

124.    In advance of that meeting, Mr. Farsura sent Mr. Varni a WhatsApp message on October 24, 2017 saying that he was "happy to see [White Bridge] but, above all, I would like to speak amongst ourselves and define my position." Ex. 76, FAR00062971 at FAR00063077.

**RESPONSE:** Undisputed to the extent the text speaks for itself.  Disputed, to the extent that it implies there was no agreement in place.  The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11.  The post-August 2, 2017, proposals by QC Terme and White Bridge reflected White Bridge's efforts to persuade Farsura to accept new terms for his participation in QC Terme US Holding LLC. Levy Ex. 70, QCT00054536, Levy Ex. 35, QCT00048896, Levy Ex. 71, QCT00047478, Levy Ex. 72, QCT00048900, Levy Ex. 36, QCT00048908, Levy Ex. 41, QCT00052914.

125.    The next day, on October 25, 2017, Mr. Sicklick sent Mr. Farsura an email with the subject line "updated final draft of the operating agreement." Ex. 68, FAR00086953 at FAR00086953.  The October 25, 2017 email from Mr. Sicklick contained two attachments. *See id.*  One attachment was a clean version of a US Holding operating agreement and the other attachment was a redline version of that document. *See id.* at FAR00086954, FAR00087004.

**RESPONSE:** Disputed to the extent that it implies there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. At a later date, QC Terme tried to change the deal. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

126.    Plaintiffs' Redaction Log referred to both of these attachments as a "Draft Agreement." Ex. 75, Plaintiffs' May 24, 2022 Privilege Log at Log Lines 99–100. Additionally,

according to Plaintiffs' May 24, 2022 Redaction Log, the email from Mr. Sicklick to Mr. Farsura is "providing, requesting, or reflecting legal advice concerning the negotiation or interpretation of QC Terme Operating Agreement." *Id.* at Log Line 98. Plaintiffs have withheld the "draft agreement[s]" attached to Mr. Sicklick's October 25, 2017 email as attorney-client privileged. *See id.* at Log Lines 98–100.

**RESPONSE**: Undisputed to the extent the paragraph quotes Plaintiffs' redaction and/or privilege log. Disputed to the extent that it implies there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41 QCT00052914.

127.    Defendants challenged Plaintiffs' assertion of privilege over these documents. *See* Ex. 77, Lerner Decl. ¶ 2. On September 15, 2022, the parties' counsel met and conferred to discuss Defendants' challenge over Plaintiffs' assertion of attorney-client privilege over these documents. *See id.* During that meet and confer, Plaintiffs' counsel explained that they would not produce either attachment. *See id.* ¶ 4. According to Plaintiffs' counsel, the redline version of the US Holding operating agreement that was attached to Mr. Sicklick's October 25, 2017 email contained "substantive edits" to the terms of that version of the agreement. *Id.* ¶ 5. As a result, Plaintiffs maintained that these documents are protected as attorney-client privilege. *See id*.

**RESPONSE**: Undisputed that Plaintiffs withheld these documents as privileged. Disputed to the extent that it implies there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. At a later date, QC Terme tried

to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

128. At the October 25, 2017 "celebratory board meeting," representatives of QC Terme and White Bridge discussed their concerns regarding certain provisions of the US Holding operating agreement, including many of the provisions the parties had been trying to negotiate for years, like the "Call Option," the "Right of Exclusivity," the "Drag and Tag" rights, and "In-kind Contributions." Ex. 10, S. Farsura Dep. Tr. 168:21-169:4; Ex. 78, QCT00023990 at QCT00023993; *see also* Ex. 2, Varni Aff. ¶ 19.

**RESPONSE:** Disputed. Plaintiffs lack knowledge on this topic and object to the use of this evidence. Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions, although it has submitted and relied on an affidavit from at least one White Bridge executive (Stefano Devescovi). Disputed to the extent that it implies there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

129. At the meeting, the QC Terme and White Bridge representatives decided that they needed to raise their concerns with Mr. Farsura and decided that they would do so at a pre-planned dinner with Mr. Farsura that was set for October 27, 2017. *See id.*; *see also* Ex. 5, Devescovi Aff. ¶ 14. During that dinner, Mr. Loredan (White Bridge's co-CEO) expressed MAP's and White Bridge's collective concerns to Mr. Farsura about some of the problematic terms of the draft operating agreement. *See* Ex. 2, Varni Aff. ¶ 19; *see also* Ex. 5, Devescovi Aff. ¶ 15.

**RESPONSE:** Disputed. Plaintiffs do not dispute that at the dinner, Mr. Loredan expressed

67

to Mr. Farsura that he had "too good of a deal" and that something had to be done about it. Disputed as to all the rest.  Plaintiffs lack knowledge on this topic and object to the use of this evidence.  Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions, although it has submitted and relied on an affidavit from at least one White Bridge executive (Stefano Devescovi).  Plaintiffs further object to the use of the affidavit from Varni to support this proposition: Varni testified that he could not hear the conversation between Farsura and Loredan.  Ex. 6, F. Varni Dep. Tr. 187:18-20;189:1-7. Disputed to the extent that it implies there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11.  At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

130.   It was clear from Mr. Farsura's reaction and tone of the discussion that followed that Mr. Farsura did not agree with MAP's and White Bridge's assessment of the draft operating agreement and that he was extremely unhappy.  *See* Ex. 2, Varni Aff. ¶ 19; *see also* Ex. 5, Devescovi Aff. ¶ 15.

**RESPONSE:** Disputed. Plaintiffs lack knowledge on this topic and object to the use of this evidence. Despite Plaintiffs' request, Defendant has refused to make Francesco Loredan, Stefano Devescovi, or other White Bridge principals with knowledge on this topic available for depositions, although it has submitted and relied on an affidavit from at least one White Bridge executive (Stefano Devescovi). Plaintiffs further object to the use of the affidavit from Varni to support this proposition: Varni testified that he could not hear the conversation between Farsura and Loredan. Ex. 6, F. Varni Dep. Tr. 187:18-20;189:1-7.  Disputed to the extent that it implies

68

there was no agreement in place. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

**VII.    The Breakdown In The Parties' Relationship**

131.    Following the October 27 dinner in Milan, the parties abandoned their attempt to formalize their relationship through an operating agreement for US Holding. *See* Ex. 79, FAR00077604 at FAR00077604. In addition to never signing the operating agreement, the parties never updated Schedule A "within 90 days" as they would have been required had the operating agreement been effective. Ex. 64 at FAR00056788. Nor did the parties "finalize[]" "[t]he details of SF's duties, as well as compensation therefor" as would have also been required by the Schedule 7.04 of the operating agreement had it been effective. *Id.* at FAR00056788. And Mr. Farsura never sought reimbursement for his expenses (Compl. ¶ 5) as he would have been entitled under Section 7.09 of operating agreement had it been effective. *See id.* at FAR00056775.

**RESPONSE:** Disputed to the extent this is intended to imply the parties lacked an agreement on August 2, 2017. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

132.    Instead, the parties explored alternative ways to formalize their relationship. *See* Ex. 79, FAR00077604 at FAR00077604. Thus, on November 9, 2017, Andrea QC sent Mr. Farsura a revised proposal under which Mr. Farsura would serve as the Head of Business Development US and be given the opportunity to invest in QC Terme. *See id.* at FAR00077605. Andrea QC described this as "a fair and financially attractive proposal" "that attempts to align all

69

of our interests and efforts." *Id.* at FAR00077604.

**RESPONSE:** Disputed. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41 QCT00052914. The paragraph addresses that attempt, which was rejected.

133.    Mr. Farsura was dissatisfied with QC Terme's November 9 proposal. *See* Ex. 80, FAR00092678 at FAR00092678–79. That same day, Mr. Farsura forwarded QC Terme's proposal and a draft response to his business partner and wife, Ms. Jordan. *See id.* Ms. Jordan—an owner of SF Capital Partners—said to Mr. Farsura "[t]hey are really screwing you" (*id.* at FAR00092678), which, Ms. Jordan later explained meant that QC Terme had, in her view, reneged on a "handshake agreement." Ex. 81, K. Jordan Dep. Tr. 280:5–283:15.

**RESPONSE:** Undisputed that Farsura rejected the November 9, 2017 deal. Disputed to the extent it implies there was no agreement in place before that date. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. Plaintiffs object to the use of the deposition testimony Kirsten Jordan to the extent such testimony was procured in violation of the Court's protective order. Dkt. 38.

134.    Mr. Farsura also consulted with his lawyer on November 16, 2017 to discuss the status of his situation with QC Terme. *See* Ex. 82, FAR00095600 at FAR00095600. As part of those discussions, Mr. Farsura reminded Mr. Sicklick that the "[t]he OA is not signed[.]" *Id.*

**RESPONSE:** Disputed. This document is privileged and should be destroyed pursuant to the Protective Order. Dkt. 38. The parties considered the Operating Agreement final and binding by

70

August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41 QCT00052914.

135.    The following day, on November 17, 2017, Mr. Farsura consulted with his business advisor, Ms. Jordan's step-father, Victor Kiarsis, during which conversation Mr. Farsura revealed the substance of the legal advice Mr. Farsura received from his lawyers the previous day. *See* Ex. 83, FAR00092647 at FAR00092647. Specifically, Mr. Farsura explained that his lawyers told him that "the fact that the oa is not signed makes me vulnerable." *Id*.

**RESPONSE:** Disputed. Farsura's father-in-law, Victor Kiarsis, is not his business advisor. Ex. 10, S. Farsura Dep. Tr. 68:4-24; Levy Ex. 57, Kiarsis Dep. Tr. at 17:8-21. The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41 QCT00052914.

136.    That is because the parties had long discussed the need for signature on the US Holding operating agreement. For example:

  a.    On June 20, 2016, Mr. Varni sent an email to Mr. Farsura in which Mr. Varni laid out his understanding of "the sequence" the parties should follow in forming the various corporate entities for the Governors Island project. *See* Ex. 37, FAR00084753 at FAR00084753. In doing so, Mr. Varni specifically stated that the US Holding required a "signed OA." *Id.* At the conclusion of Mr. Varni's email to Mr. Farsura, Mr. Varni asked "Do you disagree?" *Id.* In response, Mr. Farsura corrected several statements by Mr. Varni, but did not correct Mr. Varni's statement

about the need for a "signed OA." *See id.*

b.  Not long thereafter, on August 18, 2016, Messrs. Farsura and Varni again discussed the status of the US Holding operating agreement, with Mr. Farsura writing to Mr. Varni: "As already discussed in July, however, I felt that the points had all been resolved and I would like to be able to leave this chapter behind.  When you come back can you talk to the lawyer in order to finish this?"  Ex. 84, FAR00069569 at FAR00069569.  Mr. Varni responded: "But of course, I'll see him as soon as I get back" and emphasized, "[t]hen we'll sign and won't talk about it anymore!" *Id.*

c.  Almost two months later, on October 5, 2016, Mr. Capurro—the lawyer for QC Terme—sent an email to Mr. Farsura and his lawyer, Mr. Sicklick, concerning the status of the US Holding operating agreement.  Ex. 85, FAR00058229 at FAR00058229.  In that email, Mr. Capurro wrote: "I refer to our last conference call of September 14, last, and to the subsequent e-mail communication sent by Stefano (in which Francesco and I were copied), to kindly ask you when you believe that a final version of the Operating Agreement of the US Holding could be circulated and (hopefully) signed." *Id.*

d.  On January 19, 2017, Mr. Varni and Mr. Farsura continued their discussion of the US Holding operating agreement.  *See* Ex. 52, FAR00005607 at FAR00005607. Specifically, in response to Mr. Farsura's suggestion that the parties define "what type of role, responsibilities, remuneration you want me to have here in NY," Mr. Varni wrote that "[t]he idea about your role is as it always has been." *Id.*  Mr. Varni added they should "try to get it signed off on paper" and emphasized that "[w]e have to sign the OAs!" *Id.*

72

e.  The following month, on February 8, 2017, Mr. Farsura and Mr. Varni continued their discussion of the US Holding operating agreement. *See* Ex. 53, FAR00057103 at FAR00057103.  In this exchange, Mr. Varni wrote, "I recovered the latest version of the OAs circulated by Ken Sicklick, on which it seems we were all in agreement." *Id.*  Mr. Varni added that "[i]f you agree, we will complete it with the few missing details and will sign it." *Id.*

f.  Less than a month later, Mr. Farsura wrote to his lawyer, Mr. Sicklick, on March 7, 2017, and said, "Qc is ready to sign" the US Holding operating agreement. *See* Ex. 54, FAR00057049 at FAR00057049.

g.  On the same day, on March 7, 2017, Mr. Farsura and Mr. Varni continued their discussion of the US Holding operating Agreement. *See* Ex. 86, FAR00045723 at FAR00045723.  Mr. Varni again referenced the need for signatures on the operating agreement. *Id.*  Specifically, Mr. Varni wrote to Mr. Farsura to "[t]hank[] [him] for the OAs" and suggested "that Kenneth [Sicklick] adjust[] the dates and review[] before signing." *Id.*

h.  Mr. Farsura's and Mr. Varni's discussion of the US Holding operating agreement continued on March 17, 2017.  *See* Ex. 87, QCT00009221 at QCT00009221.  Once again, Mr. Varni referenced the need for signatures on the operating agreement. *See id.*  In particular, Mr. Varni said to Mr. Farsura "[i]f the final text [of the operating agreement] is sent out, I would say to sign it." *Id.*

i.  Then, on April 9, 2017, Mr. Farsura emailed Mr. Varni "attach[ing] the two latest versions" of the US Holding Operating Agreement, "one with revisions and the other clean and ready to be signed." Ex. 55, FAR00093861 at FAR00093861.

j. Later on April 9, 2017, Mr. Varni responded to Mr. Farsura's email from earlier in the day and again referenced the need for signatures, saying "[t]omorrow we'll exchange the signed PDFs." *Id.*

k. The parties' conversation surrounding the US Holding operating agreement continued on April 11, 2017, and, again, involved a discussion of the need for signatures on the operating agreement. *See* Ex. 56, FAR00056986 at FAR00056986. In particular, Mr. Varni wrote to Mr. Farsura saying "[p]lease find attached the final clean text" and asked Mr. Farsura to "send [Mr. Varni] the signed pdf and then [Mr. Varni] will sign[.]" *Id.*

l. On August 2, 2017, Mr. Sicklick sent another version of the US Holding operating agreement to Mr. Varni and directed him to "print the signature pages from the attached clean, Word document and execute your signature block." Ex. 64, FAR00056749 at FAR00056749. Mr. Sicklick emphasized that "[w]hen both parties have executed and exchanged signature pages" the parties will "consider the agreement signed." *Id.*

m. After August 2, 2017, Mr. Farsura continued to ask Mr. Varni for signatures of the operating agreement. For example, on August 30, 2017, Mr. Farsura forwarded Mr. Varni the August 2 email from Mr. Sicklick attaching the August 2, 2017 draft of the US Holding operating agreement and asked Mr. Varni "Are we signing?" Ex. 88, FAR00056640 at FAR00056640.

n. Then, on September 5, 2017, Mr. Farsura sent Mr. Varni WhatsApp messages asking if they should "sign the OA" "when you're available?" Ex. 105, FAR00062971 at FAR00063055.

74

o.  Mr. Farsura had long understood that in order to "finish the process" the parties needed to sign the operating agreement. *See* Ex. 10, S. Farsura Dep. Tr. 80:17–19 ("I understand it's just standard practice to just, you know, finish the process with a signature.  It's just normal."), 80:6–13 ("And I remember very well, in 2017, in August, just before the holidays, all the parties had a call in which we all said – and when I say all, I mean me, Francesco Varni and the attorneys representing the two parties – we all said we're done.  Let's, you know, let's finish it, meaning let's put a signature on it."), 112:4–10 ("At the time what I can tell you is that there was a little bit of pressure from The Trust of Governors Island and from Francesco [Varni] to sign those agreements because it was a vague part of the lease agreement, the lease requirements, to have some form documents."), 132:18–19 ("The Trust was requesting us to have signed papers, so he's pushing for that."), 133:4–5 ("I mean, we all wanted to sign it, clearly."), 134:4–5 ("we all wanted to sign the OA"), 139:18–22 ("The reason why he's saying that he wanted to sign the OA is because we have been dragging this for too long. Too long. It was about time to get done. To be done. To be over."), 147:13–16 ("[I]t was about time to sign this agreement. We had been negotiating this agreement for many years.  Since 2014"), 148:11–14 ("We all wanted to sign the agreement because we were fed up and tired about going back and forth from this agreement over and over and over again."), 161:19–22 ("I mean, everybody wanted to sign.  There was pressure from [T]he Trust of Governors Island to sign it.  Everybody wanted to leave it behind.").

p.  Mr. Varni shared Mr. Farsura's view that signatures were required. *See* Ex. 6, F. Varni Dep. Tr. 34:8–10 ("Because I expect to sign an agreement. If an agreement

75

is not finalized in a proper way formally, it is not an agreement, okay?"), 56:19-21 ("At that time, we didn't sign an agreement yet, so we were supposed to discuss and enter sooner or later an agreement."), 128:22–129:3 ("No, because it was still under discussion. I used to speak to the board when the version of a document that has to be signed on behalf of the company is let's say in the – in the final version, the execution version, let's say before the signing."), 132: 16-17 ("In fact – in fact, we didn't get to the signature at that time, and either later."), 145:14–18 ("I didn't want to meant that is was final, because we didn't get the signature. We didn't get to the signature. We didn't get the approval from Stefano Farsura. I wanted to get the approval from White Bridge."), 148:17–25 ("Nobody signed the document. We didn't sign it. Mr. Farsura didn't sign it. In the view of [White Bridge employee] Giulia Bigi, which at that times was junior at White Bridge, she says that we were waiting for a copy signed by Farsura. I don't remember if it was the position at that time, but no signed copy of anything came to us, and we weren't in the position to sign it before the – the entrance in the sake of the company by White Bridge."), 159:18-22 ("There was no agreement because it was a draft. The agreement is when – you have an agreement when you sign the agreement. This was a draft under discussion."), 164:4–11 ("To have an agreement, we have to have an agreement, to sign an agreement, in my way of doing business, and also in the way I was binded at that time, okay, due to the circumstances, due to the contract in place with White Bridge."), 164:22–165:8 ("I'm 58.· I've been working for 32 years. I think that an agreement – such an agreement has to be signed. Without the signature, there are – there is no agreement. This is my business behavior. This is what also stated in

76

the – in the draft. So the draft itself says that you have to sign as an authorized person. We never signed it. This – what you're showing me is the latest version of the operating agreement that we have been negotiating for years through our respective lawyers."), 259:12–14 ("We exchanged multiple version of – multiple draft, but we never came to the signature.").

**RESPONSE:** Disputed. To the extent this is alleging that the parties agreed there would be no binding operating agreement absent a signature, this is disputed. Farsura Decl. ¶ 6. Moreover, on August 2, 2017, the parties considered the Operating Agreement final and binding. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11.

137.    In addition to the parties' various statements over the years regarding signatures for the US Holding operating agreement, the August, 2, 2017 draft of the operating agreement contained numerous references to "signatures" and/or "execution." *See* Ex. 64, FAR00056749 at FAR00056749. For example:

    a. On Page 33 of the draft operating agreement it says: "SIGNATURES BEGIN ON NEXT PAGE" (*id.* at FAR00056786);

    b. Page 34 of the draft operating agreement is described as the "Signature Page to QC Terme US Holding LLC Operating Agreement" (*id.* at FAR00056787);

    c. The top of the "Signature Page to QC Terme US Holding LLC Operating Agreement," says "IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed," which is followed by signature blocks for representatives of both QC Terme US and SF Capital Partners (*id.*);

    d. On the same page, Mr. Farsura is designated as the "AUTHORIZED

SIGNATORY" for SF Capital Partners (*id.*);

e.  Section 7.04 states "[t]he details of SF's duties, as well as compensation therefor, shall be finalized by QC US and SF as promptly as practicable following the execution of this Agreement." (*id.* at FAR00056792);

f.  Section 11.01(b) states that "[n]o Member (or any of its Affiliates) shall be responsible or liable for any indebtedness or obligation of the other Members (or any of their Affiliates) incurred either before or after the execution of this Agreement . . ." (*id.* at FAR00056779);

g.  Section 13.10 states that "Amendments, variations, modifications or changes herein may be made effective and binding upon the Members only by the setting forth of same in a document duly executed by each Member, and any alleged amendment, variation, modification or change herein which is not so documented shall not be effective as to any Member" (*id.* at FAR00056783);

h.  Section 13.11 states that "[t]his Agreement may be executed in multiple counterparts (and by facsimile or portable document format (PDF) transmission), each of which shall be an original but all of which together shall constitute but one and the same agreement" (*id.*);

i.  The final page of the redline version describes the August 2, 2017 version of the US Holding operating agreement as the "execution copy – 8/2/17." *Id*. at FAR00056851.

**RESPONSE:** Disputed.  The provisions referenced speak for themselves.  Not a single provision of the Operating Agreement requires a signature for it to be binding. To the extent this is alleging that the parties agreed there would be no binding operating agreement absent a signature,

78

this is disputed.  Farsura Decl. ¶ 6.  The parties considered the Operating Agreement final and binding by August 2, 2017. Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11.

138.    Following the close of White Bridge Acquisition, QC Terme US continued to pursue cost reductions for the QC NY project.  Thus, on November 6, 2017, Mr. Nosotti circulated drawings reflecting the "hypothesis of using only [building] 112 plus [the] basement [of] 111," rather than all three building as originally contemplated.  Ex. 89, QCT00017485 at QCT00017485.

**RESPONSE:** Disputed as to the characterization, undisputed that the quoted material appears in the cited documents.  Further, the facts in this paragraph are immaterial to contract formation or any other relevant issues in this case.

139.    On November 22, 2017, QC Terme US instructed the architect on the QC NY project that QC Terme US had "broken down the original scope into different phases":

   i.   Phase 1 will consist of the whole of Building 112, the basement of Building 111 and the exterior Pools – see attached drawing pdf.

   ii.  The other floors of Building 111 will be sealed off and development will be on hold till a later date

   iii. Development of Building 114 will be on hold till a later date.

Ex. 90, QCT00005941 at QCT00005942.

**RESPONSE**: Disputed to the extent the paragraph attributes the cited statements to QC Terme US, as opposed to persons acting on its behalf.  Undisputed to the extent the quoted material appears in the cited documents.  Further, the facts in this paragraph are immaterial to the issues in this case.

140.    Farsura and Lindsay Harms, an investor who served a consultant for QC Terme US, reacted negatively to the phased proposal.  Harms emphasized what she saw as the possible

negative commercial effects of the revised scope:

> I am extremely concerned about about the phase 1 limited scale. While I understand this is an attempt to limit costs and spread the risk by opening another property(Boston??), I believe downscaling to this degree jeopardizes the "flagship" aspect of GI. If this is QCTerme's introduction to the US market, I am underwhelmed. Cutting back the offering to this extent will not give a proper understanding of how the QCT concept works. As currently envisioned GI does not even match Milan (7 internal water/4 external,10 massage, 32 sq m salt rooms) let alone San Pell[e]grino.

Ex. 91, QCT00003913 at QCT00003915.  Mr. Farsura "agree[d] with Lindsay [Harms] that the reduced plan for 111 only is sub optimal," stating that "Lindsay and I strongly feel that the reduced scope of the project will affect the perception in the market place, increase the seasonality of the experience and ultimately affect the revenues." *Id.* at QCT00003913–14.  Farsura also emphasized that the modifications to the project would delay opening. *Id.*

**RESPONSE:** Disputed as to the characterization, undisputed that the quoted material appears in the cited documents.  Further, the facts in this paragraph are immaterial to contract formation or any other relevant issues in this case.

141.    Dissatisfied with QC Terme's proposals for their structuring the relationship and unhappy with the direction the QC NY project was heading, Mr. Farsura, with the help of Mr. Kiarsis, began trying to build a case against QC Terme.  *See* Ex. 83 at FAR00092647 ("Your case strengthens!!"); *see also* Ex. 92, FAR00095900 at FAR00095901–03 (summary of Mr. Farsura's contemplated litigation claims and supporting allegations).  To that end, Mr. Farsura began to record conversations with the company's principals.  *See* Ex. 93, KIA00000130.

**RESPONSE:** Disputed.  The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77.  At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507, Levy Ex. 41, QCT00052914.

142.    Specifically, on November 17, 2017, Mr. Farsura recorded a call he had with Mr. Varni and Saverio and Andrea QC.  *See id.*

**RESPONSE:** Undisputed.

143.    During that call, Mr. Farsura stated:

This clearly left me a little puzzled because until a few days [before October 27, 2017] I thought of coming to Milan to celebrate your closing with you and essentially set out my position on the basis of an operating agreement that was also essentially wrapped up so that I could then get to work and finalize Governors Island in order to move forward.  So the proposal that you summarized is clearly very, very different from what we hypothesized from the start and which we worked on.  *Id*. at 4.

Francesco [Varni] and I, at least I personally then Francesco, let's say he didn't deny it to me, we were ready to finalize an agreement, let's say already in August, so, this is a significant change.  *Id*. at 5.

Let's simplify the agreement, let's leave it at the American level because at this moment it is what I think is easier, for me, or in any case it takes into account what are perhaps my most practical needs. We'll simply remove that provision that in the agreement is hedged, but it is hedged in terms of a U.S. liquidity event and then maybe we'll align it to Italian liquidity events, clearly with due proportions, in the sense that I will have nothing to do with Italy, but I will be involved with the American side, which has always been everybody's strategy and in so doing, without revolutionizing anything, but perhaps by applying corrective measures to what we already have, we can find a solution.  *Id*. at 13.

*Id.*

**RESPONSE:** Disputed.  The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11.  At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

144.    Recognizing that his status with QC Terme was in limbo, Mr. Farsura wrote again to his accountant, Frank Ortega, on December 12, 2017, saying, "my deal with QC Terme is still evolving and I am not really sure how it will end." Ex. 94, FAR00045551 at FAR00045551.

**RESPONSE:** Disputed.  The parties considered the Operating Agreement final and

81

binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; id. at 80:3–11.  At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507; Levy Ex. 41, QCT00052914.

145.    At the end of December, QC Terme US presented the proposal for phased approach to the QC NY project to The Trust.  Ex. 96, QCT00039785 at QCT00039785–88.  Over the next several weeks, QC Terme US and The Trust negotiated over how the phased approach might be implemented.  *Id.*

**RESPONSE:** Disputed as to the characterization of the document (that only QC Terme US was on the emails with the trust) as Stefano Farsura was also included.  Further, the facts in this paragraph are immaterial to the issue of contract formation or any other relevant issues in the case.

146.    Meanwhile, by February 2, 2018, Messrs. Farsura and Kiarsis had fleshed out a document summarizing the elements of the lawsuit Mr. Farsura was contemplating bringing.  Ex. 92 at FAR00095901–03.  The document contemplated "seeking relief through the courts of the State of New York" and described a "Court Petition for Relief," which included:

- o  Upon belief [*sic*] has fraudulently interfered with the contract rights of SF Capital Partners LLC in an effort to defraud such company from its rightful assets.

- o  The holders of the majority interests have fiduciary obligations with respect to the minority party and have participated in the fraudulent activity and thus ha[ve] liability[.]

- o  All representatives of the majority member will have personal liability with respect to the fraudulent scheme perpetrated on SF [C]apital Partners LLC, and the LLC veil is pierce[d] due to their actions. Discovery will identify which parties were responsible for advancing the fraudulent scheme and they and their institutions will assume personal responsibility for payment of damages.

*Id.* at FAR00095903 (emphasis omitted).

**RESPONSE:**  Disputed to the extent this is meant to imply that Farsura was aware of the

82

contours of the fiduciary duty claim he asserts in this litigation.  Farsura's fiduciary duty claim concerns the November 2018 transfer of the equity interests in QC Terme NY LLC from QC Terme US Holding LLC to Defendant QC Terme US Corp. (the majority member of QC Terme US Holding LLC) in exchange for a $500,000 promissory note.  Ex. QCT00032393.  That transfer postdated this email by many months.  Indeed, the price for the wrongful transfer (i.e., the valuation of QC Terme NY LLC), a valuation that Plaintiffs dispute, was not set until November 2018.  Ex. 103.  And Plaintiff did not learn of this wrongful transfer until May 2019.  Ex. QCT00032393.

147.   On February 9, 2018, QC Terme NY executed the First Amendment to Lease ("**Amended Lease**") reflecting the phased approach to the QC NY project.  Ex. 97, QCT00012459 at QCT00012461–66.  Section 2.1(b) of the Amended Lease defined "Phase 1 Work" as

> that portion of the Tenant Work consisting of the work in Building 112, the basement of Building 111 and the green area surrounding all buildings, including the two exterior spa pools, and all work on the exterior of the entire Premises (i.e., Buildings 111, 112 and 114), including the roof, façade and windows, necessary to keep the Premises watertight and in good order and condition.

*Id.* at QCT00012461.  "Phase 2 Work" was defined as

> that portion of the Tenant Work consisting of additional work in the interior of Building 111 and the interior of Building 114, so that each building may be used for the conduct of the activities provided for in this Lease. Tenant shall propose a scope for the Phase 2 Work, which shall be subject to the approval of Landlord, not to be unreasonably withheld.

*Id.* at QCT00012461–62.

**RESPONSE:** Undisputed, but immaterial to contract formation or any other relevant issues in the case.

## VIII.   The Dissolution And Wind-Up Of US Holding

148.   While QC Terme US was negotiating the lease amendment with The Trust, Mr. Varni sent Mr. Farsura another proposal for structuring QC Terme's relationship with Mr. Farsura on January 11, 2018, —a draft of a long-term management incentive plan for Mr. Farsura to work

directly for QC Terme.  *See* Ex. 98, QCT00018507 at QCT00018507.

**RESPONSE:** Undisputed that Varni sent Farsura this document. The parties considered the Operating Agreement final and binding by August 2, 2017.  Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id.* at 80:3–11. At a later date, QC Terme tried to change the deal already in place. Ex. 98, QCT00018507, Levy Ex. 41, QCT00052914.  This document reflects one such attempt.

149.    After Mr. Farsura had not responded to the proposal for nearly month, Mr. Varni messaged him on WhatsApp on February 7, 2018, writing:

> Hi Stefano, given the amount of time that has passed, I deduce that you still have the same strong doubts that you have expressed to me in NYC.  You did not give me any feedback after the incentive plan was sent in January.  Sorry, but I do not see any solution other than the transfer of shares to QC Terme US Corp and the compensation of the activity carried out.  We will consider, possibly, structuring a fee-based agreement for US development so that you are free to continue to operate on multiple fronts. I think you agree that we cannot continue in this vague situation. Let's talk when you want, if you feel like it.

Ex. 99, QCT00050458 at QCT00050458; *see* Ex. 100, FAR00041718 at FAR00041721.

**RESPONSE:**  Undisputed with respect to the quotes from the document.

150.    Mr. Farsura responded that "you cannot unilaterally deprive me of my share. This would be fraud[.]" Ex. 99 at QCT00050458.  To which Mr. Varni replied:

> Stefano, but how the hell are you talking about fraud.  Participation in M[AP] through Giuturna is in my first proposal and the conversion of your compensation for the activity carried out in Giuturna equity seems to be ancillary compared to the global proposal, which I don't think you ever gave me any positive feedback on. The bottom line is that Saverio and Andrea [QC] personally gave entry to WBI to make the development project achievable and to make NY achievable.  Without this step, as you know perfectly, it would be empty talk.  Today we have world- class partners and financing for our project, which we would not otherwise have had.  The general conditions have changed and we have proposed a way for you to stay involved with us that I judge more than fair, but that clearly does not satisfy you.  Let's acknowledge it.  That's it

*Id.*

**RESPONSE:**  Undisputed with respect to the quotes from the document.

84

151.     Mr. Farsura rejected the January proposal and instead wrote a demand letter to the QC brothers ("**February 28, 2018 Letter**") providing two options for QC Terme to buy out his purported interest in QC Terme US.  Ex. 100, FAR00041718 at FAR00041718.  The February 28, 2018 Letter stated that Mr. Varni's text message "shows that QC Terme is not aware of its fiduciary duty to minority shareholders." *Id.* at FAR00041721.

**RESPONSE**: Undisputed that Farsura rejected that proposal. Disputed to the extent it implies Farsura's interest was "purported".  Tax filings demonstrate that he held a 22% interest in QC Terme US Holding LLC.  Levy Ex. 2, FAR00004656 at FAR00004661 (2016); Levy Ex. 3, FAR00010981 at FAR00011065 (2017); Levy Ex. 30, FAR00089910 at FAR00089912 (2018); Levy Ex. 31, FAR00096746 at FAR00096748 (2019).  Documents sent by QC Terme's lawyer to third parties say the same.  Levy Ex. 32, JLL_000972 ("[T]here was an initial recognition by the parties (in tax filings, among other things), that SF Capital Partners was a 22% member, and QC Partners [sic] a 78% member, of the DE LLC.").

152.     Mr. Farsura's February 28, 2018 Letter did not comply with the notice provision contained in Section 13.02 of the draft operating agreement, which states that "[al]l notices, demands, claims, requests and other communications hereunder shall be in writing and shall be given by (a) personal delivery, (b) facsimile transmission with proof of receipt or (c) a nationally recognized overnight courier service, fees prepaid[.]"  Ex. 64 FAR00056749 at FAR00056781-82. Mr. Farsura did not follow those requirements when he only emailed his February 28, 2018 Letter to the Quadrio Curzio brothers.  Ex. 100, FAR00041718 at FAR00041718.

**RESPONSE:** Undisputed that Farsura's letter was emailed. Disputed on the basis that this paragraph does not assert facts, but rather a legal conclusion.  Disputed to the extent this is meant to imply that the parties did not agree on August 2, 2017 to the terms of their operating agreement.

85

Farsura Decl. ¶¶ 4-6; Levy Ex. 36, QCT00048908; Levy Ex. 35, QCT00048896; Ex. 10, S. Farsura Dep. Tr. 77:2-25; *id*. at 80:3–11.

153.    On March 28, 2018, the QC Brothers responded to Mr. Farsura's February 28, 2018 Letter.  *See* Ex. 101, FAR00090202 at FAR00090202.  They rejected the existence of "an agreed–upon operating agreement or other binding agreement to govern the parties' relationship or Holdings." *Id*.

**RESPONSE:** Undisputed to the extent the document speaks for itself.

154.    Given the apparently irreconcilable conflict with Farsura, QC Terme began looking for an appraiser to conduct an independent valuation of the assets of QC Terme NY.  Ex. 95, F. Gala Dep. Tr. 181:22-182:20; 183:3–23.  In May 2018, QC Terme NY retained Jones Lang LaSalle Incorporated ("**JLL**") to prepare a valuation report for use by "[t]he management team and direct and indirect majority shareholders of QC Terme NY LLC as well as potential investors into QC Terme NY LLC." Ex. 102, QCT00044913 at QCT00044918.

**RESPONSE**: Disputed to the extent that the paragraph states that QC Terme sought an "independent valuation of the assets of QC Terme NY"; JLL's valuation was not fair, reasonable or free of significant inaccuracies.  *See* Levy Ex. 46, Rebuttal Report of Mike Cliff ¶¶ 26-53.

155.    On November 7, 2018, JLL sent QC Terme their final valuation report (the "**JLL Valuation**") reflecting that JLL assessed the value of QC Terme NY's assets as $500,000.  Ex. 103, JLL_000415 at JLL_000418.

**RESPONSE:** Undisputed that JLL assessed the value of QC Terme NY's assets as $500,000 and that JLL only finalized its valuation in November 2018, but disputed that the valuation was fair or independent or accurate.  *See* Levy Ex. 46, Rebuttal Report of Mike Cliff ¶¶ 26-53

156.    On November 29, 2018, QC Terme US purchased QC Terme NY from US Holding for a $500,000 interest-bearing promissory note, i.e., the amount assessed in the JLL Valuation. Ex. 104, QCT00041741 at QCT00041743–44.  After executing the transaction, US Holding's only asset, was the $500,000 promissory note. *Id.*

**RESPONSE:** Disputed as incomplete.  The conduct described in paragraph 156 violated numerous provisions of the Operating Agreement, including sections 3.05, 3.06(a), 5.01, 7.03(a) and (c), 8, 12.01, 13.15, and 13.16(b), Ex. 4, or, alternatively, Defendant's fiduciary duties.  After this November 2018 transaction, Defendant underwent what it termed a "corporate reorganization" (Levy Ex. 74, QCT00019949) of its US operations.  To that end, Defendant adopted a new, three-page "operating agreement" for QC Terme US Holding LLC (Levy Ex. 74, at QCT00019964) which excised Mr. Farsura as a member.  Then, pursuant to that new agreement, Defendant dissolved QC Terme US Holding LLC (Levy Ex. 74, QCT00021212), and transferred the promissory note to Defendant (Levy Ex. 74 QCT00021233).  Mr. Farsura only learned of these developments in 2019.  Levy Ex. 26.

157.    On September 7, 2021, Mr. Farsura and SF Capital Partners filed in New York Supreme Court, New York County, a lawsuit against QC Terme US, MAP, White Bridge, and Giuturna Investments S.p.A.  See generally Compl. The Complaint alleged various causes of action against QC Terme US, including an alleged breach of the August 2, 2017 draft of the US Holding operating agreement and breach of fiduciary duty. See generally Compl.; see also ECF No. 220.

**RESPONSE:** Undisputed.

158.    QC NY opened to the public in early March 2022. Hannah Frishberg, $50M Italian Spa Opens in Former NYC Army Barracks With a Skyline View, N.Y. POST, March 7, 2022 (available    at    https://nypost.com/2022/03/07/sprawling-italian-spa-opens-in-former-nyc-army-

87

barracks/).

   **RESPONSE:** Undisputed.

Dated: April 5, 2024
       New York, New York

                                  HOLWELL SHUSTER & GOLDBERG LLP

                                  By: */s/ Vincent Levy*
                                  Daniel Goldberg
                                  Vincent Levy
                                  Priyanka Timblo
                                  Brian T. Goldman
                                  Aditi Shah

                                  425 Lexington Ave., 14th Floor
                                  New York, New York 10017
                                  Tel: 646.837.5151
                                  vlevy@hsgllp.com

                                  *Attorneys for Plaintiffs*