## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

STEFANO FARSURA and
SF CAPITAL PARTNERS LLC,

    *Plaintiffs,*

  v.

QC TERME US CORP.,

    *Defendant.*

Case No. 1:21-cv-09030-AT-RWL

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

HOLWELL SHUSTER & GOLDBERG LLP
425 Lexington Ave., 14th Floor
New York, New York 10017
Tel: 646.837.5151

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..........................................................................................1

FACTUAL BACKGROUND...........................................................................................3

    A.    Mr. Farsura and QC Terme Become Business Partners ......................................... 3

    B.    The Parties Work On the North American Spa Business ....................................... 5

    C.    QC Terme US Holdings LLC: Formation and Operating Agreement.................... 6

    D.    QC Terme US Attempts to Change the Operating Agreement.............................. 9

    E.    QC Terme US Freezes Plaintiffs Out.................................................................. 10

LEGAL STANDARD....................................................................................................11

ARGUMENT .................................................................................................................12

I.    A JURY COULD FIND THAT
    THE OPERATING AGREEMENT WAS BINDING...................................................... 12

    A.    Defendant Does Not Establish the Insufficiency of Plaintiffs' Evidence............ 12

    B.    Evidence Of Discussions About the "Put/Call" and
        "Drag/Tag" Provisions Does Not Negate the Existence of an Agreement.......... 14

    C.    The Absence of a Signature Does Not Negate Contract Formation ..................... 17

    D.    The Parties' Subsequent Conduct Does Not Negate Contract Formation ........... 20

II.    A JURY COULD ALSO FIND, ALTERNATIVELY, THAT DEFENDANT
    BREACHED ITS FIDUCIARY DUTIES UNDER THE DELAWARE LLC ACT ....... 21

    A.    Absent the OA, Defendant Owed Plaintiffs Fiduciary Duties Implied by Law ... 21

    B.    Defendant Cannot Negate the Existence of Fiduciary Duties ............................. 23

    C.    Plaintiffs' Claim for Breach of Fiduciary Duties is Timely ................................ 26

CONCLUSION...............................................................................................................30

## TABLE OF AUTHORITIES

**Cases**                                                                                                    **Page(s)**

*77 Charters, Inc. v. Gould*,
    2020 WL 2520272 (Del. Ch. May 18, 2020) ..................................................................... 25, 26

*Anchor Motor Freight v. Ciabattoni*,
    716 A.2d 154 (Del. 1998) ............................................................................................... 17, 20

*Aveta Inc. v. Bengoa*,
    986 A.2d 1166 (Del. Ch. 2009) ............................................................................................ 19

*Bamford v. Penfold, L.P.*,
    2022 WL 2278867 (Del. Ch. 2022) ...................................................................................... 28

*Bren v. Capital Realty Grp. Senior Hous., Inc.*,
    2004 WL 370214 (Del. Ch. Feb. 27, 2004) ......................................................................... 29

*Bryant v. Way*,
    2011 WL 2163606 (Del. Super. Ct. May 25, 2011) ............................................................. 17

*Buxbaum v. Deutsche Bank AG*,
    196 F. Supp. 2d 367 (S.D.N.Y. 2002) .................................................................................. 14

*Ciaramella v. Reader's Dig. Ass'n, Inc.*,
    131 F.3d 320 (2d Cir. 1997) ................................................................................................. 19

*CelestialRX Investments, LLC v. Krivulka*,
    2017 WL 416990 (Del. Ch. Jan. 31, 2017) .......................................................................... 22

*Eagle Force Holdings, LLC v. Campbell*,
    187 A.3d 1209 (Del. 2018) ................................................................................................... 13

*Emerson v. Universal Products Co.*,
    179 A. 383 (1934) ................................................................................................................. 20

*Feeley v. NHAOCG, LLC*,
    62 A.3d 649 (Del. Ch. 2012) ..................................................................................... 24, 25, 26

*Gallagher v. Long*,
    2013 WL 718773 (Del. Ch. Feb. 28, 2013) ......................................................................... 31

*Gibralt Capital Corp. v. Smith*,
    2001 WL 647837 (Del. Ch. 2001) ........................................................................................ 31

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010) ................................................................. 12

*Green v. Wisneski*,
    2021 WL 4999348 (Del. Ch. Oct. 15, 2021) ...................................... 20

*Grunstein v. Silva*,
    2011 WL 378782 (Del. Ch. Jan. 31, 2011) ........................................ 25

*Hokanson v. Petty*,
    2008 WL 5169633 (Del. Ch. Dec. 10, 2008) ...................................... 28

*Iacono v. Est. of Capano*,
    2020 WL 3495328 (Del. Ch. June 29, 2020) ................................. passim

*In re Atlas Energy Res., LLC*,
    2010 WL 4273122 (Del. Ch. Oct. 28, 2010) .......................... 22, 26, 27

*In re Carlisle Etcetera LLC*,
    2015 WL 1947027 (Del. Ch. Apr. 30, 2015) ............................... 24, 27

*In re Dean Witter P'ship Litig.*,
    1998 WL 442456 (Del. Ch. July 17, 1998) ......................................... 30

*In re Match Grp., Inc. Derivative Litig.*,
    2024 WL 1449815 (Del. Apr. 4, 2024) ............................................... 27

*K&K Screw Products, L.L.C. v. Emerick Capital Investments, Inc.*,
    2011 WL 3505354 (Del. Ch. Aug. 9, 2011) ........................................ 28

*Kaufman v. C.L. McCabe & Sons, Inc.*,
    603 A.2d 831 (Del. 1992) ................................................................... 27

*Keel v. Del. State Univ. Bd. of Trs.*,
    2019 WL 494621 (D. Del. Feb. 8, 2019) ............................................ 30

*Kerns v. Dukes*,
    2004 WL 766529 (Del. Ch. Apr. 2, 2004) .......................................... 30

*Kisor v. McDonough*,
    995 F.3d 1347 (Fed. Cir. 2021) .......................................................... 18

*Lebanon Cnty. Employees' Ret. Fund v. Collis*,
    287 A.3d 1160 (Del. Ch. 2022) .................................................... 27, 30

*Leeds v. First Allied Connecticut Corp.*,
    521 A.2d 1095 (Del. Ch. 1986) .......................................................... 13

iii

*Loppert v. WindsorTech, Inc.*,
    865 A.2d 1282 (Del. Ch. 2004) ........................................................ 20

*Loppert v. WindsorTech, Inc., aff'd*,
    867 A.2d 903 (Del. 2005) .............................................................. 20

*Meyer v. Ins. Co. of Am.*,
    1998 WL 709854 (S.D.N.Y. Oct. 9, 1998) ............................................ 22

*Miller v. HCP & Co.*,
    2018 WL 656378 (Del. Ch. Feb. 1, 2018) ............................... 3, 24, 26, 27

*Moll v. Telesector Res. Grp., Inc.*,
    94 F.4th 218 (2d Cir. 2024) ........................................................... 20

*Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*,
    861 F. Supp. 2d 344 (S.D.N.Y. 2012) ................................................ 19

*Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*,
    182 F.3d 157 (2d Cir. 1999) ........................................................... 12

*Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*,
    875 F.3d 107 (2d Cir. 2017) ..................................................... passim

*Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*,
    2014 WL 4374261 (Del. Ch. Sept. 4, 2014) ......................................... 23

*Transamerican S.S. Corp. v. Murphy*,
    1989 WL 12181 (Del. Ch. Feb. 14, 1989) ........................................... 18

*William Penn P'ship v. Saliba*,
    13 A.3d 749 (Del. 2011) .............................................................. 27

*Williams v. Borough of Highland Park*,
    707 F. App'x 72 (3d Cir. 2017) ...................................................... 30

*Wilson v. Horton's Towing*,
    906 F.3d 773 (9th Cir. 2018) ......................................................... 18

**Statutes**

6 Del. C. § 18-101(9) ...................................................................... 17, 24

6 Del. C. § 18-1101(c) .......................................................................... 24

6 Del. C. § 18–1104 ...................................................................... 24, 27

6 Del. C. § 18-201 .............................................................................. 23

**Other Authorities**

*Symonds & O'Toole on Delaware Limited Liability Companies* § 4.01[B] (2d ed. 2017)........... 24

Wright & Miller, *Federal Practice and Procedure*, § 2730 (4th ed.) ......................................... 12

## PRELIMINARY STATEMENT

Defendant QC Terme US Corp. ("QC Terme US" or "Defendant") is unable to show there are no genuine disputes of material fact on Plaintiffs' contract and fiduciary-duty claims.

In June 2016, the parties formed QC Terme US Holdings LLC by filing a certificate of formation in Delaware. Plaintiffs held 22% of that LLC, while Defendant held the balance. Through August 2017, the parties negotiated the terms of an operating agreement for their LLC. Based on the record evidence, a reasonable jury can conclude that the parties did reach agreement on August 2, 2017, with its terms reflected in an unsigned document dated that same day. This was Plaintiff Stefano Farsura's testimony at deposition. Ex. 10, Farsura Dep. Tr. 80:3–11 ("I remember very well, in 2017, in August, just before the holidays, all the parties had a call in which we all said—and when I say all, I mean me, Francesco Varni [(of QC Terme US)] and the attorneys representing the two parties—we all said we're done.").[1] And it is corroborated by contemporaneous emails sent by Defendant's principal negotiator, Mr. Varni, who wrote to QC Terme's private-equity investors at White Bridge that the deal with Mr. Farsura was "closed," and "although not actually signed by us, we will have to consider [the document] as such since it reflects our understandings with Stefano Farsura." Levy Exs. 35, 36.

White Bridge's response was that Mr. Farsura had "too good of a deal." Ex. 110; *see also* Ex. 10, Farsura Dep. Tr. 219:14–22. So, at its behest, QC Terme US tried to persuade Mr. Farsura "to renegotiate the contract." Levy Ex. 41. When that failed, as Plaintiffs will prove, QC Terme US ultimately caused the LLC to transfer the LLC's interest in the business (worth

---

[1] Reference to "Ex." refers to exhibits submitted by Defendant in connection with its motion. Reference to "Levy Ex." refers to exhibits attached to the Declaration of Vincent Levy, filed herewith. All exhibit page references are to the PDF page number.

many millions of dollars) to *itself* in exchange for a $500,000 promissory note.  This meant that Defendant now owned the business, and Plaintiffs now owned a 22% stake of a shell entity— which Defendant proceeded to dissolve, for good measure.

At trial, Plaintiffs intend to prove that QC Terme US violated the terms of the August 2, 2017 Operating Agreement by squeezing Plaintiffs out.  In the alternative, if a jury were to find that the Operating Agreement is not binding (as Defendant claims), Plaintiffs intend to prove that QC Terme US, the controlling member of QC Terme US Holding LLC, breached its fiduciary duties under Delaware law when it sold the LLC's assets to itself at an unfair price.

Defendant now seeks summary judgment on both claims.  That motion should be denied.  On the breach-of-contract claim, Defendant fails to address any of the evidence noted above, and thus fails to satisfy its burden to "demonstrat[e] that [Plaintiffs'] evidence is insufficient to establish [the] essential element" of contract formation.  *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017).  This means that to prevail, Defendant must "submit[] evidence that negates [this] essential element."  *Id.*  But Defendant has not done that either.  For instance, it points to evidence of further discussions between the parties on terms Defendant claims were essential, but "[w]hen examined under the standard that governs a motion for summary judgment," these "do[] not suggest a lack of agreement on material terms, but rather an effort by [QC Terme US] to amend the agreement that [the parties] reached."  *Iacono v. Est. of Capano*, 2020 WL 3495328, at *12 (Del. Ch. June 29, 2020).  Indeed, that is what the documents show—that Defendant tried "to renegotiate the contract."  Levy Ex. 41.

Defendant fares no better on the fiduciary-duty claim pressed in the alternative.  The parties formed a Delaware LLC in which Mr. Farsura held a 22% interest in June 2016.  Under Delaware law, "assuming for the sake of argument that [the parties] did not agree on all material

2

terms" of their operating agreement (as Defendant alleges), the jury can find that they simply agreed "on the general structure of a joint venture and committed to negotiate in good faith over the terms of an LLC agreement." *Iacono*, 2020 WL 3495328, at *19. That would also mean, in the meantime, that Delaware law filled in any gaps, including imposing default fiduciary duties. Indeed, in Delaware, it is not the operating agreement but "an LLC itself [that] implies default fiduciary duties" and "to eliminate such duties, the members must explicitly waive them." *Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. Feb. 1, 2018). Defendant is left to argue that a reasonable jury *must* find that the parties reached agreement to eliminate fiduciary duties. This is not a showing it can make.

Finally, the fiduciary-duty claim is timely. Plaintiffs allege that Defendant violated their default fiduciary duties by causing the LLC to sell its assets to Defendant at an unfair price in November 2018. Plaintiffs sued within three years of that transaction (the limitations period). The fact that Mr. Farsura previously cautioned Defendant not to treat him unfairly does not mean Plaintiffs did not have three years to challenge the price that Defendant paid in November 2018.

## FACTUAL BACKGROUND

### A.    Mr. Farsura and QC Terme Become Business Partners

Mr. Farsura is an experienced and successful real-estate developer. Ex. 10, Farsura Dep. Tr. 232–39. He developed iconic projects under the "Colonnade Group" brand, including converting a former telecommunications building in TriBeCa into an expansive office and commercial production space. *Id.* at 233–25; http://www.colonnadegrp.com/50-varick-building/.

QC Terme US is wholly owned by Italian entities that run a global spa business under the "QC Terme" brand (we refer herein to the business as a whole as "QC Terme"). 56.1 ¶ 4; Ex. 3 at 11. In 2011, when Mr. Farsura first met its executives, QC Terme had multiple spas in Italy,

3

but none in North America.  56.1 ¶ 9; Ex. 14.  Francesco Varni, QC Terme's then-General Manager and now-CEO and Managing Director of QC Terme s.r.l. (QC Terme US's parent), first expressed an interest in opening a spa in New York in 2010, but Mr. Varni and the owners of QC Terme, Saverio and Andrea Quadrio Curzio (together, the "QC brothers"), did not pursue it before connecting with Mr. Farsura.  56.1 ¶¶ 3, 8; Ex. 8.

In 2011, a mutual friend introduced Mr. Farsura to the QC brothers.  56.1 ¶ 10; Ex. 11, Pozetto Dep. Tr. 20:18–21:7.  At the time, Saverio told Mr. Farsura of his ambition to expand the QC Terme spa business to North America, starting with New York.  Ex. 10, Farsura Dep. Tr. 86:6–8, 13–17.  Mr. Farsura was eager to partner with the QC brothers and to use his experience and contacts in New York.  Ex. 14.  Between September and December 2011, Mr. Farsura investigated multiple locations for a QC Terme spa in New York.  *E.g.*, Levy Exs. 16, 22.

In October 2011, Saverio visited Mr. Farsura in New York.  56.1 ¶ 11; Levy Ex. 13.  The latter organized three days of scouting locations, including a visit to a day spa in Queens.  56.1 ¶ 11; Ex. 10, Farsura Dep. Tr. 84–87.  Mr. Farsura and Saverio then "started discussing about, oh, wow, we should do this together[.]"  56.1 ¶ 12, Ex. 10, Farsura Dep. Tr. 86:6–8, 13–17.  Saverio agreed and said "he needed a partner, because clearly [QC Terme was] an Italian company with an Italian presence . . . so they couldn't do it by themselves."  *Id.* at 86:18–24.

On October 24, 2011, Mr. Farsura emailed Saverio that he would love to "give a hand" in expanding QC Terme's business and, "[i]n relation to the economic structure of a collaboration, you [(Saverio)] had mentioned your desire to possibly leave a stake in the business[,]" which was "very interesting" to Mr. Farsura.  Ex. 14.  Saverio responded that he "would also like to work with [Mr. Farsura] to develop our initiatives in the United States."  *Id.*  Although he had not "thought about the possible collaboration yet," he reiterated his "desire to find partners rather

4

than brokers" and that he "will be sure to talk to [his] brother and Francesco [Varni] as soon as [he] get[s] back to Milan, and to send [Mr. Farsura] a proposal as soon as possible." *Id.*

On November 19, 2011, after Saverio returned to Italy, Mr. Varni emailed Mr. Farsura with the broad strokes of an agreement:

> [W]e have reflected on the essential elements of an agreement and our conclusions are to propose, in a nutshell, to plan, for the initiatives that will be successful, the transfer to you, or to the legal entity you wish to indicate, a minority stake in the capital of the new.Co for which our holding company will give life for the development and operation of the health center in the selected location(s). Currently, . . . we imagine proceeding with the corporate structure . . . which calls for the incorporation, for each center established, of a new company, essentially 'special purpose' and, obviously, limited liability. . . . With respect to the stake, we can tell you in advance that our idea is to set aside a share of up to 20% for you[.] . . . If our general approach seems acceptable to you, we could think about the text of the agreement under these terms.

*Id.*  Mr. Farsura responded this "corresponds precisely to my desires." *Id.*; 56.1 ¶ 17.

In January 2012, Mr. Farsura and the QC brothers met for a dinner, and agreed that Mr. Farsura's stake in the North American business would be 22 percent.  Ex. 10, Farsura Dep. Tr. 258:18–23.  That "was confirmed, again, with more details . . . in 2013." *Id.* 79:20–22.

### B.    The Parties Work On the North American Spa Business

Between 2011 and 2012, Mr. Farsura continued to scout locations for a possible QC Terme spa in New York.  Levy Exs. 10, 13.  He identified, for example, a site in Brooklyn that QC Terme pursued seriously, obtaining architect calculations and a feasibility report.  Levy Exs. 4, 13.  In 2012, Saverio learned of a Request for Proposal ("RFP") issued by the Trust for Governors Island ("the Trust").  56.1 ¶ 27; Levy Ex. 23.  This became the parties' focus.

In pursuing this project, Mr. Varni referred to Mr. Farsura as "our business partner."  Levy Exs. 11; 28 (Mr. Varni referring to Mr. Farsura as "our partner" and "our local partner" in an email to the Trust).  Thus, when the Trust asked a QC Terme entity, Quadratec, what would

be its "plan for local presence and expertise," Quadratec responded by identifying Colonnade Group (the brand name for Mr. Farsura's venture) as its "business partner in the US" and stated that the QC brothers and Mr. Varni would "be directly involved in plan[ning] and coordinat[ing] the different phases, with the cooperation of Stefano Farsura (principal of the local partner firm)." 56.1 ¶ 29; Ex. 19 at 3. Mr. Farsura and QC Terme worked together to submit joint responses to the Trust's questions. Levy Ex. 28. On January 31, 2014, the Trust accepted the RFP and issued a Designation Letter conditionally designating QC Terme, Quadratec, Colonnade Group or any "Qualified Successor Entity" as tenants on a 49-year lease. 56.1 ¶ 30; Ex. 20. The Qualified Successor Entity was required to be a New York entity. 56.1 ¶ 31 Resp.; Ex. 20 at 3.

After the Trust conditionally designated QC Terme and Mr. Farsura as the tenants on the Governor's Island lease, Mr. Farsura continued to devote substantial time to the project. He consulted with a suite of vendors, including a tax advisory firm to secure historical tax credits (which would result in millions of dollars in tax savings), an architect to plan the project, a general contractor to lead the construction, structural engineers, and environmental consultants, among other vendors. 56.1 ¶ 54 Resp., Levy Exs. 5–6, 17–20, 25, 29, 33, 39. He presented the project to the New York State Landmarks Preservation Commission, securing approval, and coordinated diligence with the Trust, all without pay. 56.1 ¶ 54 Resp.; Levy Exs. 7–8, 27.

Mr. Farsura also helped to develop other potential locations. This included travel to Canada with Mr. Varni, as well as assessments of possible QC Terme spa locations in, among other places, Chicago, Atlantic City, and Las Vegas. Levy Exs. 1, 12, 21, 34, 37.

### C.    QC Terme US Holdings LLC: Formation and Operating Agreement

*LLC Formation*. Mr. Farsura and QC Terme created an umbrella entity to hold their interests in the North American spa business of QC Terme. 56.1 ¶ 35; Ex. 22. They did so on

June 20, 2016, when the parties registered in Delaware the LLC that is at the center of this case—QC Terme US Holding LLC.  Levy Ex. 54 at 10.  As tax filings from 2016-19 show, Mr. Farsura's LLC, SF Capital Partners, held a 22% stake in that LLC while Defendant QC Terme US Corp. held the balance.  56.1 ¶ 151 Resp.; Levy Exs. 2 at 11, 3 at 86, 30 at 5, 31 at 5.

As noted, QC Terme US Holding LLC was a holding company that would own all the QC Terme branded spas in North America; each separate spa would be held in a distinct LLC wholly owned by QC Terme US Holding LLC.  Ex. 10, Farsura Dep. Tr. 89:11–15 ("We also discussed about some technicalities like we should have a holding company with some local LLCs so we can somehow separate the risk of every single location from each other."); *see also* Ex. 14.  Consistent with that design, the parties formed QC Terme NY LLC, also on June 20, 2016; this entity would hold the New York spa and sign the Governors Island lease.  56.1 ¶¶ 63, 65 Resp., 66; Levy Ex. 55 at 11.  Until the Wrongful Asset Transfer in November 2018 (*see infra*), QC Terme US Holding LLC owned 100% of QC Terme NY LLC.  56.1 ¶ 63, Ex. 37.

***Operating Agreement.***  While the parties were working on the Governor's Island spa project, they began working on a written document that would memorialize and elaborate upon the terms of the joint-venture deal reached verbally and in writing in 2011-13 (pursuant to which Mr. Farsura had 22% in the North American business).  56.1 ¶¶ 54 Resp., 55, Ex. 29.  Given that their interests would be held in an LLC, they exchanged drafts of an operating agreement for the LLC starting in 2014.  *E.g.*, 56.1 ¶ 52, Exs. 29–30, 33–35, 41–42, 44–45, 48.

In mid-late 2016, the parent company of QC Terme s.r.l. (then, MAP s.r.l.) began discussing a potential investment by private-equity firm White Bridge Investments S.p.A. ("White Bridge").  56.1 ¶ 81; Ex. 50.  Mr. Farsura learned of White Bridge's interest in acquiring a stake in MAP s.r.l. in late 2016, and, as he understood it, White Bridge would proceed as a

silent partner—investing capital in exchange for a return.  56.1 ¶ 82; Ex. 50.  In January 2017, White Bridge signed a Letter of Intent.  56.1 ¶ 84; Ex. 2, Varni Aff. ¶ 14.

Shortly thereafter, on February 8, 2017, Mr. Varni forwarded the September 2016 draft of the Operating Agreement to Mr. Farsura, stating that the parties were "all in agreement" on the terms in that draft.  56.1 ¶ 87 Resp.; Ex. 53 at 2.  In a later email to his lawyer, Mr. Farsura agreed with Mr. Varni that the parties agreed on all the terms of the Operating Agreement and could treat it as final.  56.1 ¶ 88; Ex. 54.  Based on all these statements, Mr. Farsura understood that "in 2017, early 2017, the agreement was final."  Ex. 10, S. Farsura Dep. Tr. at 93:7–8.

Further, on August 2, 2017, Mr. Farsura's attorney sent an email to Messrs. Farsura, Varni, and QC Terme's lawyer with the subject "final draft of operating agreement."  56.1 ¶ 102, Ex. 64 at 2.  That email enclosed the latest draft agreement—which, in material respects, was the same as the prior draft circulated in April 2016.  At the time, "the parties had a call in which," as Mr. Farsura testified, "we all said we're done."  Ex. 10, Farsura Dep. Tr. 80:7–11.  This is consistent with contemporaneous chat messages between Messrs. Farsura and Varni about scheduling a call "to finalize the wording once and for all."  56.1 ¶ 101 Resp.; Levy Ex. 40.

Contemporaneous communications between Defendant and White Bridge further confirm that the parties reached agreement no later than August 2, 2017, and that the draft circulated that day reflected the terms of a binding agreement.  For example, the very next day, on August 3, 2017, Mr. Varni wrote to Stefano Devescovi—a Managing Director at White Bridge—that:

> [W]e are going to sign the OAs [(Operating Agreement)] for QC Terme Holding LLC with Stefano Farsura.  The text was set out some time ago together with [QC Terme's lawyer] and has undergone fine tuning in recent days.  As it is still a draft, I was not sure that it was in the DD [(due diligence)] Cloud, so I believed it appropriate to send it to you . . . .[2]

---

[2] This translation is apparently disputed as between the parties.  *See* Ex. 6, Varni Dep. Tr. 132:22–133:2.

56.1 ¶ 107 Resp.; Levy Ex. 70 at 3.  Mr. Devescovi responded "It's hard to read with the proper

attention right now. Can we wait to sign it until the end of August so that I can give this a proper

reading?"  Levy Ex. 36 at 4.

> In reply, Mr. Varni said Mr. Devescovi could take his time to review:

> The text was agreed upon over time, and although not actually signed by us, we will have to consider it as such since it reflects our understandings with Stefano Farsura.[3]

*Id.*; 56.1 ¶ 108 Resp.  In other words, Mr. Varni was explaining that the deal was done.

> White Bridge emails reflect that Mr. Varni relayed the same thing verbally.  Thus, one of

Mr. Devescovi's colleagues, Giulia Bigi (an investment manager) reported to her colleagues that

Mr. Varni considered the deal "closed":

> I spoke with [Mr.] Varni.  They consider the text closed and are waiting for a copy signed and scanned by [Mr.] Farsura[.] . . . [Mr.] Varni said . . . if we want to make changes we will talk about it later with [Mr.] Farsura too, because by now this contract has been 'closed' and therefore it will be signed as it is.

56.1 ¶ 108 Resp.; Levy Ex. 35 at 7.  As the contemporaneous documents and Mr. Farsura's

testimony show, the parties understood the Operating Agreement to be binding as of August 2,

2017, and that the terms of their agreement were set forth in the August 2, 2017 version.

> **D.    QC Terme US Attempts to Change the Operating Agreement**

> White Bridge's reaction, as reflected in documents, was to push back on QC Terme for

"finaliz[ing] [the Operating Agreement] . . . without our knowledge."  *Id.* at 6.  White Bridge

was to become a significant investor, and, as reflected in an August 31, 2017 email to QC Terme,

its view was that they should "renegotiate the contract with Stefano Farsura." 56.1 ¶ 109 Resp.;

Levy Ex. 41 at 6.

---

[3] This translation has never been disputed and thus is deemed accurate.  Dkt. 90, ¶ 25.

To that end, Defendant attempted to persuade Mr. Farsura to change the terms they had agreed upon. For example, Mr. Varni sent Mr. Farsura a copy of the Operating Agreement "amended in clause 8" to reflect a proposed modification to the put/call options. 56.1 ¶ 117; Ex. 69 at 3. Mr. Varni similarly attempted to reopen negotiation on the "drag/tag" provisions, as to which the parties had reached agreement. 56.1 ¶ 119, 126; Ex. 65. Mr. Farsura refused. *See generally* Ex. 93.

On October 25, 2017, after Mr. Farsura presented to the QC Terme board on a potential location for the next QC Terme spa in North America, Mr. Farsura, the QC brothers, Mr. Varni, and White Bridge personnel departed for a dinner. 56.1 ¶ 129; Ex. 10, Farsura Dep. 219:14–22. At dinner, a White Bridge representative told Mr. Farsura he had "too good of a deal" and they "wanted to change it completely." Ex. 100 at 4; Ex. 10, Farsura Dep. Tr. 219:14–22.

Following the dinner, QC Terme and White Bridge continued to attempt to change the terms of the Operating Agreement, and ultimately tried to persuade Mr. Farsura to agree to divest his interest, efforts that Mr. Farsura rejected. 56.1 ¶¶ 129 & Resp., 130; Ex. 79. In February 2018, Mr. Farsura sent a letter to the QC brothers stating the parties "agreed [on] an Operating Agreement effective August 2, 2017" and "we all operated based on a binding and valid contract being in place," and expressing his concern about Defendant's subsequent efforts to "ignore our agreement." 56.1 ¶ 151; Ex. 100 at 3. In March 2018, the QC brothers responded that they "reject [Mr. Farsura's] allegation that there is an agreed-upon operating agreement or other binding agreement to govern the parties' relationship or Holdings." 56.1 ¶ 153; Ex. 101 at 2.

### E.    QC Terme US Freezes Plaintiffs Out

Eventually, Defendant secretly deprived Mr. Farsura of the value of his interests. As noted, QC Terme US Holding LLC held a 100% stake in QC Terme NY LLC (which held the

New York spa).  On May 6, 2019, QC Terme's lawyers informed Mr. Farsura, for the first time, that QC Terme US Holding LLC transferred its own interests in QC Terme NY LLC in November 2018 to "another legal entity"—later revealed to be Defendant—in exchange for a $500,000 note.  56.1 ¶ 156 Resp.; Levy Ex. 26 at 2.  As a result of this secretive and self-dealing sale (the "Wrongful Asset Transfer"), Mr. Farsura's interest went from a 22% stake in QC Terme's North American business to a 22% interest in that note.  *Id.*  The $500,000 price was predicated on a valuation commissioned by Defendant in April 2018 and issued in November 2018—a valuation Plaintiffs will contest at trial as inadequate.  56.1 ¶ 155 Resp.; Levy Ex. 46.

After this November 2018 transaction, Defendant underwent what it termed a "corporate reorganization" (Levy Ex. 73 at 3) of US operations, which is a euphemism.  Defendant unilaterally adopted a new, three-page "operating agreement" for QC Terme US Holding LLC, *id.* at 25–27, which excised Plaintiffs' membership in the LLC.  Then, pursuant to that new agreement, Defendant dissolved QC Terme US Holding LLC, Levy Ex. 74, and transferred Plaintiffs' $110,000 (*i.e.*, 22%) interest in the promissory note to Defendant, *id.* at 45.  The squeeze out was now complete.

## **LEGAL STANDARD**

The Second Circuit has "long recognized that summary judgment is a 'drastic device, since its prophylactic function, when exercised, cuts off a party's right to present his case to the jury.' Accordingly, the moving party bears a heavy burden of demonstrating the absence of any material issues of fact."  *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, Inc.*, 182 F.3d 157, 160 (2d Cir. 1999).  In that light, "summary judgment frequently is denied in contract actions requiring an inquiry into the intentions of the contracting parties."  Wright & Miller, *Federal Practice and Procedure*, § 2730 (4th ed.); *see also id.* § 2730.1 n. 19 (collecting cases).

11

As the party moving for summary judgment, Defendant must "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party[.]' . . . In assessing the record to determine whether there is a genuine issue to be tried, [the Court is] required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought."  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (citation omitted).

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,]'" Defendant, as the moving party, "'may satisfy [its] burden of production under Rule 56 in either of two ways: (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'"  *Nick's Garage, Inc.*, 875 F.3d at 114 (citation omitted).  "[I]f the defendant's papers fail[] to show the insufficiency of plaintiffs' evidence and entitlement to judgment, the plaintiff is entitled to the dismissal of the motion without having to make any evidentiary showing."  *Id.* at 118.

## ARGUMENT

### I.    A JURY COULD FIND THAT THE OPERATING AGREEMENT WAS BINDING

#### A.    Defendant Does Not Establish the Insufficiency of Plaintiffs' Evidence

Defendant seeks summary judgment on the contract claim solely on the basis that, according to it, the August 2, 2017 Operating Agreement does not reflect the terms of a binding agreement.  Under Delaware law, an agreement is binding where "a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in [the relevant factual] setting, that the agreement reached constituted agreement on all of the terms that the

parties themselves regarded as essential and thus that that agreement concluded the negotiations and formed a contract." *Leeds v. First Allied Connecticut Corp.*, 521 A.2d 1095, 1097 (Del. Ch. 1986). As this Court previously held, "[w]ether the parties intended to be bound [by the August 2, 2017 Operating Agreement] is a question of fact." Dkt. 163 at 14.

On this motion, Defendant does not even try to discharge its burden by "demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim." *Nick's Garage*, 875 F.3d at 114. When Defendant previewed its motion for summary judgment, Plaintiffs pointed out that Mr. Farsura had testified that "all the parties had a call in which we all said—and when I say all, I mean me, Francesco Varni and the attorneys representing the two parties—we all said we're done." Dkt. 294 at 2; *see also* Ex. 10, Farsura Dep. Tr. 80:3–11. This testimony, corroborated by contemporaneous texts, Levy Ex. 40, suffices to create a fact dispute on contract formation, as it establishes "overt manifestation[s] of assent"—"the parties communicated to each other up until the time that the contract was [finalized]." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1229–30 (Del. 2018).

There is more. Plaintiffs' letter also pointed to multiple contemporaneous emails. Those emails show, consistent with Mr. Farsura's testimony, that Mr. Varni told White Bridge that the deal with Mr. Farsura, reflected in the August 2, 2017 agreement, was "closed"—and that, "although not actually signed by us, we will have to consider [the August 2, 2017 agreement] as such since it reflects our understandings with Stefano Farsura." Dkt. 294 at 2; *see also* Levy Exs. 35–36. These communications came on the heels of a multi-year process whereby Mr. Farsura and Mr. Varni were negotiating and memorializing the material terms of their deal (starting with an email exchange "reflect[ing] on the essential elements of an agreement," Ex. 14, and subsequent verbal agreements that Mr. Farsura's stake would be 22%, Ex. 10, Farsura Dep.

13

Tr. 79:20–22; 258:18–23).  In August 2017, White Bridge understood all of this perfectly well, writing that it was not "courteous" of Mr. Varni to close the deal with Mr. Farsura.  Levy Ex. 35.

Defendant's motion nowhere grapples with this evidence.  The testimony and emails, though front and center in Plaintiffs' response to Defendant's pre-motion letter (Dkt. 294), go unmentioned in Defendant's motion.  Indeed, although Defendant's counsel indicated during depositions that they disputed the translation of one of the emails on which Plaintiffs rely (*e.g.*, Ex. 6, Varni Dep. Tr. 132:22–133:2), this dispute again goes unmentioned—and could only show a fact dispute.  *Buxbaum v. Deutsche Bank AG*, 196 F. Supp. 2d 367, 373 (S.D.N.Y. 2002) ("[A]rgument[s] as to the correct translation . . . raise[] an issue of material fact[.]").

Plainly, Defendant made a tactical decision not to address key evidence on which Plaintiffs intend to rely at trial to prove the formation of a contract on August 2, 2017, and they cannot claim not to have known about it; indeed, that is the purpose of the pre-motion letters. Having not addressed the evidence in Plaintiffs' letter, Defendant waived the opportunity to show that Plaintiffs' evidence "is insufficient to establish an essential element of [their] claim." *Nick's Garage*, 875 F.3d at 114.  In that light, the Court simply deny the motion for failure to satisfy Defendant's burden.  Indeed, as explained below, the evidence that Defendant does adduce could not "negate[] an essential element of the non-moving party's claim," which is the only other route open to Defendant to obtain summary judgment.  *Id.*

### B.    Evidence Of Discussions About the "Put/Call" and "Drag/Tag" Provisions Does Not Negate the Existence of an Agreement

In support of its motion, Defendant first argues that the lack of an agreement can be seen from the fact that, even after August 2, 2017, the parties continued to discuss two supposedly "essential" provisions (the so-called "put/call" and "drag/tag" provisions).  This argument fails.

14

To begin, the evidence that Defendant points to is logically insufficient to "negate" the essential element of contract formation. *Id*. To see why that is so, the Court should consider the counterfactual world where the parties *had* signed the August 2, 2017 document. Plainly, in that world, evidence of discussions after August 2, 2017 about these two provisions would be inadequate to demonstrate Defendant's entitlement to summary judgment on contract formation. The evidence would not "negate" the fact that the parties reached agreement, but would rather tend to show there was effort to reopen discussions. It follows that if the jury accepts Mr. Farsura's testimony (corroborated by Defendant's own emails and documents) that the parties did reach agreement on August 2, 2017, then the post-August 2, 2017 discussions also cannot negate the element of contract formation. Analytically, there is no difference.

Second, to accept Defendant's argument, the Court would have to conclude that there is no genuine dispute as to whether the parties agreed that *no part* of the Operating Agreement would be binding *unless* there was agreement *on these two terms*. But Defendant offers no evidence to suggest that the put/call and drag/tag provisions were deemed "essential." The most it can point to is a 2014 email from Mr. Farsura's lawyer, Christian Moretti, to Messrs. Farsura and Varni stating that, "in case the parties are unable to reach an agreement on fundamental decisions, either of the two partners may initiate a 'buy-sell' process to propose the purchase of the other's shares. Alternatively, we could provide put/call options[.]" 56.1 ¶ 50; Ex. 29 at 3. With respect to the drag/tag provisions, which concern majority and minority rights in a sale, Defendant relies on a 2016 email in which Mr. Farsura listed "Drag along" as one of "[t]he big items still on the table." 56.1 ¶ 71; Ex. 43 at 2. Neither of these emails shows a jury *must* conclude that the parties considered these terms essential, or agreed there would be no binding

contract without agreement on these two points.  And although Defendant did not ask him at deposition, Mr. Farsura declares he never had any such communications.  Farsura Decl. ¶ 5.

Third, even if Defendant had meet its burden of showing no genuine factual dispute as to whether these two provisions were considered "essential," a jury could still conclude that they, like all other terms in the Operating Agreement, *were* finalized on August 2, 2017.  Defendant does not dispute that the August 2, 2017 Operating Agreement did contain put/call and drag/tag provisions that the parties, in Defendant's words, "tinker[ed] over . . . for months" and "haggled extensively over[.]"  Dkt. 298 at 14–15.  Instead, it contends those provisions were not finalized because the parties thereafter "continued negotiations."  *Id.* at 16.

But evidence of further discussions cannot possibly satisfy Defendant's burden.  "When examined under the standard that governs a motion for summary judgment," the purported further "negotiations" of these two provisions after August 2, 2017 "do[] not suggest a lack of agreement on material terms, but rather an effort by [Defendant] to amend the agreement that [the parties] reached."  *Iacono*, 2020 WL 3495328, at *12; *id.* at *8 (Delaware's summary judgment rule, Court of Chancery Rule 56, substantially identical to Federal Rule of Civil Procedure 56).  That is particularly the case here, given the evidence that White Bridge was told by Mr. Varni that the deal with Mr. Farsura was "closed," but was unhappy and wished to have Defendant reopen discussion on the two provisions that now feature in Defendant's summary-judgment motion.  Levy Ex. 41.  Plaintiffs are entitled to every permissible inference, but not much of an inference is needed:  Mr. Pinciroli wrote to QC Terme on August 31, 2017 that they should "*renegotiate the contract* with Stefano Farsura."  *Id.* at 6 (emphasis added).

### C.    The Absence of a Signature Does Not Negate Contract Formation

The second basis cited by Defendant for summary judgment on contract formation is that the Operating Agreement was unsigned.  This Court has "reject[ed] [Defendant's] argument that Plaintiffs have failed to plead the existence of a contract because the Operating Agreement was never executed.  Under Delaware law, '[a] member . . . of a[n LLC] . . . is bound by the [LLC] agreement whether or not the member . . . executes the [LLC] agreement.'"  Dkt. 163 at 13–14 (quoting 6 DEL. C. § 18-101(9)).  "'The fact that the parties intend[ed] to execute a formal agreement . . . is not dispositive.  The question is whether the parties positively agree[d] that there will be no binding contract until the formal document is executed.'"  *Id.* at 14 (quoting *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998)).

"[D]etermining the intent of the parties on this issue is 'generally a question of fact.'"  *Bryant v. Way*, 2011 WL 2163606, at *4 (Del. Super. Ct. May 25, 2011).  Given the posture, Defendant bears the burden to show that a reasonable jury *must* find that "the parties positively agree[d] that there will be no binding contract until the formal document is executed."  *Anchor Motor Freight*, 716 A.2d at 156.  Only that showing could "negate" the element of contract formation and entitle Defendant to judgment as a matter of law.  *Nick's Garage*, 875 F.3d at 114.

Defendant does not meet its burden to show the absence of a genuine issue of fact on this point.  Indeed, Defendant points to no document where any party so much as said "that [it] will not be bound until an event—such as the signing of a memorandum that might not otherwise be required—occurs."  *Transamerican S.S. Corp. v. Murphy*, 1989 WL 12181, at *1 (Del. Ch. Feb. 14, 1989).  Mr. Farsura declares there were no such communications, Farsura Decl. ¶ 6, and this is the evidence Defendant would need to produce to try to negate contract formation.

Defendant cites numerous emails suggesting that the parties would eventually sign the OA, but it does not follow, let alone as a matter of law, that they did not consider themselves bound without signing. Put differently, each example shows the parties considered execution *sufficient* for the OA to be binding, not that it was *necessary*. "By mixing necessary and sufficient conditions, [Defendant] commits a classic fallacy." *Kisor v. McDonough*, 995 F.3d 1347, 1371 n. 5 (Fed. Cir. 2021); *see also Wilson v. Horton's Towing*, 906 F.3d 773, 782 n. 11 (9th Cir. 2018) (noting "logical fallacy of mistaking a sufficient factor for a necessary one").

Consider by way of example Mr. Sicklick's email containing the August 2, 2017 Operating Agreement that directed the parties to "print the signature pages" and "execute." Ex. 64 at 2. He wrote that "[w]hen both parties have executed and exchanged signature pages, we can consider the agreement *signed*." *Id.* (emphasis added). It does not follow that the parties did not consider themselves *bound* before execution. The email can reasonably be read to refer only to the process of collecting signatures. Meanwhile, Mr. Farsura's testimony and Mr. Varni's contemporaneous emails show that the parties were *bound*—that "although [the document was] not actually signed by us, we will have to consider it as such[.]" Levy Ex. 36 at 4.

Nor is there any merit to Defendant's argument that the Operating Agreement "itself demonstrates the parties' understanding and agreement that signatures were required for it to become a binding cont[r]act." Dkt. 298 at 20–22. The Operating Agreement never says this. The requirement in what Defendant calls a "merger clause" "that any amendments or modifications to the [Operating Agreement] could be effective and binding only if set forth 'in a document duly executed by each Member[,]'" *id.* at 21 (emphasis omitted), is inapposite because it addresses "amendments or modifications" to the Operating Agreement, not the binding effect of the Operating Agreement itself. Neither of Defendant's two cases is on point, as both apply

18

New York law on "express reservation," rather than Delaware's "positive agreement" standard, although even under New York law this is just *one factor*. *See Ciaramella v. Reader's Dig. Ass'n, Inc.*, 131 F.3d 320, 324 (2d Cir. 1997) and *Nat'l Gear & Piston, Inc. v. Cummins Power Sys., LLC*, 861 F. Supp. 2d 344, 357 (S.D.N.Y. 2012). In any event, that clause would not negate the fact disputes generated by Mr. Farsura's testimony and Mr. Varni's emails. *E.g.*, *Aveta Inc. v. Bengoa*, 986 A.2d 1166, 1187 (Del. Ch. 2009) (to determine positive agreement, "this Court looks to the plain language of the purported agreement, but may also consider other evidence").

Lastly, Mr. Farsura's testimony that "he expected to 'finish the process with a signature'" and "'we all wanted to sign'" and "'it was about time to sign this agreement,'" Dkt. 298 at 22 (emphasis omitted), may reflect a *desire* to execute the Operating Agreement, but it does not demonstrate that the parties considered execution to be *necessary*. Moreover, again, the testimony must be considered alongside his further testimony that the parties agreed by phone that they were bound. Similarly, Mr. Varni's after-the-fact testimony regarding his subjective belief that "I didn't want to mean[] that it was final, because we didn't get the signature," Ex. 6, Varni Dep. Tr. 145:14–15, must be evaluated by the jury against the contemporaneous and inconsistent statements he made to White Bridge, as well as Mr. Farsura's testimony. It is ultimately for the jury to weigh potentially inconsistent testimony. *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 227 (2d Cir. 2024) ("[T]he court [on a summary judgment motion] 'may not make credibility determinations or weigh the evidence[.]'") (collecting cases).

There accordingly is no evidence suggesting that "the parties 'positively' agreed to be bound only by a formal[, executed] document." *Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1287 (Del. Ch. 2004), *aff'd*, 867 A.2d 903 (Del. 2005). Still less is there evidence showing that a jury *must* find in Defendant's favor on this point. *Id.* n. 33 ("'Positive' is defined as . . . 'Express

or affirmative[,] [d]irect, absolute, explicit'" and "[t]he fact that *Universal Products Co.*, 179 A. at 394, and *Anchor Motor Freight*, 716 A.2d at 156, use the term 'positive' is not lost on the Court."). On the other side of the ledger, substantial evidence shows the parties were bound, including testimony and Mr. Varni's emails. That leaves a genuine fact dispute.

### D.    The Parties' Subsequent Conduct Does Not Negate Contract Formation

Finally, Defendant again points to the parties' "subsequent conduct" after August 2, 2017. This is one factor the jury may consider in determining whether there was a contract. *See Green v. Wisneski*, 2021 WL 4999348, at *2 (Del. Ch. Oct. 15, 2021), *report and recommendation adopted*, (Del. Ch. 2022) ("In determining whether there was a meeting of the minds and mutual asse[n]t, 'this Court looks to the plain language of the purported agreement, but may also consider other evidence, such as the parties' subsequent conduct, to determine whether or not the parties intended to be bound.'") (citation omitted). But again, the post-contract conduct here does not "negate" contract formation. *Nick's Garage*, 875 F.3d at 114.

Take Defendant's citation of Mr. Farsura's statements that he is "meeting with QC [T]erme this week to finalize the agreement" (October 17, 2017 email) and his "deal with QC Terme is still evolving" (December 12, 2017 email). 56.1 ¶¶ 112, 144; Exs. 66 at 2; 94 at 2. Both statements, as well as the alleged failure of the parties to comply with some (non-material) provisions in the Operating Agreement, were made in the context of White Bridge telling QC Terme to "renegotiate the contract with [Mr.] Farsura." Levy Ex. 41 at 6; *see also* Ex. 100 at 4 (White Bridge representative said Mr. Farsura received "too good of a deal"). As with the continued discussions over put/call, a jury could find, per the documents, that Defendant reneged and was trying to "renegotiate the contract with Stefano Farsura," Levy Ex. 41 at 6, with Mr.

Farsura merely reacting to "an effort by [Defendant] to amend the agreement that [the parties] reached." *Iacono*, 2020 WL 3495328, at *12.  It does not show there was no binding agreement.

## II.    A JURY COULD ALSO FIND, ALTERNATIVELY, THAT DEFENDANT BREACHED ITS FIDUCIARY DUTIES UNDER THE DELAWARE LLC ACT

### A.    Absent the OA, Defendant Owed Plaintiffs Fiduciary Duties Implied by Law

As this Court previously held, Plaintiffs "have sufficiently alleged, in the event that the Operating Agreement is not binding, the existence of a fiduciary duty under the [Delaware] LLC Act and breach of that duty by Defendant."  Dkt. 220 at 5.

On this motion, Defendant does not dispute the facts essential to that ruling.  *First*, Defendant admits that "[o]n June 20, 2016 . . . [the parties] agreed to form . . . a holding company, US Holding [LLC], that would own 100% of QC Terme NY."  56.1 ¶ 63; Ex. 37. *Second*, Defendant cannot dispute that a jury could find this entity would hold the new North American locations of the business for the joint venture of which Mr. Farsura was a part.  Ex. 14 (November 19, 2011 email from Mr. Varni discussing "essential elements of an agreement" whereby Mr. Farsura would have "a minority stake in the capital of the new.Co for which our holding company will give life for the development and operation of the health center in the selected location(s)," which would "call[] for the incorporation . . . of a new company, essentially 'special purpose' and obviously, limited liability").  *Finally*, it cannot be disputed that Plaintiffs had a 22% stake in that entity, with Defendant holding the balance; this ownership structure is reflected in multiple tax filings submitted to the U.S. authorities, including a 2016 Schedule K-1 and 2017-2019 tax returns.  Levy Exs. 2 at 11, 3 at 86, 30 at 5, 31 at 5; *see also Meyer v. Ins. Co. of Am.*, 1998 WL 709854, at *10 (S.D.N.Y. Oct. 9, 1998) (tax estoppel binds party to facts included in tax forms).

In that light, it is plain as a fundamental baseline that if the jury were to conclude that the Operating Agreement was not binding (as Defendant argues), then Defendant, as controlling member of the LLC, owed fiduciary duties to Plaintiffs as minority holders.  Indeed, "Delaware's case law clearly teaches that, 'in the absence of provisions in the LLC agreement explicitly disclaiming the applicability of default principles of fiduciary duty, controlling members . . . owe minority members the traditional fiduciary duties that controlling shareholders owe minority shareholders.'"  *In re Atlas Energy Res., LLC*, 2010 WL 4273122, at *7 (Del. Ch. Oct. 28, 2010) (citation omitted); *see also CelestialRX Investments, LLC v. Krivulka*, 2017 WL 416990, at *16 (Del. Ch. Jan. 31, 2017) ("[O]ur Courts have implied fiduciary duties to managers of an LLC, unless contractually waived.  This approach has been embodied in the LLC Act itself" (citing 6 *Del. C*. § 18–1104)).  That instruction controls.

### B.    Defendant Cannot Negate the Existence of Fiduciary Duties

On the fiduciary-duty claim, Defendant does not argue that it abided by its duties but rather that the parties waived fiduciary duties.  The Court should reject this argument.

As discussed, Defendant owed Plaintiffs fiduciary duties by default under Delaware law given that Defendant controlled the LLC and Plaintiffs had a 22% stake.  To prevail on its motion, Defendant must show that the parties agreed to displace default fiduciary duties, and that there is no genuine fact dispute as to that agreement.  Thus, Defendant must show not that a jury *could* find there was such an agreement, but that a reasonable jury *must* find as much.  Because the mere creation of the LLC created fiduciary duties by operation of law, it is not Plaintiffs' burden—but *Defendant's*—to identify an agreement displacing fiduciary duties in the event the jury were to find that the August 2, 2017 Operating Agreement was not binding.  The waiver must be "in the limited liability company agreement."  18 Del. C. § 18-1101(c).  And it must be

both "plain and unambiguous." *Ross Holding & Mgmt. Co. v. Advance Realty Grp., LLC*, 2014 WL 4374261, at *13 (Del. Ch. Sept. 4, 2014) ("Drafters of a limited liability company agreement 'must make their intent to eliminate fiduciary duties plain and unambiguous.'"); *Miller v. Am. Real Est. Partners, L.P.*, 2001 WL 1045643, at *8 (Del. Ch. Sept. 6, 2001) ("A topic as important as [fiduciary duty waivers] should not be addressed coyly.").

This is a burden Defendant cannot meet. To begin, its argument-by-questioning, Dkt. 298 at 25 ("'what agreement?'" and "that merely begs the next question: What were the terms of this supposed LLC agreement?"), regarding the parties' LLC agreement misstates Delaware law. In Delaware, an LLC is created not by drafting an operating agreement but by filing a certificate with the Secretary of State. 6 Del. C. § 18-201. "'The formation and governance of an LLC can be as simple or complex as the circumstances require.'" *Iacono*, 2020 WL 3495328, at *11 (quoting Robert Symonds, Jr. and Matthew J. O'Toole, *Symonds & O'Toole on Delaware Limited Liability Companies* § 4.01[B] (2d ed. 2017)). And the statute permits LLCs to have operating agreements that are "oral or implied," 6 Del. C. § 18-101(9). "If an oral or implied agreement does not cover every aspect of the parties' relationship, then the parties can rely on the LLC Act to supply default rules to govern their affairs." *Iacono*, 2020 WL 3495328, at *11. This includes fiduciary duties. *Feeley v. NHAOCG, LLC*, 62 A.3d 649, 663 (Del. Ch. 2012).

Indeed, "the General Assembly in 2013 adopted an amendment to the LLC Act inconsistent with the purely contractarian view" now endorsed by Defendant, which primarily relies on pre-2013 cases. *See In re Carlisle Etcetera LLC*, 2015 WL 1947027, at *11 (Del. Ch. Apr. 30, 2015). And, in modifying the Delaware LLC Act in 2013, the Delaware legislature made clear that it is not the operating agreement that creates fiduciary duties; instead, "under [Delaware] law *an LLC itself implies default fiduciary duties*; to eliminate such duties, the

23

members must explicitly waive them." *Miller v. HCP & Co.*, 2018 WL 656378, at *2 (Del. Ch. Feb. 1, 2018) (emphasis added); *see* 6 Del. C. §§ 18-1101(c); 18-1104.

Moreover, although Defendant says an LLC must have an LLC agreement, this is no tall order. As the Chancery Court has explained:

> By authorizing oral LLC agreements, and by further authorizing 'any agreement . . . as to the affairs of a limited liability company and the conduct of its business' to be deemed an LLC agreement, the LLC Act creates myriad opportunities for LLC agreements that range from the minimalistic to the ill-formed to the simply incomplete. In authorizing this level of informality, the LLC Act resembles its partnership forebears, where agreements likewise can be formed orally or by implication and where fiduciary duties are an important part of the entity landscape. . . . For the LLC Act to take the same approach suggests that the General Assembly assumed that a similar backdrop of default fiduciary duties would be available to fill the potentially considerable gaps in the parties' agreement.

*Feeley*, 62 A.3d at 663 (citations omitted). In that light, "if 'a definitive oral agreement was reached initially,'" and if "'later documents were never adopted,'" then "'the initial agreement controls,'" along with background norms and duties to fill any gaps. *Iacono*, 2020 WL 3495328, at *11 (quoting *Grunstein v. Silva*, 2011 WL 378782, at *10 (Del. Ch. Jan. 31, 2011)).

Defendant argues the August 2, 2017 Operating Agreement is not binding. If the jury (or the Court) were to accept that, then it does not follow that the parties had a rigorous operating agreement for their LLC—let alone one displacing fiduciary duties. And, of course, any such contention by Defendant must be considered in context of the rule that "if the parties have not unambiguously disavowed common law fiduciary duties, [the Court] must look to corporate law principles by analogy when determining whether and to what extent fiduciary duties are owed." *77 Charters, Inc. v. Gould*, 2020 WL 2520272, at *10 (Del. Ch. May 18, 2020).

"[A]ssuming for the sake of argument that [the parties] did not agree on all material terms" of the operating agreement, as Defendant argues, it is permissible for the parties to have

24

agreed "on the general structure of a joint venture and committed to negotiate in good faith over the terms of an LLC agreement." *Iacono*, 2020 WL 3495328, at *19. Indeed, "[a]n agreement to negotiate in good faith is itself an enforceable agreement." *Id.* It is thus open for the jury to find that the LLC formed in June 2016 reflected an agreement solidifying the essential terms of a partnership for a spa business in North America, to be governed by background norms while the parties negotiated their operating agreement. To repeat, "[i]f an oral or implied agreement does not cover every aspect of the parties' relationship, then the parties can rely on the LLC Act to supply default rules to govern their affairs." *Iacono*, 2020 WL 3495328, at *11.

As a result, there is no basis for Defendant's bizarre argument that "[Mr.] Farsura points to the August 2, 2017 [] Operating Agreement" as the source "for the terms" of his 22% interest in US Holding LLC on his fiduciary-duty claim. Dkt. 298 at 26. Defendant's argument ignores that the parties agreed to and did form the LLC, with Mr. Farsura holding a 22% interest in the LLC, in June 2016—*more than a year before* August 2, 2017. To repeat, "under [Delaware] law an LLC itself implies default fiduciary duties[.]" *Miller*, 2018 WL 656378, at *2. Fiduciary duties were imposed by law because the parties did form a Delaware LLC, with Mr. Farsura being a minority member and Defendant a controlling member. No more of a showing will be required at trial. *Id.*; *Atlas Energy Res., LLC*, 2010 WL 4273122, at *7; *Feeley*, 62 A.3d at 663.

Defendant's argument that there must have been more than that to the parties' implied or oral LLC agreement, including a fiduciary-duty waiver, is not just irrelevant and contradicted by settled Delaware law, but also fails as an evidentiary matter on summary judgment. No deponent testified that the parties reached a stand-alone agreement to abridge Defendant's fiduciary duties, without at the same time regulating Defendant's ability to enter into transactions with the LLC. Nor can Defendant prevail by pointing to the fact that drafts of the written operating agreement

25

included a fiduciary-waiver provision, when it claims no written operating agreement was ever finalized for several reasons, including the lack of a signature (Dkt. 298 at 17–23), and those same drafts included contractual limitations stating that Defendant could not enter into transactions with the LLC unless they were on fair terms. *E.g.*, Ex. 35 at 32 (fiduciary waiver), 20–21 (limits on permissible transactions). There is in short no evidence to substantiate Defendant's argument that the parties lacked a binding written operating agreement but nonetheless did have an operating agreement that "unambiguously disavow[ing] common law fiduciary duties." *77 Charters, Inc.*, 2020 WL 2520272 at *10.

In sum, Defendant does not come close to satisfying its burden of demonstrating there were no fiduciary duties. The mere establishment of the LLC imposes fiduciary duties. *Miller*, 2018 WL 656378, at *2; *In re Carlisle Etcetera LLC*, 2015 WL 1947027, at *11; 6 Del. C. § 18-1104. Defendant cannot negate the existence of fiduciary duties on the basis of its waiver argument, because it cannot show the absence of a genuine dispute of material fact as to whether Plaintiffs and QC Terme US agreed to waive fiduciary duties.

### C.    Plaintiffs' Claim for Breach of Fiduciary Duties is Timely

Defendant's final argument, that Plaintiffs' fiduciary-duty claim is time-barred, rests on a misstatement of Plaintiffs' claim and of the applicable law. Plaintiffs' claim is timely because they brought this case within three years (the limitations period) of the wrongful act.

"A cause of action in tort accrues at the time of injury." *Kaufman v. C.L. McCabe & Sons, Inc.*, 603 A.2d 831, 834 (Del. 1992). "Like other types of [equitable tort] claims, '[a] claim for breach of fiduciary duty accrues at the time of the wrongful act.'" *Lebanon Cnty. Employees' Ret. Fund v. Collis*, 287 A.3d 1160, 1196 (Del. Ch. 2022) (citation omitted).

Plaintiffs' fiduciary-duty claim is simple.  As noted, they allege that if the Operating Agreement were not binding, then Defendant, as controlling equity-holder, owed fiduciary duties to Plaintiffs.  Under Delaware law, when a controlling equity-holder enters into an interested transaction with the corporate entity it controls, that transaction must meet the "entire fairness" standard.  This standard applies to LLCs.  *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011); *Atlas Energy*, 2010 WL 4273122, at *10.  At trial, *Defendant* (not Plaintiffs) will bear the high burden of showing both "fair price and fair dealing."  *Atlas Energy*, 2010 WL 4273122, at *11; *In re Match Grp., Inc. Derivative Litig.*, 2024 WL 1449815, at *7 (Del. Apr. 4, 2024) ("To satisfy entire fairness review, the defendants bear the burden of demonstrating that the corporate act being challenged is entirely fair to the corporation and its stockholders.").

Defendant will have to make that showing with respect to what the complaint calls the Wrongful Asset Transfer, which occurred in November 2018, when Defendant, as controlling member, caused QC Terme US Holding LLC to transfer its stake in the New York spa business for a $500,000 note.  *See* Dkt. 163 at 5 (Court's decision on motion to dismiss, noting that Plaintiffs allege they were injured when their "interest in QC Terme US Holding [LLC] was wrongfully transferred on November 29, 2018") (citing Dkt. 1-2 (Compl.) ¶¶ 15–16; *see also* ¶¶ 116–117 (alleging that the "fiduciary duty standard of entire fairness" was breached by "the Wrongful Asset Transfer orchestrated through QC Terme US[.]").  Defendant may point to allegations in the complaint to "self-serving and bad faith conduct" preceding the Wrongful Asset Transfer, *id.* ¶ 154, but those do not make Plaintiffs' fiduciary-duty claim for the actual wrongful act, and its challenge to the price paid in the Wrongful Asset Transfer, untimely.

Plainly, under the law, Plaintiffs' fiduciary-duty ("entire fairness") claim accrued when the transaction that is said to have violated Defendant's fiduciary duties actually occurred.  *See*

27

*Bamford v. Penfold, L.P.*, 2022 WL 2278867, at \*25, 30 (Del. Ch. 2022) ("Bamford filed this lawsuit [(alleging breach of fiduciary duties)] on January 4, 2019. By default, challenges to payments [(transfers that were unfair)] *made before* January 4, 2016, are untimely.") (emphasis added); *K&K Screw Products, L.L.C. v. Emerick Capital Investments, Inc.*, 2011 WL 3505354, at \*15 (Del. Ch. Aug. 9, 2011) ("[T]he actions that gave rise to ECI's potential claims for breach of fiduciary duties involved K & K LLC's conduct in entering into the 2001 Transaction . . . . Thus, ECI would be time-barred from pursuing claims relating to breaches of fiduciary duty . . . as of the end of 2004, or three years after the Company entered into the 2001 Transaction."); *Hokanson v. Petty*, 2008 WL 5169633, at \*5 (Del. Ch. Dec. 10, 2008) (claim accrues when "[t]he material decisions about the transaction, *including the price and transaction form*, were made") (emphasis added); *Bren v. Capital Realty Grp. Senior Hous., Inc.*, 2004 WL 370214, at \*4 (Del. Ch. Feb. 27, 2004) ("In the case at bar, fiduciary duties were owed . . . at the time of the 1998 transaction. Any cause of action arising out of that transaction accrued at that time.").

Plaintiffs obviously could not bring an "entire fairness" challenge disputing the fairness of the "price" paid by Defendant as part of the Wrongful Asset Transfer (and they were not injured by it) until the price was *actually* set, and payment was made, in November 2018. Indeed, Plaintiffs might not have had a claim if, in November 2018, QC Terme US paid the value of the business calculated by Plaintiffs' expert in this suit, because then the price would not have been unfair, and Defendant would not have breached its fiduciary duties. The clock for Plaintiffs' fiduciary-duty claim therefore could not have started earlier than November 29, 2018.

In an effort to move the accrual date back, Defendant relies on a February 2018 "timeline," which stated that "[s]ince the October 27th, 2017 Milan meeting [the QC brothers] . . . have been pursuing a scheme to defraud [Mr. Farsura] from his negotiated benefits." Ex. 92

at 4.  This document cannot bear the weight Defendant places upon it.  Whether Mr. Farsura perceived a "scheme to defraud" in 2017 is irrelevant to whether QC Terme US later breached its fiduciary duties and caused injury by siphoning the holdings of QC Terme US Holding LLC through an unfair process and at an unfair price.  Defendant did not even begin speaking with the appraiser until May 2018, and the appraisal to set the price for the Wrongful Asset Transfer was not completed until November 2018, the month the challenged transaction occurred.

The exchange of text messages between Messrs. Varni and Farsura in February 2018 is similarly inapposite.  Mr. Varni told Mr. Farsura "I do not see any solution other than the transfer of shares to [Defendant,]" and Mr. Farsura responded "you cannot unilaterally deprive me of my share."  Ex. 99 at 2.  Again, the parties may have been discussing the issue of a possible squeeze out, and Mr. Farsura may have warned Mr. Varni not to pursue that course, but the siphoning of assets—the wrongful act that caused injury—did not occur before November 29, 2018.  A tort accrues not when the tortfeasor threatens to do something, but when he actually does it.  *Lebanon Cnty.*, 287 A.3d at 1196.  The price could not be challenged as unfair until it was set and paid.

Next, if the Court were to accept (for argument's sake) the claim that the Wrongful Asset Transfer "was merely a continuing effect of the repudiation that . . . had already taken place," Dkt. 298 at 30, under Delaware law, "[w]hen a court determines that a continuing wrong exists, 'the cause of action is timely so long as the last act evidencing the continuing wrong falls within the limitations period.  That is, the cause of action does not accrue until the last act of the continuing wrong.'"  *Lebanon Cnty.*, 287 A.3d at 1197 (quoting *Kerns v. Dukes*, 2004 WL 766529, at *4 (Del. Ch. Apr. 2, 2004)).  So, even assuming, for argument's sake, that Plaintiffs' fiduciary-duty claim were based on repudiatory conduct predating the Wrongful Asset Transfer

and continued through November 2018, Plaintiffs' claim would still be timely because the "last act" of the "continuing effect of the repudiation" did not occur before November 29, 2018.

Defendant's cases on this point are not to the contrary. Two are federal cases addressing § 1983 claims, not cases addressing fiduciary-duty claims under Delaware law. *Williams v. Borough of Highland Park*, 707 F. App'x 72, 75 (3d Cir. 2017) ("The date of accrual of a § 1983 claim is a matter of federal law."); *Keel v. Del. State Univ. Bd. of Trs.*, 2019 WL 494621, at *4–5 (D. Del. Feb. 8, 2019). Defendant otherwise cites passages of a Delaware decision discussing tolling, not accrual, *see In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *6–9 (Del. Ch. July 17, 1998), and a Delaware decision where, unlike here, "more than three years [] elapsed since [the date of the auction, the subject of the plaintiff's fiduciary-duty claim]" and the plaintiff had "notice of the action," *Gallagher v. Long*, 2013 WL 718773, at *3–4 (Del. Ch. Feb. 28, 2013). (Here, Plaintiffs did not have "notice" of the Wrongful Asset Transfer until after it happened.)

Finally, even if the accrual date preceded the suit by more than three years, it should be open to the jury to find that the limitations period was tolled. In *Gibralt Capital Corp. v. Smith*, 2001 WL 647837 (Del. Ch. 2001), then-Vice-Chancellor Jacobs (later Delaware Supreme Court Justice) considered a "three-step transaction" that was "said to constitute the alleged breach of duty" resulting in the Defendant improperly obtaining corporate control. The court held that the limitations period was tolled until the stockholder was on notice of *all three* steps. *Id.* at *10. Here, even if Mr. Farsura were to have been attune to a scheme to freeze him out, Mr. Farsura only learned of the Wrongful Asset Transfer, and the unfair price, in May 2019. Levy Ex. 26.

## **CONCLUSION**

The Court should deny Defendant's motion for summary judgment and schedule a date for trial on the merits of both of Plaintiffs' alternate claims on the earliest available date.

30

Dated: April 5, 2024
      New York, New York

                        HOLWELL SHUSTER & GOLDBERG LLP

                        By: */s/ Vincent Levy*
                        Daniel Goldberg
                        Vincent Levy
                        Priyanka Timblo
                        Brian T. Goldman
                        Aditi Shah

                        425 Lexington Ave., 14th Floor
                        New York, New York 10017
                        Tel: 646.837.5151
                        vlevy@hsgllp.com

                        *Attorneys for Plaintiffs*

31