UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>Stefano Farsura, SF Capital Partners LLC,</td></tr>
<tr><td>Plaintiffs,</td></tr>
<tr><td>-against-</td></tr>
<tr><td>QC Terme US Corp.,</td></tr>
<tr><td>Defendant.</td></tr>
</table>

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  _1/17/2025__

21 Civ. 9030 (AT)

**<u>ORDER</u>**

ANALISA TORRES, District Judge:

Plaintiffs, Stefano Farsura and SF Capital Partners LLC ("SF Capital"), bring this action against Defendant, QC Terme US Corp. ("QC Terme US"), alleging breach of contract and, in the alternative, breach of fiduciary duty in connection with the parties' efforts to develop a spa facility on New York City's Governors Island.  *See generally* Compl., ECF No. 1-2. Specifically, Plaintiffs contend that QC Terme US reneged on its agreement with Farsura to develop the spa as partners, "freezing him out" of the parties' shared enterprise and "offering only *de minimis* consideration" in return.  *Id.* ¶ 1.

Defendant moves for summary judgment on both of Plaintiffs' remaining claims, and the parties move to seal certain exhibits filed in connection with the summary judgment motion. Mot., ECF No. 297; ECF Nos. 296, 302, 304, 310.  For the reasons stated below, Defendant's motion is DENIED, and the motions to seal are GRANTED IN PART and DENIED IN PART.

## BACKGROUND

I.    <u>Factual Background</u>

Farsura is a New York-based real estate developer.  Def. 56.1 ¶ 1, ECF No. 307.[1]  In 2011, he flew to Italy for business and was introduced to Saverio Quadrio Curzio, who, along

---

[1] The facts are taken from Defendant's Rule 56.1 statement, Plaintiffs' response, and declarations, unless otherwise

with his brother Andrea (together, the "QC Brothers"), owns and runs an Italian spa and wellness business called QC Terme S.r.l. ("QC Terme").[2]  *Id.* ¶¶ 4–6, 9.  Saverio expressed interest in expanding QC Terme's operations to the United States, and Farsura offered to help the QC Brothers establish a foothold in the New York market.  *Id.* ¶ 10.  Shortly after, Saverio visited the United States, where he and Farsura discussed a possible partnership.  *Id.* ¶¶ 11–12.  Farsura followed up with an email explaining that he would continue to look for sites to develop a spa, and Saverio replied that he would talk to his brother and another business partner, Francesco Varni, and send Farsura a proposal.  *Id.* ¶¶ 6, 14; Pl. Ex. 14 at FAR00032591.[3]

Farsura, Varni, and the QC Brothers continued to email back and forth about a potential partnership.  In November 2011, Varni emailed Farsura to lay out his and the QC Brothers' "general approach" and "the essential elements of an agreement": Farsura would receive a minority stake of 20% in a new company, which would develop and operate a health center.  Def. Ex. 14 at FAR00028057–8.[4]  If that "general approach seem[ed] acceptable" to Farsura, the parties "could think about the text of the agreement under th[o]se terms."  *Id.*  Farsura wrote back enthusiastically and asked Varni to "prepare a bit more in detail what [his] 'vision' [was] in terms of how [he] would intend to proceed."  *Id.*  Farsura also asked whether the 20% stake represented compensation for Farsura's setting up the development opportunity, or whether

---

noted.  Disputed facts are so noted.  Citations to a paragraph of Defendant's Rule 56.1 statement also include Plaintiffs' response.  "[W]here there are no citations[,] or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion."  *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001) (alteration adopted).

[2] QC Terme was formed in 2018 after MAP S.r.l. merged with its wholly owned subsidiary, Quadratec S r.l, and another Italian entity, QC Terme S r.l.  Def. 56.1 ¶¶ 3–5.  For simplicity's sake, the Court shall refer to all these entities as "QC Terme."  From its founding in 1982 until late 2017, QC Terme was wholly owned by the QC Brothers and their mother.  *Id.* ¶ 5.  Since October 2017, the QC Brothers have each owned slightly more than 25% of the business.  *Id.*

[3] Citations to "Pl. Ex." are to the attachments to Vincent Levy's declaration at ECF No. 308.

[4] Citations to "Def. Ex." are to the attachments to Tara M. Lee's declaration at ECF No. 300.

Farsura was expected to have a 20% stake "in the financial commitments" as well.  *Id.*  Varni

responded that he and the QC Brothers were "pleased that the approach [was] acceptable" to

Farsura and that they "w[ould] try to put it into action quickly."  *Id.*  In the same email, Varni

confirmed that the 20% stake represented a "reward" for Farsura's "contribution" in "the

selection of suitable locations" and the "search for investors, financing and construction," but

that it was "premature . . . to try to hypothesize roles for the operating phase" of the business and

that the parties would need to "draft an agreement."  *Id.*

In early 2012, Varni sent Farsura a draft "Advisory and Consulting Services Agreement."

Def. Ex. 15.  The draft agreement stated that Farsura would "advise, consult and assist" QC

Terme in "finding a suitable location" for the spa and "negotiating the lease agreement," in

addition to "carry[ing] out any other ancillary activity related thereto."  *Id.* at FAR00028122.

Although Farsura did not respond to Varni's email, he sent Saverio an itinerary for the QC

Brothers' upcoming trip to New York, where they would visit different spas.  Def. 56.1 ¶ 23;

Def. Ex. 17 at FAR00033029.  According to Farsura, during this 2012 visit, he and the QC

Brothers agreed that Farsura would receive a 22% stake in the planned development's holding

company.  Farsura Dep. at 91:9–92:18, 258:11–23, Def. Ex. 10.  According to Defendant, this

22% stake did not represent anything other than a possible "alternative compensation."

Def. 56.1 ¶ 24.  No written agreement was signed.  *Id.* ¶ 25.

Later that year, Saverio learned that an entity called The Trust for Governors Island (the

"Trust") had issued a request for proposals for a redevelopment project.  *Id.* ¶ 27.  In March

2013, after Farsura helped obtain information about the site, QC Terme submitted a proposal for

a spa on the island.  *Id.* ¶ 28; Pl. Ex. 23 at FAR00015314–15.  In the ensuing back-and-forth

between QC Terme and the Trust employees, QC Terme referred to Farsura and Farsura's real

estate business, Colonnade Group, as its "partner" and "business partner."  *Id.* ¶ 9; Pl. Ex. 28 at

FAR00072612; Def. Ex. 19 at 2.  In January 2014, the Trust issued a letter designating QC

Terme and the Colonnade Group, "jointly and severally, or any Qualified Successor Entity," as

tenants on a 49-year lease of three Governors Island buildings (the "Designation Letter").

Def. 56.1 ¶ 30; Def. Ex. 20 at QCT00053809.  The letter defined a "Qualified Successor Entity"

("QSE") as "an entity which is Controlled By . . . Quadratec and/or QC Terme" and is "qualified

to conduct business" in New York.  Def. Ex. 20 at QCT00053809–10.

    Over the next several years, Farsura, Varni, and the QC Brothers worked to get the spa up

and running and to create a corporate entity that would serve as the QSE.  Def. 56.1 ¶¶ 34–35.  In

March 2014, Farsura wrote to Varni that that the parties "should push to define the agreements

between the shareholders and the corporate structure."  Def. Ex. 22 at FAR00064274.  Varni

proposed the formation of two LLCs: a "sub holding" company and a "[n]ewco," in which the

"sub holding" company would own a majority stake.  Def. Ex. 23 at FAR00018055.  QC Terme

would own 78% of the "sub holding" company and Colonnade Group would own 22%.  *Id.*  Two

days later, Varni wrote to Farsura suggesting that they ask the Trust to extend the 90-day period

for forming a QSE so that the parties could "properly define the agreements."  Def. Ex. 24 at

FAR00036230.  Farsura expressed frustration that the process was taking so long, and Varni

responded that he empathized but that he did not think the existing deadline would allow the

parties enough time to work out the details of their "rights, responsibilities and obligations" with

respect to the enterprise.  *Id.* at FAR00036229.

    Varni and Farsura continued to discuss the details of the agreement.  In June 2014, they

selected a tax advisor, Def. 56.1 ¶¶ 42–43, and Varni worked with an Italian attorney, Manuel

Capurro, to create a shareholder agreement, *id.* ¶ 44; Def. Ex. 26 at FAR00031837.  On July 6,

2014, Capurro emailed Varni and Farsura, explaining that "many of the assumptions underlying the business plan are still uncertain (or subject to further negotiations with investors and lenders)" and that "the only thing we know with certainty is that some corporate vehicles need to be incorporated in the US, specifically:" (1) "a US holding [company] owned by QC Terme (100%)," (2) "a US sub-holding [company] owned by [both] the US holding of QC Terme (78%) and a US company owned by the Farsura Group (22%)," and (3) "an operational company that will manage the spa facility (initially owned 100% by the US subholding [company] of QC Terme and F[arsura], before allowing the admission of other investors)."  Def. Ex. 26 at FAR00031837.

Around this time, Farsura also retained an attorney, Christian Moretti, to help finalize the arrangement between himself and QC Terme.  Def. Ex. 27.  Describing the scope of Moretti's work, Farsura wrote that two operating agreements would likely be necessary—one for the parties' shared holding company and one for the company that would operate the spa—and that they "needed to be set up from scratch."  *Id.* at FAR00036793.  That September, Moretti sent Farsura and Varni the first draft of the operating agreement for the holding company.  Def. Ex. 29 at FAR00031856.  The agreement specified that QC Terme US—a holding company wholly owned by QC Terme—would own a 78% interest in the company, and EDI LLC, an entity controlled by Farsura, would own a 22% interest.  *Id.* at FAR00031893; Def. 56.1 ¶¶ 3, 47.  In October, Moretti sent around a revised draft that "implemented [Farsura and Varni]'s comments."  Def. Ex. 30 at FAR00020087.

Although Farsura and Varni continued to work toward the development of the Governors Island spa, progress on the draft agreement stalled, so the parties extended the Designation Letter's due diligence period multiple times, to March 31 and then to December 31, 2015, and

they extended the Designation Letter's expiration date to July 3, 2016. Def. 56.1 ¶ 54; Def.

Ex. 31 at QCT00025442; Def. Ex. 32 at QCT00000242. Then, in early 2016, Varni sent Farsura

an updated draft of the holding company's operating agreement. Def. 56.1 ¶ 55; Def. Ex. 33.

The two men continued to send each other versions of the draft operating agreement with

additional edits. Def. 56.1 ¶¶ 57–62; *see* Def. Exs. 34–35.

 In June 2016, recognizing that the Designation Letter would soon expire, Varni and

Farsura formed two limited liability companies: (1) QC Terme NY LLC ("QC Terme NY"), the

QSE that would sign the lease with the Trust, and (2) QC Terme US Holding LLC ("US

Holding"), which owned 100% of QC Terme NY. Def. 56.1 ¶ 63; Def. Ex. 36 at

FAR00060035–36; Def. Ex. 37 at FAR00084753. US Holding would in turn be 78% owned by

QC Terme US, which was formed concurrently, and 22% owned by EDI LLC, Farsura's

company. Def. 56.1 ¶ 64; Def. Ex. 36 at FAR00060035; Def. Ex. 37 at FAR00084753; Def.

Ex. 38 at FAR00059867. In his email to Farsura laying out this arrangement, Varni noted the

ownership of US Holding "with signed O[perating] A[greement]." Def. Ex. 37 at

FAR00084753. Shortly thereafter, on June 27, 2016, QC Terme NY executed the lease with the

Trust. Def. 56.1 ¶ 67; Def. Ex. 40.

 Negotiations over the draft operating agreement between Farsura, Varni, and their

attorneys continued by email into fall 2016. Def. 56.1 ¶¶ 68–75. At the same time, QC Terme,

which was facing liquidity issues, worked to obtain additional financing for the Governors Island

spa. *Id.* ¶¶ 80–82. In late 2016, Farsura learned that QC Terme was planning to sign a letter of

intent with Whitebridge Investments S.p.A. ("Whitebridge"), a private equity firm. *Id.* ¶ 82.

Pursuant to the letter, which was signed in January 2017, Whitebridge would acquire a minority

stake in QC Terme after a six-month due diligence period. *Id.* ¶ 84. Two days after the letter

was signed, Farsura emailed Varni to express his desire to "define, among other things, what type of role, responsibilities, [and] remuneration you want me to have here in NY." *Id.* ¶ 85; Def. Ex. 52 at FAR00005607.  Varni responded: "The idea about your role is as it always has been.  Let's try to get it signed off on paper.  We have to sign the O[perating] A[greements]!" Def. Ex. 52 at FAR00005607.

In February 2017, Varni forwarded Farsura the latest version of the US Holding draft operating agreement, "on which it seems [he and Farsura] were all in agreement."  Def. 56.1 ¶ 87; Def. Ex. 53 at FAR00057103.  Varni wrote to Farsura, "If you agree, we will complete it with the few missing details and will sign it."  Def. Ex. 53 at FAR00057103.  Farsura sent the draft to an attorney, Kenneth Sicklick,[5] writing that the agreement looked fine but that Farsura was concerned that he had yet to receive an operating agreement for QC Terme NY.  Def. 56.1 ¶ 88; Def. Ex. 54 at FAR00057049.  Sicklick agreed, advising Farsura to wait to receive that document before executing the US Holding operating agreement.  Def. 56.1 ¶ 89; Def. Ex. 55 at FAR00093862.

Farsura and Varni continued to exchange drafts of the US Holding operating agreement. Def. 56.1 ¶ 90.  On April 11, 2017, Varni sent Farsura a draft that he described as the "final clean text," which read "Effective as of April 11, 2017."  Def. Ex. 56 at FAR00056986–87.  Varni asked Farsura to "send [him] the signed pdf and then [he] w[ould] sign."  *Id.* at FAR00056986. Farsura did not sign the draft agreement.  Def. 56.1 ¶ 92.  Meanwhile, during summer 2017, Whitebridge continued its due diligence on QC Terme, ultimately contracting to purchase a minority stake in QC Terme in July.  *Id.* ¶ 93.  Throughout that time, Farsura knew that some

---

[5] Defendant asserts that Farsura retained Sicklick to represent him in connection with the negotiation of the operating agreement.  Def. 56.1 ¶ 56.  Plaintiffs disagree, claiming that Sicklick's law firm represented both Farsura and QC Terme.  *Id.*

amount of progress was being made on the Whitebridge acquisition but did not expect that deal to affect his own rights in US Holding. *Id.* ¶¶ 94–95.

On August 2, 2017, Varni, Farsura, and their attorneys held a call to further refine the draft operating agreement. *Id.* ¶ 101. Sicklick memorialized the edits in a draft agreement designated "Effective as of August 2, 2017" (the "Operating Agreement") and stated that "[w]hen both parties have executed and exchanged signature pages, we can consider the agreement signed." Def. Ex. 64 at FAR00056749–50. Relevant to the claims at issue here, the Operating Agreement, like the drafts before it, waived "any and all fiduciary duties" that the contracting parties owed each other. Operating Agreement ¶ 7.08(b); *see also* Def. 56.1 ¶¶ 51, 53, 55, 59–60, 68–69, 72–73, 76, 91, 102. The parties did not sign the agreement. Def. 56.1 ¶ 104.

Nevertheless, the following day, Varni emailed Whitebridge, stating "We are going to sign the O[perating] A[greement] for [US Holding] with Stefano Farsura. The text was set out some time ago . . . and has undergone fine tuning in recent days." Pl. Ex. 35 at QCT00048896–98. In the email, Varni referred to the agreement as "still a draft." *Id.* However, when Whitebridge requested additional time to review the agreement, Varni responded that "[t]he text was agreed upon over time, and although not actually signed by us, we will have to consider it as such since it reflects our understandings with Stefano Farsura." Pl. Ex. 36 at QCT00048908. Whitebridge reviewed the Operating Agreement and identified several concerns. Def. 56.1 ¶ 109.

On August 30, 2017, Farsura emailed Varni "Are we signing?" Def. Ex. 65 at QCT00015788. The record does not reflect whether Varni responded, but one week later, Farsura messaged him on WhatsApp, saying "Let's sign the O[perating] A[greement] . . . when

you're available?"  Def. Ex. 105 at FAR00063055.  Still, in October 2017, Farsura and Varni

continued to email back and forth with proposed edits.  Def. Ex. 67 at FAR00045254; Def.

Ex. 69 at QCT00017932.  On October 23, Farsura forwarded the most recent version of the

Operating Agreement to Sicklick.  Def. Ex. 67 at FAR00045254.  Two days later, Sicklick sent

back an email with the subject line "updated final draft of the operating agreement."  Def. Ex. 68

at FAR00086953.

On October 18, 2017, Whitebridge acquired its minority stake in QC Terme.  Def. 56.1

¶ 118.  Soon after, Farsura traveled to Italy to attend a QC Terme board meeting to celebrate

Whitebridge's investment.  *Id.* ¶ 123; *see also* Def. Ex. 78 at QCT00023991.  At the meeting,

Whitebridge representatives communicated that they were unhappy with the Operating

Agreement and wanted to revise it.  Def. 56.1 ¶¶ 128–29; *see also* Def. Ex. 78 at ACT00023993.

The following month, Andrea Quadrio Curzio emailed Farsura with a "collaboration proposal."

Def. Ex. 79 at FAR00077604.  Under the proposal's terms, Farsura would receive $250,000 per

year to serve as QC Terme's head of U.S. business development.  *Id.* at FAR00077605.  Farsura

would also receive an opportunity to invest in Giuturna Investments S.p.A. ("Giuturna"), a

related investment vehicle, "in recognition of his role in assisting [QC Terme] in their US

initiatives to-date."  *Id.*  Farsura responded that, based on a 2013 handshake agreement with the

QC Brothers, he understood himself to be entitled to a 22% stake in US Holding, in other words,

to a 22% stake in the Governors Island spa.  Def. Ex. 82 at FAR00095600–01.  Farsura

explained that the QC Brothers' new proposal left him financially worse off and expressed his

opinion that "there is a very big distance between us."  *Id.*  Nevertheless, in January 2018, Varni

sent Farsura a draft management incentive plan for Farsura to work for QC Terme.  Def. 56.1

¶ 148; Def. Ex. 98.  When Farsura did not respond, Varni followed up by WhatsApp message,

suggesting that the only way forward was for Farsura to transfer his shares in US Holding.  Def. Ex. 99 at QCT00050458.  Farsura responded that to "unilaterally deprive [him] of [his] share . . . would be fraud."  *Id.*

Three weeks later, in February 2018, Farsura sent a letter to the QC Brothers laying out his position that he was entitled to a 22% stake in the Governors Island development and proposing two mechanisms by which QC Terme could buy his share in the project for about $6 million.  Def. Ex. 100 at FAR00041721–22.  In response, the QC Brothers stated that they never entered into a binding agreement with Farsura and that, although they were open to negotiation, Farsura had vastly overestimated the value of his share.  Def. Ex. 101 at FAR00090202.  The QC Brothers subsequently retained an appraiser to determine the value of QC Terme NY, and in November 2018, the appraiser reported that the company's assets were worth $500,000, a value Farsura challenges as inaccurate.  *See* Def. Ex. 102; Def. Ex. 103 at JUL_000418; Def. 56.1 ¶¶ 154–55.  That month, QC Terme US purchased QC Terme NY from US Holding for a $500,000 interest-bearing promissory note, divesting US Holding—and by extension, Farsura—of his interest in the Governors Island spa.  Def. Ex. 104 at QCT00041743–44; Def. 56.1 ¶ 156.  QC Terme US later dissolved US Holding, leaving Farsura with his 22% share of US Holding's sole asset, namely, a promissory note for $110,000.  Pl. Ex. 74 at QCT00021216, QCT00021233.

II.    Procedural History

On September 7, 2021, Plaintiffs filed this action against QC Terme US, MAP s.r.l. ("MAP"), Whitebridge, and Giuturna in Supreme Court, New York County, alleging, *inter alia*, breach of contract, breach of the implied covenant of good faith and fair dealing, breach of fiduciary duty, and unjust enrichment.  Compl. ¶¶ 118–25.  QC Terme US removed the action to this Court, ECF No. 1, and in February 2022, Defendants moved to dismiss all claims, ECF

No. 34. The Court granted in part and denied in part Defendants' motion. *Farsura v. QC Terme US Corp.*, No. 21 Civ. 9030, 2022 WL 4226266 (S.D.N.Y. Sept. 13, 2022). Specifically, the Court dismissed Plaintiffs' claims against MAP, Whitebridge, and Giuturna for lack of personal jurisdiction and dismissed all other counts against QC Terme US, except for Count I (breach of contract), for failure to state a claim. *Id.* at *6, *10; *see* Compl. ¶¶ 118–25. Plaintiffs moved for clarification and/or reconsideration, ECF No. 181, and in November 2022, the Court reinstated Count V (breach of fiduciary duty) against QC Terme US, *Farsura v. QC Terme US Corp.*, No. 21 Civ. 9030, 2022 WL 16838212, at *4 (S.D.N.Y. Nov. 8, 2022); *see* Compl. ¶¶ 151–57.

In sum, two alternative claims against QC Terme US remain: Count I, for breach of the Operating Agreement, and Count V, for breach of fiduciary duty, if the Operating Agreement is not binding. ECF No. 280 at 1. Before the Court is Defendant's motion for summary judgment. Mot.; *see* Def. Mem., ECF No. 298; Pl. Mem., ECF No. 309; Def. Reply, ECF No. 312.

## LEGAL STANDARD

A party is entitled to summary judgment if it can establish that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–26 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

The moving party bears the initial burden of informing the Court of the absence of a genuine dispute of material fact by citing particular evidence in the record. Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323–24. In making this showing, the party may rely on "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other

11

materials." Fed. R. Civ. P. 56(c)(1)(A).  If the moving party meets its initial burden, the burden

then shifts to the opposing party to establish a genuine dispute of material fact.  *See Beard v.*

*Banks*, 548 U.S. 521, 529 (2006); *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir.

2002).  The Court views all facts "in the light most favorable to the non-movant, resolving all

ambiguities in h[is] favor."  *Borley v. United States*, 22 F.4th 75, 78 (2d Cir. 2021).

## DISCUSSION

I.     Count I: Breach of Contract

Plaintiffs allege breaches of nine provisions of the Operating Agreement.  Compl. ¶¶ 97–

112.  These alleged breaches relate primarily to US Holding's sale of QC Terme NY in exchange

for a $500,000 promissory note and US Holding's subsequent dissolution, all implemented at the

behest of the QC Brothers, Varni, and QC Terme US.  *See id.*; *see also* Pl. Mem. at 10–11.

Defendant does not argue that the alleged conduct did not occur or that its conduct did not breach

the Operating Agreement's terms.  Rather, Defendant argues that the Operating Agreement is not

an enforceable contract.

Under Delaware law,[6] a contract is formed if the parties to the purported contract

"intended to bind themselves."  *Leeds v. First Allied Conn. Corp.*, 521 A.2d 1095, 1097 (Del.

Ch. 1986).  "[O]vert manifestation of assent—not subjective intent—controls the formation of a

contract."  *Fairstead Cap. Mgmt. LLC v. Blodgett*, 288 A.3d 729, 753 (Del. Ch. 2023) (quoting

*Indus. Am., Inc. v. Fulton Indus., Inc.*, 285 A.2d 412, 415 (Del. 1971)).  The inquiry is

"objective," requiring courts to ask "whether a reasonable [person] would, based upon the

---

[6] The parties assume that their dispute is governed by Delaware law, and both rely on Delaware law in their respective memoranda of law.  *See* Def. Mem. at 11; Pl. Mem. at 2–3.  They have therefore "implicitly consented" to Delaware law's application.  *Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 441 n.5 (S.D.N.Y. 2021); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (explaining that "implied consent . . . is sufficient to establish choice of law" (citation omitted)).

'objective manifestation of assent' and all of the surrounding circumstances, conclude that the parties intended to be bound by contract." *Leeds*, 521 A.2d at 1101. Therefore, to determine whether a contract has been formed, courts look to "the ordinary meaning of the language employed in writings reflecting agreements, the course and substance of negotiations, prior dealings between the parties[,] and customs or practices in their trade or business." *Id.* at 1097. There is no "simple or mechanical test" because "[n]egotiations typically proceed over time[,] with agreements on some points being reached along the way towards a completed negotiation. It is when all of the terms that the parties themselves regard as important have been negotiated that a contract is formed." *Id.* at 1101.

If the Operating Agreement is indeed binding, Defendant clearly breached its contractual duties to Plaintiffs. But Defendant asserts that summary judgment is warranted on this claim because the Operating Agreement is not an enforceable contract; that is, according to Defendant, no reasonable juror could conclude that Farsura and QC Terme US "intended that the [Operating Agreement] would bind them." Def. Mem. at 11 (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010)).

To that end, Defendant makes three arguments. First, there is no genuine dispute that the parties never agreed on all material terms of the Operating Agreement. Def. Mem. at 12. Second, the parties never signed the Operating Agreement. *Id.* at 17. And third, the parties' conduct subsequent to the Operating Agreement's purported effective date demonstrates that they did not intend to be bound by the document. *Id.* at 23. The Court addresses each point in turn.

First, Defendant contends that the Operating Agreement is not binding because the parties did not agree on all of its material terms, namely, (1) a provision concerning put and call

options that would give the parties the right to sell or purchase shares in US Holding upon certain triggering events (the "Put/Call Provision") and (2) a provision concerning the rights of the parties in the event that US Holding were sold (the "Drag/Tag Provision"). *Id.* at 13–16.

For a contract to be enforceable, it must contain "all material terms." *Eagle Force Holdings, LLC v. Campbell*, 187 A.3d 1209, 1230 (Del. 2018) (quoting *Osborn*, 991 A.2d at 1159). "What terms are material is determined on a case-by-case basis, depending on the subject matter of the agreement and on the contemporaneous evidence of what terms the parties considered essential." *Id.*

The record does not conclusively establish that the parties did not agree on the Put/Call and Drag/Tag Provisions. Although Defendant points to the parties' ostensible negotiation over these terms after August 2, 2017, the date of the Operating Agreement, Farsura testified at his deposition that the parties orally agreed to the provisions laid out in the written document. Def. Mem. at 16 (quoting Def. Ex. 65 at QCT00015788); Farsura Dep. at 80:6–14. A reasonable juror could conclude that the continued discussion of these terms after August 2017 reflected the parties' attempt to renegotiate, an inference that is particularly reasonable given the record evidence that Defendant attempted to renegotiate other portions of its purported contract with Farsura. Moreover, Defendant has not carried its burden of demonstrating that the Put/Call and Drag/Tag Provisions indisputably constituted "essential" terms of the Operating Agreement. For example, a November 2011 email from Varni to Farsura referenced the "essential elements of an agreement" and made no mention of terms similar to the Put/Call or Drag/Tag Provisions. Def. Ex. 14 at FAR00028058. As such, lack of agreement on those two terms does not necessarily render the entire Operating Agreement invalid.

Second, Defendant argues that the parties "expressed their understanding and agreement" that they would need to sign a written operating agreement for any such agreement to be binding; because it is undisputed that the parties never signed the Operating Agreement, Defendant explains, it never became a contract.  Def. Mem. at 17–18.

Defendant is generally correct that, under Delaware law, "[t]here is no enforceable contract if the parties do not intend to be bound before a formal written agreement is drafted and signed."  *Anchor Motor Freight v. Ciabattoni*, 716 A.2d 154, 156 (Del. 1998).  But, importantly, "[t]he fact that the parties intend to execute a formal agreement . . . is not dispositive.  The question is whether the parties positively agree that there will be no binding contract until the formal document is executed."  *Id.*; *see also Loppert v. WindsorTech, Inc.*, 865 A.2d 1282, 1288 (Del. Ch. 2004) ("'[T]he fact that the parties . . . manifest an intention to prepare and adopt a written memorial' will not prevent contract formation if the evidence reveals '[m]anifestations of assent that are in themselves sufficient to conclude a contract.'" (quoting Restatement (Second) of Contracts § 27 (Am. L. Inst. 1981))).  Whether the parties intended to be bound is a question of fact.  *Eagle Force Holdings, LLC v. Campbell*, 235 A.3d 727, 735 (Del. 2020).

Defendant points to a range of evidence suggesting that the parties did not intend to be bound until they executed a formal written contract.  For example, in early 2017, after Whitebridge had agreed to acquire a portion of QC Terme and Farsura asked Varni about his role going forward, Varni responded: "The idea about your role is as it always has been.  Let's try to get it signed off on paper.  We have to sign the O[perating] A[greements]!"  Def. Ex. 52 at FAR00005607.  After Varni sent Farsura a draft of the agreement the next month, an attorney told Farsura to wait to execute the document until he received a separate operating agreement for QC Terme NY.  Def. 56.1 ¶ 89; Def. Ex. 55 at FAR00093862.  And when the attorney ultimately

circulated the Operating Agreement to Farsura and Varni, he wrote that "[w]hen both parties have executed and exchanged signature pages, we can consider the agreement signed." Def. Ex. 64 at FAR00056749–50.

Nevertheless, Farsura points to other evidence indicating that he and Varni considered the Operating Agreement a binding contract, and to defeat summary judgment, that is all he must do. For example, in August 2017, Varni emailed Whitebridge to let it know that QC Terme US was planning to sign the Operating Agreement with Farsura. Pl. Ex. 35 at QCT00048896–98; *see also id.* at QCT00048897 (email among Whitebridge employees reporting, after a conversation with Varni, that QC Terme "consider[s] the text [of the Operating Agreement] closed"). When Whitebridge requested additional time to review the agreement, Varni responded that "[t]he text was agreed upon over time, and although not actually signed by us, we will have to consider it as such since it reflects our understandings with Stefano Farsura." Pl. Ex. 36 at QCT00048908. That evidence, combined with Farsura's testimony that the parties did not consider a signature absolutely necessary to bind themselves, *see* Farsura Dep. at 115:20–116:2, 132:18–133:7, 135:25–137:6, establishes a dispute of material fact that must be left to the factfinder to resolve.

Third, Defendant contends that the parties' conduct after the Operating Agreement was circulated in August 2017 "demonstrates they did not intend to be bound" by the agreement. Def. Mem. at 23. In support of this argument, Defendant cites post-August 2017 email exchanges between Farsura and his accountant discussing Farsura's desire "to finalize the agreement," as well as the parties' failure to adhere to certain terms of the Operating Agreement. *Id.* at 23–24 (quoting Def. Ex. 66 at FAR00094993). Defendant argues that the parties' failure to comply with the Operating Agreement's terms "is further evidence that no reasonable juror could

conclude the parties objectively believed they had manifested their assent to be bound by the unsigned draft of that agreement." *Id.* at 24.

Defendant is correct that the Court may look to the parties' subsequent conduct as one factor relevant to whether the parties created a binding contract. *See, e.g.*, *Gomes v. Karnell*, No. 11814, 2016 WL 7010912, at *4 (Del. Ch. Nov. 30, 2016). However, the parties' post-contract conduct here does not conclusively establish that they did not intend to be bound. Defendant highlights Farsura's October 2017 statement that he and QC Terme US planned to "finalize the agreement" and his December 2017 email, which stated that the "deal with QC Terme is still evolving" and that he was "not really sure how it will end." Def. Mem. at 23; Def. Ex. 66 at FAR00094993; Def. Ex. 94 at FAR00045551. In referencing the parties' plan to "finalize the agreement," Farsura could have been referring to their desire to execute the already agreed-upon Operating Agreement; as discussed above, the lack of a signature does not necessarily render the contract invalid. As for the December 2017 email, Farsura made those statements soon after the QC Brothers upended his understanding of his position with respect to the Governors Island development; his words may merely have reflected his anxiety in the face of an uncertain situation.

Defendant observes that the parties could not have intended to bind themselves because they did not adhere to certain of the Operating Agreement's terms. Def. Mem. at 24. Specifically, the parties failed to update Schedule A of the Operating Agreement, a schedule of capital contributions that was supposed to be revised "within 90 days," and did not update Schedule 7.04, which required the parties to "finalize" the "details of [Farsura]'s duties, as well as compensation therefore." *Id.*; Def. Ex. 64 at FAR00056788, FAR00056792. This evidence of noncompliance is relevant, but certainly not dispositive, as to whether the parties formed a

contract.  Its weight is not for the Court to evaluate at summary judgment.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997).

II.    Count V: Breach of Fiduciary Duty

Defendant argues that it is entitled to summary judgment on Plaintiffs' claim for breach of fiduciary duty, first, because the agreement that granted Farsura a 22% interest in the Governors Island spa also waived any fiduciary duties the parties owed each other, and second, because the claim is time-barred.  Def. Mem. at 24.

A.    Waiver of Fiduciary Duties

Plaintiffs' complaint alleges that, even if the Operating Agreement is not a binding contract, QC Terme US breached the fiduciary duty it owed Plaintiffs under Delaware's Limited Liability Company Act (the "LLCA"), Del. Code Ann. tit. 6, §§ 18-101 *et seq.*  Pl. Mem. at 21–30.  Under the LLCA, "managers of a Delaware limited liability company owe traditional fiduciary duties of loyalty and care to the members of the LLC, unless the parties expressly modify or eliminate those duties in the operating agreement."  *William Penn P'ship v. Saliba*, 13 A.3d 749, 756 (Del. 2011); *see also Feeley v. NHAOCG, LLC*, 62 A.3d 649, 661–63 (Del. Ch. 2012).  Under "the traditional rules of law and equity . . . '[a] fiduciary relationship is a situation where . . . a special duty exists on the part of one person to protect the interests of another.'"  *Feeley*, 62 A.3d at 661 (citation omitted).

The parties agree that QC Terme US and Farsura were both members of US Holding, a limited liability company formed in June 2016.  Def. 56.1 ¶ 66; Def. Ex. 37 at FAR00084753.  The parties also agree that, if the Operating Agreement is a binding contract, it validly waived any fiduciary duties owed by QC Terme US to Farsura, and vice versa.  Def. 56.1 ¶ 102; *see also* Operating Agreement ¶ 7.08(b).

18

According to Plaintiffs, assuming for the purposes of this claim that QC Terme US and Farsura never executed a binding operating agreement and therefore never waived any fiduciary duties through said contract, Farsura and QC Terme US still owed each other fiduciary duties under the LLCA. Pl. Mem. at 21–22. Defendant breached its fiduciary duty in November 2018, Plaintiffs argue, when it "caused [US Holding] to transfer its stake in the New York spa business for a $500,000 note." *Id.* at 27.

QC Terme US does not contest that its actions would violate its fiduciary duties to Plaintiffs, should such duties exist. Rather, Defendant asserts that the terms of the agreement that granted Farsura a minority interest in US Holding are contained only in the Operating Agreement, and because that document explicitly waives the signatories' fiduciary duties toward each other, QC Terme US owed Farsura no fiduciary obligations. Def. Mem. at 25–26; *see* Operating Agreement § 7.08(b).

Contrary to this assertion, a wide range of evidence outside of the Operating Agreement could lead a reasonable juror to find that Farsura was promised a 22% stake in US Holding in exchange for his work on the Governors Island development. Farsura testified that the QC Brothers agreed to give him a 22% stake in the planned spa's holding company when they visited the United States in 2012. Farsura Dep. at 91:9–92:18, 258:11–23. Emails between Farsura and Varni dating back to 2014 suggest that the parties agreed that Farsura would retain a 22% interest in the limited liability company ultimately created as US Holding. Def. Ex. 23 at FAR00018055; Def. Ex. 26 at FAR00031837; Def. Ex. 29 at FAR00031893. Emails with the attorney who formed US Holding in 2016 include a chart showing Farsura's 22% interest in the company. Def. Ex. 37 at FAR00084753, FAR00084756. And, tax returns from 2016 through 2018 record Plaintiffs as having a 22% interest in US holding. Pl. Ex. 2 at FAR00004661; Pl. Ex. 3 at

FAR00011065; Pl. Ex. 30 at FAR00089912. Tellingly, even after the relationship between

Farsura and the QC Brothers soured and US Holding sold its interest in QC Terme NY in

exchange for a $500,000 promissory note, QC Terme's attorney explained to Farsura that he was

still entitled to a 22% interest in US Holding. Def. Ex. 104 at QCT00041744.

On this record, a reasonable juror could find that Farsura held a minority stake in

US Holding even before the Operating Agreement was drafted. All that remains for Defendant

to argue is that the provision in the Operating Agreement that waived any fiduciary duties

between the parties was valid, while the portions of the Operating Agreement that Defendant

allegedly violated were not. Defendant offers no evidence in support of this theory, and the

Court rejects it.

### B. Statute of Limitations

Defendant also contends that Plaintiffs' breach-of-fiduciary-duty claim is time-barred by

Delaware's three-year statute of limitations. Def. Mem. at 28–30. As an initial matter, the Court

is not strictly bound by a statute of limitations when assessing a claim for breach of fiduciary

duty because "actions in equity are time-barred only by the equitable doctrine of laches." *Kraft

v. WisdomTree Invs., Inc.*, 145 A.3d 969, 978 (Del. Ch. 2016) (quoting *Whittington v. Dragon

Grp., L.L.C.*, 991 A.2d 1, 9 (Del. 2009)); *see also Lebanon Cnty. Emps.' Ret. Fund v. Collis*, 287

A.3d 1160, 1194 (Del. Ch. 2022) (explaining that breach of fiduciary duty is an equitable tort).

Despite this general principle, courts should "still look to comparable statutes of limitations at

law, and give the analogous limitations period 'great weight in deciding whether the claims are

barred by laches.'" *Kraft*, 145 A.3d at 978 (quoting *Whittington*, 991 A.2d at 9). Here, the

analogous limitations period is the three-year statute of limitations applicable to actions "based

on a statute," in this case, the LLCA. Del. Code Ann. tit. 10, § 8106(a); *see Kraft*, 145 A.3d at

988; *Ont. Provincial Council of Carpenters' Pension Tr. Fund v. Walton*, 294 A.3d 65, 85 (Del. Ch. 2023). This period runs from the time of the wrongful act. *Kraft*, 145 A.3d at 989.

According to Defendant, Plaintiffs' claim is untimely because the allegedly wrongful act occurred in October 2017, when QC Terme US "breached its fiduciary duty through its 'self-serving and bad faith conduct' in 'squeez[ing] out' SF Capital," and Plaintiffs did not bring suit until four years later, in September 2021. Def. Mem. at 28 (quoting Compl. ¶ 155); Compl. at 50. This argument distorts the record. Although Defendant arguably breached its fiduciary duty at several junctures over the course of its dealings with Plaintiffs, its actions culminated in November 2018, when US Holding, at the direction of QC Terme US, sold its entire interest in the Governors Island spa to QC Terme US in exchange for a $500,000 promissory note, leaving Farsura with only a claim to 22% of that note. Pl. Mem. at 27–28; Def. Ex. 104 at QCT00041743–44; Def. 56.1 ¶ 156. Because Plaintiffs filed this action on September 7, 2021, less than three years after that event, their suit is timely.

III.    <u>Motions to Seal</u>

The parties move to seal certain documents filed in connection with Defendant's motion for summary judgment. ECF Nos. 296, 302, 304, 310.

The public enjoys a "general right to inspect and copy public records and documents, including judicial records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978) (footnote omitted). This presumption of public access "is based on the need for federal courts . . . to have a measure of accountability and for the public to have confidence in the administration of justice." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quoting *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995)). When a party moves to place documents under seal, it "bears the burden of showing that higher values

overcome the presumption of public access." *Samsung Elecs. Co., Ltd. v. Microchip Tech. Inc.*, No. 24 Misc. 269, 2024 WL 4169353, at *2 (S.D.N.Y. Sept. 12, 2024) (quoting *Kewazinga Corp. v. Google LLC*, No. 20 Civ. 1106, 2024 WL 3442428, at *1 (S.D.N.Y. July 17, 2024)).

Courts conduct a three-step analysis. First, a court determines whether the relevant material constitutes a "judicial document," *i.e.*, a document that is "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch*, 435 F.3d at 119 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)). The relevance of a specific document does not depend on "which way the court ultimately rules or whether the document ultimately in fact influences the court's decision." *Brown v. Maxwell*, 929 F.3d 41, 49 (2d Cir. 2019). Rather, what is important is whether the document "would reasonably have the *tendency* to influence a district court's ruling on a motion." *Id.*

If material constitutes a judicial document, the "common law presumption of access attaches," and a court must evaluate the "weight of that presumption." *Lugosch*, 435 F.3d at 119. "[T]he presumption of public access is at its highest when the material is relevant to a court's decision on a dispositive motion." *SEC v. Ripple Labs, Inc.*, No. 20 Civ. 10832, 2022 WL 329211, at *1 (S.D.N.Y. Feb. 3, 2022). The presumption is "weaker where the 'documents play only a negligible role in the performance of Article III duties,'" *Olson v. Major League Baseball*, 29 F.4th 59, 89 (2d Cir. 2022) (quoting *Amodeo*, 71 F.3d at 1050), including, for example, where the relevant material is "largely collateral to the factual and legal issues central to the resolution" of the parties' dispute, *Oliver Wyman, Inc. v. Eielson*, 282 F. Supp. 3d 684, 706 (S.D.N.Y. 2017).

Finally, a court must balance the weight of the presumption against "competing considerations." *Lugosch*, 435 F.3d at 120 (quoting *Amodeo*, 71 F.3d at 1050). These considerations include but are not limited to "'the danger of impairing law enforcement or

judicial efficiency' and 'the privacy interests of those resisting disclosure.'" *Id.* (quoting *Amodeo*, 71 F.3d at 1050). They also include "the protection of sensitive, confidential, or proprietary business information." *Ripple*, 2022 WL 329211, at *1. Ultimately, sealing judicial documents "may be justified only with specific, on-the-record findings that sealing is necessary to preserve higher values and only if the sealing order is narrowly tailored to achieve that aim." *Lugosch*, 435 F.3d at 124.

The documents at issue here, "by virtue of having been submitted to the court as supporting material in connection with a motion for summary judgment," are "unquestionably judicial documents." *Id.* at 123. The more relevant issues, then, are the strength of the presumption of access for each document and the corresponding weight of competing considerations.

Defendant requests that the Court seal or redact Defense Exhibits 70–71, 73, and 103 and Plaintiff Exhibits 26, 46, and 49 because these exhibits, which include the 2018 valuation of QC Terme NY and Plaintiffs' corresponding expert rebuttal report, "contain detailed financial information regarding the QC Terme business," including "line-by-line, in-depth breakdowns [of] the budgets and cost estimates for the Governors Island [spa] facility." ECF No. 296 at 2; ECF No. 310 at 2. Defendant also asks the Court to seal Defense Exhibit 78 and Plaintiff Exhibit 77, which contain the minutes from a QC Terme executive committee meeting, and Defense Exhibits 4, 59, and 61–62, which contain the details of contracts between QC Terme and related entities. ECF No. 296 at 2; ECF No. 310 at 2. Plaintiffs ask the Court to seal Defense Exhibit 1 and Plaintiff Exhibits 2–3 and 30–31, each of which contain portions of SF Capital's tax returns. ECF No. 302 at 1; ECF No. 304 at 1.

The parties have generally met their burden to justify the sealing of the specified exhibits. SF Capital's tax returns and the details of QC Terme's financials and business strategy, including contracts with affiliated entities, are "largely collateral to the factual and legal issues central to the resolution" of Defendant's motion for summary judgment, so the weight of the presumption of access is low. *Oliver Wyman*, 282 F. Supp. 3d at 684. Countervailing interests also support keeping these documents under seal, as "specific business information and strategies, . . . if revealed, 'may provide valuable insights into a company's current business practices that a competitor would seek to exploit.'" *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F. Supp. 3d 485, 511 (S.D.N.Y. 2015) (quoting *Encyc. Brown Prods., Ltd. v. Home Box Off., Inc.*, 26 F. Supp. 2d 606, 614 (S.D.N.Y. 1998)); *see also Solomon v. Siemens Indus., Inc.*, 8 F. Supp. 3d 261, 285 (E.D.N.Y. 2014) (noting that "[t]ax returns are generally afforded special protection from public disclosure").

The Court shall not, however, grant Defendant's motion to fully seal Defense Exhibit 78 and Plaintiff Exhibit 77, nearly identical documents that contain the minutes from the October 25, 2017 QC Terme executive committee meeting. Although a portion of these documents describe business strategies that should be sealed for the reasons just explained, pages 1 through 3 of the meeting minutes contain information relevant to the validity of the Operating Agreement and Farsura's role in the Governors Island development. *See* Def. Ex. 78 at QCT00023991–93; Pl. Ex. 77 at QCT00023452–54. Because this information is "relevant to [a] dispositive motion[]," a "high presumption of public access attaches." *Ripple*, 2022 WL 329211, at *2. The Court shall grant Defendant leave to file a renewed sealing motion with appropriate redactions.

24

## CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is DENIED.

The parties' motions to seal Defense Exhibits 1, 4, 59, 61–62, 70–71, 73, and 103 and

Plaintiff Exhibits 2–3, 26, 30–31, 46, and 49 is GRANTED.  Defendant's motion to seal Defense

Exhibit 78 and Plaintiff Exhibit 77 is DENIED without prejudice.  By **January 31, 2025**,

Defendant shall propose redactions consistent with this order.  If it has not done so by that date,

the Court shall direct the Clerk of Court to unseal those exhibits.

The Clerk of Court is respectfully directed to terminate the motions at ECF Nos. 296–97,

302, 304, and 310.

SO ORDERED.

Dated:  January 17, 2025
     New York, New York

ANALISA TORRES
United States District Judge